No. 2022-2036

# United States Court of Appeals for the Federal Circuit

ALEXSAM, INC.,
*Plaintiff-Appellant*

v.

AETNA, INC.,
*Defendant-Appellee*

**Appeal From The United States District Court For The District of Connecticut in Case No. 3:19-cv-0010125-VAB Judge Victor A. Bolden.**

**ALEXSAM, INC.'S CORRECTED OPENING BRIEF**

Jacqueline K. Burt
HENINGER GARRISON DAVIS, LLC
3621 Vinings Slope, Ste. 4320
Atlanta, Georgia 30339
Email: jburt@hgdlawfirm.com
Telephone: (404) 996-0861

Steven W. Ritcheson
INSIGHT PLC
578 Washington Blvd., #503
Marina del Rey, California 90292
Email: swritcheson@insightplc.com
Telephone: (818) 744-8714

Timothy C. Davis
HENINGER GARRISON DAVIS, LLC
2224 1st Avenue North
Birmingham, Alabama 35203
Email: tim@hgdlawfirm.com
Telephone: (205) 326-3336

W. Lee Gresham, III
HENINGER GARRISON DAVIS, LLC
2224 1st Avenue North
Birmingham, Alabama 35203
Email: lee@hgdlawfirm.com
Telephone: (205) 326-3336

*Attorneys for Plaintiff-Appellant, AlexSam, Inc.*

December 27, 2022

**PATENT CLAIMS AT ISSUE – U.S. Patent No. 6,000,608**

32 - A multifunction card system comprising:

a. at least one debit/medical services card having a unique identification number encoded on it comprising a bank identification number approved by the American Banking Association for use in a banking network;

b. a transaction processor receiving card data from an unmodified existing standard point-of-sale device, said card data including a unique identification number;

c. a processing hub receiving directly or indirectly said card data from said transaction processor; and

d. said processing hub accessing a first database when the card functions as a debit card and said processing hub accessing a second database when the card functions as a medical card.

33 - The multifunction card system of claim 32, wherein the unique identification number further comprises a medical identification number.

# CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant, Alexsam, Inc., certifies the following:

1. The full name of every party or amicus represented by me is:

   AlexSam, Inc. (Plaintiff-Appellant)

2. The name of the real party in interest represented by me is: None.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me is: None.

4. The names of all law firms and the partners or associates that appeared for Alexsam, Inc. in the trial court or agency or are expected to appear in this Court (and who have not or will not enter an appearance in this case) are:

   Travis Lynch
   Jonathan R. Miller

5. Related Cases: *see* section entitled "Statement Of Related Cases"

6. Organizational Victims and Bankruptcy Cases: **None**.

Dated: December 27, 2022 Respectfully submitted,

*/s/ Jacqueline K. Burt*
Jacqueline K. Burt
*Attorney for Plaintiff-Appellant, AlexSam, Inc.*

## TABLE OF CONTENTS

PATENT CLAIMS AT ISSUE....................i
CERTIFICATE OF INTEREST.................... ii
TABLE OF AUTHORITIES....................v

**STATEMENT OF RELATED CASES....................1**

**STATEMENT OF JURISDICTION....................1**

**STATEMENT OF THE ISSUES....................2**

**STATEMENT OF THE CASE....................2**

**A. FACTUAL BACKGROUND**....................2

**1. The Patent-in-Suit.**....................2

**2. The Accused Aetna Card Products.**....................3

**3. The Notice Letters.**....................4

**B. RELEVANT PROCEDURAL HISTORY**....................5

**1. AlexSam's Complaint**....................5

**2. AlexSam's Attempts to Obtain Discovery.**....................6

**3. AlexSam's Attempts to Amend After Dismissal of its Claims.**.....8

**SUMMARY OF ARGUMENT....................9**

**STANDARD OF REVIEW....................10**

**ARGUMENT....................11**

**I. THE DISTRICT COURT ERRED BY GRANTING AETNA'S MOTION TO DISMISS. ....................13**

**A. ALEXSAM'S FACTUAL ALLEGATIONS WERE SUFFICIENT WHEN CONSIDERED IN THEIR ENTIRETY USING THE PROPER LEGAL STANDARDS.** ....................13

**1. AlexSam's SAC Sufficiently Stated Claims For Direct And Indirect Infringement.** ....................15

***a. The SAC met the threshold requirement of alleging direct infringement.***....................*15*

***b. AlexSam properly plead the remaining elements of indirect infringement.***....................*17*

i. **AlexSam properly plead indirect infringement by inducement.** ......17

ii. **AlexSam properly plead contributory infringement.** ......24

2. **AlexSam's SAC Sufficiently Stated A Claim For Direct Infringement.** ......28

a. ***The Dismissal Order prematurely dismissed AlexSam's claim of direct infringement.*** ......*28*

i. **It is plausible that Aetna "uses" its card processing system.** ......32

ii. **It is plausible that Aetna "makes" its card processing system.** ......35

B. **THE DISTRICT COURT ERRONEOUSLY FOUND THE ACCUSED MASTERCARD PRODUCTS WERE LICENSED.** ......39

1. **The Judgment Rests on an Erroneous Interpretation of the AMPL, So It Must Be Reversed.** ......40

2. **AlexSam Pled Sufficiently to Negate the Affirmative Defense.** ......43

3. **The Judgment Is Compromised by Two Other Errors, Also Providing Ground for Reversal.** ......46

a. ***The Court Misread IDT.*** ......*47*

b. ***The Mastercard Case Does Not Support the Dismissal Order.*** ......*48*

4. **AlexSam Did Not Judicially Admit that Aetna Is Licensed, and AlexSam Is Not Judicially Estopped from Denying a License.** ......50

a. ***The Transfer Motion Is Not an Admission of License.*** ......*51*

b. ***AlexSam Is Not Judicially Estopped by PTAB.*** ......*53*

II. **THE DISTRICT COURT ERRED BY CONCLUDING THAT ALEXSAM NAMED THE WRONG PARTY** ......**55**

**CONCLUSION** ......**60**

ADDENDUM
CERTIFICATE OF SERVICE
CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**

*A. Natterman & CIE GmBH v. Bayer Corp.*, 428 F.Supp.2d 253 (E.D. Pa. 2006) .......... 39

*A. Stucki Co. v. Worthington Indus., Inc.*, 849 F.2d 593 (Fed. Cir. 1988) .......... 55

*Acceleration Bay LLC v. 2K Sports, Inc.*, 15 F.4th 1069 (Fed. Cir. 2021) .......... 36

*AlexSam, Inc. v Mastercard Int'l Inc.*, No. 1:15-cv-02799-ILG-SMG, 2019 U.S. Dist. LEXIS 166247 (E.D. N.Y. Sep. 26, 2019) .......... 49

*AlexSam, Inc. v. IDT Corp.*, 715 F.3d 1336 (Fed. Cir. 2013) .......... 47

*AlexSam, Inc. v. Mastercard Int'l Inc.*, No. 1:15-cv-02799-ILG-SMG, 2021 U.S. Dist. LEXIS 2508 (E.D. N.Y. Jan. 6, 2021) .......... 50

*Aperture Net LLC v. HTC America Inc.*, Case No. 2:19-cv-01746-RAJ-BAT (W.D. Wash. Mar. 31, 2020) (Report & Recommendation) .......... 30

*Arista Recs., LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) .......... 15, 22, 23, 38

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......... 11, 14, 17

*Autronic Plastics, Inc. v. Apogee Lighting, Inc.*, 2021 U.S. Dist. LEXIS 240490 (E.D. N.Y. Dec. 6, 2021) .......... 59

*Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903 (Fed. Cir. 1984) . 39, 40, 43

*Banff Ltd. v. Limited*, 869 F.Supp. 1103 (S.D. N.Y. 1994) .......... 59

*Bank of N.Y. v. First Millennium, Inc.*, 598 F.Supp.2d 550 (S.D. N.Y. 2009) .......... 42

*Bassick Manufacturing Co. v. Adams Grease Gun Corp.*, 54 F.2d 285 (2d Cir. 1931) .......... 39

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......... 14, 15, 24, 28

*BioMérieux, S.A. v. Hologic, Inc.*, No. 18-21-LPS, 2018 WL 4603267 (D. Del. Sep. 25, 2018) .......... 29

*Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342 (Fed. Cir. 2021) .......... 29, 30

*Broadvision Inc. v. General Elec. Co.*, 2009 WL 1392059, *4 (S.D. N.Y. May 5,2009) .......... 57

*Canon Inc. v. Tesseron Ltd.*, 146 F.Supp.3d 568 (S.D. N.Y. 2015) .......... 42

*Carborundum Co. v. Molten Metal Equip. Innovations*, 72 F.3d 872 (Fed. Cir. 1995) .....39

*Centillion Data Sys., LLC v. Qwest Communs. Int'l, Inc.*, 631 F.3d 1279 (Fed. Cir. 2011) .....32

*Centrak, Inc. v. Sonitor Technologies, Inc.*, 915 F.3d 1360 (Fed. Cir. 2019) .. 35, 36

*Commil USA v. Cisco Systems, Inc.*, 575 U.S. 632, 135 S.Ct.1920 (2015) .....24

*Conley v. Gibson*, 355 U.S. 41 (1957) ..... 13, 28, 30, 32

*FairWarning IP, LLC v. Iatric Sys.*, Inc., 839 F.3d 1089 (Fed. Cir. 2016) .....10

*Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321 (Fed. Cir. 2010) .....24

*Gibson v. City of Chi.*, 910 F.2d 1510 (7th Cir. 1990) .....29

*Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011) .....17

*Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464 (Fed. Cir. 1990) .....24

*In re: Adelphia Recovery Tr.*, 634 F.3d 678 (2d Cir. 2011) .....54

*In re: Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323 (Fed. Cir. 2012) ..... 16, 18, 26, 29

*Innova Hospital San Antonio, Ltd. v. Blue Cross*, 892 F.3d 719 (5th Cir. 2018) .. 23, 38

*Intellectual Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320 (Fed. Cir. 2017) .....33

*Johnson v. Priceline.com, Inc.*, 711 F.3d 271 (2d Cir. 2013) .....11

*Koch v. Christie's Int'l Pub. Ltd. Co.*, 699 F.3d 141 (2d Cir. 2012) .....44

K-*Tech Telecomms., Inc. v. Time Warner Cable, Inc.*, 714 F.3d 1277 (Fed. Cir. 2013) .....29

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195 (2d Cir. 2005) .....42

*Lerner v. Fleet Bank, NA*, 318 F. 3d 113 (2d Cir. 2003) .....11

*Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372 (Fed. Cir. 2017) ..... 18, 24

*Lincoln Benefit Life Co. v. AEI Life, LLC*, 800 F.3d 99 (3d Cir. 2015) ..... 23, 38

*Littlejohn v. City of N.Y.*, 795 F.3d 297 (2d Cir. 2015) .....13

*MEMC Electr. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369 (Fed. Cir. 2005) .....18

*Merck Sharp & Dohme Corp. v. Teva Pharms. USA, Inc.*, No. 14-874-SLR-SRF, 2015 WL 4036951 (D. Del. July 1, 2015), rpt. & rec. adopted, 2015 WL 4477699 (D. Del. July 22, 2015)....................................26

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005)..........18

*Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46, 150 N.Y.S.2d 171 (1956) ......42

*Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337 (Fed. Cir. 2018)... 14, 15, 21, 24, 26, 28, 29, 31, 32

*New Hampshire v. Maine*, 532 U.S. 742 (2001)....................................................54

*ntellivision v. Microsoft Corp.*, 484 F. App'x 616 (2d Cir. 2012)..........................54

*NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282 (Fed. Cir. 2005), abrogated on other grounds by *IRIS Corp. v. Japan Airlines Corp.*, 769 F.3d 1359 (Fed. Cir. 2014) ........................................................................32

*Ottah v. Fiat Chrysler*, 884 F.3d 1135 (Fed. Cir. 2018)........................................10

*Psihoyos v. Pearson Educ., Inc.*, 855 F.Supp.2d 103 (S.D. N.Y. 2012) ................39

*Purgess v. Sharrock*, 33 F.3d 134 (2d Cir. 1994) ..................................................53

*Quad Envtl. Techs. Corp. v. Union Sanitary Dist.*, 946 F.2d 870 (Fed. Cir. 1991) ........................................................................................................43

*Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325 (Fed. Cir. 2008).... 18, 21, 22, 24

*Ruttenberg v. Davidge Data Sys. Corp.*, 215 A.D.2d 191 (N.Y. 1st Dep't 1995) ..42

*Sheet Metal Div. v. Local 38 of the Sheet Metal Workers Int'l Ass'n*, 208 F.3d 18 (2d Cir. 2000)...............................................................................43

*Tchernitsky v. Pigott*, No. 93-CV-4272 (FB), 2019 U.S. Dist. LEXIS 58397 (E.D. N.Y. Mar. 31, 2019)........................................................................46

*U.S. Underwriters Ins. Co. v. Beckford*, No. 93-CV-4272 (FB), 1998 U.S. Dist. LEXIS 574 (E.D. N.Y. Jan. 20, 1998)........................................................42

*Unisone Strategic IP, Inc. v. Life Techs. Corp.*, No. 3:13-cv-1278-GPC-JMA, 2013 WL 5729487 (S.D. Cal. Oct. 22, 2013)...............................................25

*United States v. McKeon*, 738 F.2d 26 (2d Cir. 1984)............................................53

*Wang Labs., Inc. v. Mitsubishi Electronics Am., Inc.*, 103 F.3d 1571 (Fed. Cir. 1997) ........................................................................................................39

*Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660 (Fed. Cir. 1988) .............22

**Statutes**

35 U.S.C. § 271(b) ........................................................................................17

**Rules**

Fed. R. Civ. P. 12(b)(6)...................................................................... 10, 11, 14, 21
Fed. R. Civ. P. 8(e)........................................................................................31

## **STATEMENT OF RELATED CASES**

Pursuant to Federal Circuit Rule 47.5, AlexSam provides as follows:

(a) There have been no previous appeals in this case.

(b) Seven (7) district court case(s) may be affected by the Court's decision in this case:

- *AlexSam, Inc. v. Mastercard International Inc.*, Case No. 1:15-cv-02799 (Eastern District of New York);

- *AlexSam, Inc. v. Cigna Corp.*, Case No. 2:20-cv-00081 (Eastern District of Texas);

- *AlexSam, Inc. v. Simon Property Group, et al.*, Case No. 2:19-cv-00331 (Eastern District of Texas);

- *AlexSam, Inc. v. Cigna Corporation et al.*, Case No. 2:20-cv-0081 (Eastern District of Texas);

- *AlexSam, Inc. v. U.S. Bank, Inc.*, Case No. 1:21-cv-00588 (Southern District of Ohio);

- *AlexSam, Inc. v. American Express Travel Related Services Company, Inc.*, Case No. 1:21-cv-08116 (Southern District of New York); and

- *AlexSam, Inc. v. HealthEquity, Inc., et al.*, Case No. 2:19-cv-00445 (District of Utah).

## **STATEMENT OF JURISDICTION**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1295(a), as this is an appeal from the final decision of The United States District Court for the District of Connecticut in a civil action in which AlexSam asserted a claim of

patent infringement against Aetna, who also asserted counterclaims relating to AlexSam's asserted patent.

## STATEMENT OF THE ISSUES

- Whether the District Court erred by granting Aetna's motion to dismiss for failure to state claims of direct and indirect infringement.
- Whether the District Court erred by ignoring key facts and by resolving factual disputes regarding the nature, extent, and applicability of one of AlexSam's licenses in favor of Aetna in granting its motion to dismiss.

## STATEMENT OF THE CASE

### A. FACTUAL BACKGROUND

#### 1. The Patent-in-Suit.

Appellant, AlexSam, Inc. (hereinafter, "AlexSam" or "Appellant"), owns two patents: United States Patent No. 6,000,608 entitled "Multifunction Card System" ("the '608 Patent") and No. 6,189,787 entitled "Multifunctional Card System" ("the '787 Patent").[1] Only the '608 Patent is at issue in this appeal. (See generally Appx0492-0506). The '608 Patent has been the subject of prior district court

[1] The technology at issue in this case can be understood in a general way as follows. The claimed card system is used to transmit ***nonstandard card transactions*** using a ***standard*** "bank identification number" to direct transactions to a card processor's "processing hub" through intermediary devices (such as a "transaction processor") over a general "banking network." Notably, the processor's "hub" also can access databases that include medical account information and financial information.

proceedings, including claim construction, patent eligibility, and summary judgment motions, and in proceedings before this Court.[2] The ‘608 Patent is also at issue in three pending appeals before this Court. At issue in this case is independent claim 32 and dependent claim 33 (the “Asserted Claims”) of the ‘608 Patent.

AlexSam contends that Aetna infringed the foregoing claims through, inter alia, the use of Aetna-branded card products over the VISA and Mastercard card processing networks, as is described below.

### 2. The Accused Aetna Card Products.

AlexSam alleged in the District Court that Aetna infringed the Asserted Claims by, inter alia, providing its customers debit/medical services cards, “such as a card to access a Flexible Spending Account (“FSA”), Health Savings account (“HSA”), and/or a Health Reimbursement Account (“HRA”) for use in a multifunction card system that operate on the VISA and MasterCard Networks.” (Appx0457 at ¶1). AlexSam has asserted that Aetna’s VISA-branded cards (the “Accused VISA Product”) and Mastercard-branded cards (the “Accused Mastercard Product”) meet the requirements of claim element 32(a), above. Examples of the Accused VISA Product and the Accused Mastercard Product are depicted below:

---

[2] Closed cases include Case Nos. 2012-1063, 2012-1064 (*AlexSam v. IDT* (unasserted claims 57, 58)); and Case No. 2021-1785 (*AlexSam v. Mastercard International Inc.*) (reversed and remanded).







(Appx0468 at ¶50); (Appx0634-0638 at D-1).

As is explained in AlexSam's complaint (and herein below), Aetna has infringed the Asserted Claims, directly and indirectly, by at least "using" and "making," the patented system and by contributing and/or inducing the infringing use of such system by its customers. (See, e.g., Appx0478-0479 at ¶¶111, 116-117). The manner in which the Accused Products infringe the Asserted Claims is detailed in AlexSam's complaint as discussed in Part I below.

### 3. The Notice Letters.

Based on information obtained from Aetna's website, on June 16, 2015, AlexSam sent Aetna a letter informing it that Aetna required a license from AlexSam for at least the Aetna Health Care FSA Debit Card and Aetna HSA Visa Debit Card. Appx0469 at ¶52; Appx0639-0643 at Ex. E (the "Aetna Notice").

In or about 2011, Aetna acquired PayFlex Holdings, Inc. ("PayFlex"), "an account-based health plan administrator with its HealthHub technology platform, [which] became a wholly owned subsidiary of Aetna." (Appx0469 at ¶53). On July 10, 2015, AlexSam sent a letter to PayFlex, informing it that PayFlex required a

license under the '608 Patent for its HSA Visa Debit Card. (Appx0469 at ¶54); (Appx0644-0647 at Ex. F)(the "PayFlex Notice") (collectively, the Aetna Notice and the PayFlex Notice are referred to as the "Notice Letters").

In-house counsel for Aetna responded to both letters on July 15, 2015. (Appx0470 at ¶58); Appx0648-0651 (Dkt. No. 57-7 (Ex. H)). In the letter, Aetna confirmed that (i) it had received both Notice Letters, (ii) it was "reviewing Alexsam's allegations of possible infringement of U.S. Patent No. 6,000,608", and (iii) it would provide a response once Aetna's review was complete. Id. AlexSam received no further response.[3]

## B. Relevant Procedural History

### 1. AlexSam's Complaint

AlexSam originally filed its claim of patent infringement on June 28, 2019; the case was dismissed with prejudice on June 24, 2022, having not left the pleading stage. The case failed to progress beyond the pleading stage for various reasons as described below.

AlexSam's original complaint, which addressed only infringement by Aetna's VISA-branded products (the "Accused VISA Products"), was served on August 2,

---

[3] During briefing on its Motion to Dismiss, Aetna produced a letter it represented had been sent to Appellant in response to the Notice Letters. Appellant's counsel, to whom the response was purportedly addressed, has no record of having received it.

2019. (Appx0087 at Dkt. No. 19). AlexSam voluntarily filed an Amended Complaint on October 4, 2019, to add claims related to Aetna's Mastercard-branded products offered through PayFlex (the "Accused Mastercard Products") and to make non-substantive edits. (Appx0088 at Dkt. No. 27). Then, on December 6, 2019, AlexSam voluntarily filed a Second Amended Complaint (the "SAC") to address arguments advanced by Aetna during the parties' Rule 26(f) Conference of Counsel that the Accused Mastercard Products were licensed under AlexSam's license with Mastercard. (Appx0084-0099 at Dkt. No. 24, Part IV, p. 4); (Appx0457-0721). These changes included, inter alia, the addition of a claim for Declaratory Judgment that the Accused Mastercard Products were not licensed in response to arguments advanced by Aetna.( Id. at¶2, Claim III).

**2. AlexSam's Attempts to Obtain Discovery.**

Prior to the filing of the SAC, the parties' counsel met and conferred on October 22, 2019, as required by Federal Rule of Civil Procedure 26(f) and submitted their Rule 26(f) Report on October 23, 2019. (Appx0088 at Dkt. No. 29). During the conference of counsel, Aetna, for the first time, informed AlexSam of its argument that the named defendant, Aetna, Inc., was not properly named as a defendant because it was merely a "holding company." Id.

Opening of Discovery was repeatedly delayed by the District Court. Specifically, in the parties' Rule 26(f) Report, AlexSam informed the District Court

that it wished to obtain early discovery regarding "the named Defendant's products and services and whether the correct entity has been named, which is an issue first raised by Defendant's counsel on October 22, 2019 during the parties' meet and confer" and "whether the named Defendant is claiming to be covered by one or more of AlexSam's license agreements and the bases or any such contention." (Appx2522-2538 at Part VI, E). AlexSam proposed that the parties immediately begin fact discovery, whereas Aetna proposed that discovery be delayed until 21 days after Aetna filed an Answer. (Id., at Ex. A, A-2). In short, Aetna sought to delay AlexSam from obtaining discovery it needed to address the very issues raised by Aetna during the conference of counsel.

In response, the District Court set an initial schedule that allowed Plaintiff to amend its complaint and/or to add parties until December 6, 2019 but delayed the opening of fact discovery until January 31, 2020. (Appx0089 at Dkt. No. 39). In short, the Court denied AlexSam's request for the opening of discovery, including early discovery regarding prospective additional defendants. Thereafter, at the parties' request, the Court adopted a modified schedule that further delayed opening of discovery until March 30, 2020. (Appx0091 at Dkt. Nos. 61, 62).

On January 10, 2020, Aetna filed a Motion to Dismiss the SAC (the "Motion to Dismiss"). (Appx0092 at Dkt. Nos. 65, 66). Shortly thereafter, on February 4, 2020, the District Court stayed proceedings while the Judicial Panel on Multidistrict

Litigation (the "JPML") considered AlexSam's request to consolidate the Aetna case with other related proceedings (the "JPML Stay"). (Appx0092 at Dkt. Nos. 67, 68). At that time, the COVID-19 pandemic impacted the parties to the extent that, after the JPML denied AlexSam's request for consolidation, the parties agreed to defer discovery and complete briefing on Aetna's Motion to Dismiss. (Appx2544-2548 at ¶10(c)) ("In light of the unprecedented disruption to Court and business functions that COVID-19 has caused, the parties submit that this Court should leave the stay in place for all proceedings other than the motion to dismiss.").

In short, AlexSam could not obtain discovery because of the COVID-19 pandemic and the schedule(s) set by the Court. Significantly, the parties had not commenced patent-related discovery (such as infringement contentions and invalidity contentions) or claim construction, nor had AlexSam received responses to document requests when its claims were dismissed.

**3. AlexSam's Attempts to Amend After Dismissal of its Claims.**

As is noted above, Aetna filed its Motion to Dismiss on January 10, 2020. Appx0092 (Dkt. Nos. 65, 66). After the JPML Stay lifted, AlexSam filed its Opposition to the Motion to Dismiss on April 30, 2020. (Appx1020-1181.) With its Opposition, AlexSam filed a proposed Third Amended Complaint. (Appx1107-1149).

On September 11, 2020, the Court granted Aetna's Motion to Dismiss and dismissed all of AlexSam's claims (the "Dismissal Order"). Appx0001-0047. Thereafter, the District Court did not grant AlexSam leave to file an amended complaint; instead, the Court granted AlexSam leave to file a motion seeking leave to file an amended complaint. (See Appx0047)

Following the Dismissal Order, AlexSam repeatedly sought to add additional facts to meet the heightened pleading standard set by the District Court. However, AlexSam's efforts to support its claims of direct and indirect infringement and even to add an additional party (an Aetna subsidiary) were foreclosed by the District Court. (Appx0084-0099 at Dkt. Nos. 104, 106, 118). Each time, the District Court denied leave to amend (the "Orders Denying Leave").[4] (Appx0084-0099 at Dkt. Nos. 96, 115, 123). In fact, after entering the Dismissal Order, the District Court never granted leave to file an amended complaint before it dismissed the claims with prejudice. (Appx0074-0083).

## SUMMARY OF ARGUMENT

In ruling on Aetna's Motion to Dismiss, the District Court erroneously (i) found that AlexSam failed to provide Aetna with sufficient notice of its claims of

[4] In order to preserve Court and party resources by focusing on essential issues, Appellant is not challenging the Orders Denying Leave, and instead has focused on the Dismissal Order from which the remaining orders flowed.

direct and indirect infringement in the SAC, and (ii) resolved disputes of law and fact in deciding that the Accused Mastercard Products were licensed. First, the District Court failed to consider the entirety of the factual allegations provided in the SAC and attached Exhibits, which included all facts necessary to state a claim that is plausible on its face and to put Aetna on notice of the claims against it. Second, the District Court erred by resolving the Mastercard issues on the limited information provided in the Motion to Dismiss briefing. The resolution of whether the Accused Mastercard Products were licensed required the marshalling of and the consideration of facts that were not part of the record before the District Court.

These errors, individually and collectively, support vacating the Dismissal Order, and remanding the case for further proceedings.

## STANDARD OF REVIEW

The Federal Circuit applies regional circuit law when reviewing motions to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). See *Fair Warning IP, LLC v. Iatric Sys.*, Inc., 839 F.3d 1089, 1092 (Fed. Cir. 2016). "In the Second Circuit, grant of a motion to dismiss is reviewed *de novo* to determine whether the claim is plausible on its face, accepting the material factual allegations in the complaint and drawing all reasonable inferences in favor of the plaintiff." *Ottah v. Fiat Chrysler*, 884 F.3d 1135, 1141 (Fed. Cir. 2018) (citing *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009); and *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013)).

## ARGUMENT

A motion to dismiss is only appropriate if the movant satisfies its burden of proving that the plaintiff's complaint fails to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *Lerner v. Fleet Bank, NA*, 318 F. 3d 113, 128 (2d Cir. 2003) (noting "[in a] 12(b)(6) motion, … the defendant has the burden of proof.") That is not the case here.

AlexSam alleged sufficient facts of indirect infringement to require denial of the Motion to Dismiss. First, AlexSam alleged facts that plausibly demonstrated that Aetna is liable for induced infringement of the Asserted Claims by its customers, who acted as "direct infringers." Specifically, Aetna had knowledge of the '608 Patent and AlexSam's claim of infringement, yet it instructed its customers on how to use Aetna's "debit/medical services cards" such that the customers that followed Aetna's instructions infringed the Asserted Claims. Also, AlexSam plausibly alleged that, with the requisite knowledge of the '608 Patent and of infringement based on the Aetna card processing system, Aetna contributed to the infringement of its customers by providing and integrating a Processing Hub that has no substantial non-infringing use other than to act as a part of (and controlling) the infringing system. The District Court improperly dismissed both claims of indirect infringement.

The District Court also erred by dismissing AlexSam's direct infringement claim. AlexSam advanced a plausible claim of direct infringement by (i) Aetna's "use" of the infringing system, and (ii) Aetna "making" the infringing system, such that the District Court should not have been dismissed AlexSam's claims.

Finally, the District Court erred by resolving contested and disputed questions of fact and law when it dismissed AlexSam's claims related to the Accused Mastercard Products based on its determination that such products were licensed. On its face, the Mastercard license does not extend to the systems claimed in Claims 32 and 33. Compare (Appx0654-0675 at Dkt. No. 57-9), Sec. 1.3 (defining "Licensed Transaction" as "each process of activating or adding value to an account or subaccount") with (Appx0492-0506 at Dkt. No. 57-1, Claim 32 (unlike other '608 Patent claims, contains no "activation" (e.g., claim 57, "activation") or "adding value" (e.g., claim 38, "recharge")) limitations. Instead, Claim 32 relates to purchase transactions that require access to a "medical database" that on its face is not part of the Mastercard system. Claim 33 highlights this further by requiring that the unique card identification number (which includes a BIN) that is used to route purchase transactions "comprise a medical identification number." It was error on this record for the District Court to determine that Mastercard's Licensed Transactions, which require "activat[ion] or adding value," include purchase transactions that access a medical information database or include the use of a "medical identification

number." Lastly, the District Court could not possibly determine, on this record, that the Mastercard License was even in effect at the relevant time; Mastercard itself believes the license terminated years before the expiration of the '608 Patent. (Appx0472-0473 at ¶78). In short, the record below provides an insufficient basis for the District Court to find that the Accused Mastercard Products were licensed and to dismiss AlexSam's claims related thereto.

## I. THE DISTRICT COURT ERRED BY GRANTING AETNA'S MOTION TO DISMISS.

On a motion to dismiss, all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor. *Littlejohn v. City of N.Y.*, 795 F.3d 297, 306 (2d Cir. 2015). A complaint may not be dismissed pursuant to Rule 12(b)(6) unless it appears beyond doubt, even when the complaint is liberally construed, that "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

### A. ALEXSAM'S FACTUAL ALLEGATIONS WERE SUFFICIENT WHEN CONSIDERED IN THEIR ENTIRETY USING THE PROPER LEGAL STANDARDS.

It is well settled that "the Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley*, 355 U.S. at 45-46. The Supreme Court has advised that "[s]uch

***simplified 'notice pleading' is made possible by the liberal opportunity for discovery and the other pretrial procedures*** established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues. … ***The Federal Rules*** reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and ***accept the principle that the purpose of pleading is to facilitate a proper decision on the merits***." Ibid. (***Emphases*** added); see also *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1350 (Fed. Cir. 2018) (a complaint sufficiently pleads infringement when it puts the defendant "on notice of what activity ... is being accused of infringement.")

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint that fails "to state a claim upon which relief can be granted." To avoid dismissal on that basis, a complaint must "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. The facial "plausibility standard is ***not*** akin to a 'probability requirement.'" Ibid. (***emphasis*** added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)). But it requires a plaintiff to allege sufficient facts to enable the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." Ibid.

Importantly, a plaintiff may "plead[] facts alleged 'upon information and belief' where the facts are peculiarly within the possession and control of the

defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citations omitted). Moreover, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof [of the facts alleged] is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (quotations omitted).

#### 1. AlexSam's SAC Sufficiently Stated Claims For Direct And Indirect Infringement.

The District Court erred by failing to consider AlexSam's allegations of direct infringement by Aetna's customers. (Appx0033) ("AlexSam responds to Aetna's specific arguments regarding induced and contributory infringement, but the Court has already found AlexSam has failed to plead alleged direct infringement [by Aetna]. Accordingly, AlexSam's claims for indirect infringement cannot proceed and will be dismissed.")

Moreover, the District Court erred when it supplemented its dismissal of the direct infringement claims by concluding that the SAC failed to satisfy the remaining elements of indirect infringement.

##### *a. The SAC met the threshold requirement of alleging direct infringement.*

"It is axiomatic that '[t]here can be no inducement or contributory infringement without an underlying act of direct infringement.'" *Nalco*, 883 F.3d at

1355 (reversing district court's dismissal of indirect infringement claims to the extent it relied on failure to plead direct infringement), quoting *In re: Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1331 (Fed. Cir. 2012).

In this case, the District Court erroneously concluded that "AlexSam … failed to plead allegations of direct infringement." (Appx0033). The Court therefore dismissed AlexSam's claims for indirect infringement. The District Court's view, however, overlooks that AlexSam separately identified Aetna ***and its customers*** as direct infringers. (Appx0457-0721 at ¶¶115, 122, 135-136, 138, 140) (each referencing infringement by Aetna's customers)); see also (Appx0011) (citing SAC at ¶115); (Appx0012 at ¶¶122, 135, 136, 138, 140)), (Appx0034). In fact, the District Court acknowledged as much: "Aetna may provide the physical cards and technical support, ***but the ultimate user, the user allegedly causing the infringement, is a third-party customer***." (Appx0028). Although AlexSam disagrees with the District Court's conclusion that the ***only*** direct infringer is a third-party customer, as is explained in Part B below, it is clear that the District Court understood that AlexSam alleged that Aetna's customers were direct infringers. That the District Court erroneously found that AlexSam did not properly plead its direct infringement claims based on Aetna's conduct does not perforce render AlexSam's indirect infringement claims deficient based on ***customer use***. Thus, AlexSam sufficiently plead direct infringement by Aetna's customers, which was not disputed below.

#### b. *AlexSam properly plead the remaining elements of indirect infringement.*

After erroneously ordering dismissal of AlexSam's indirect infringement claims for failure to plead direct infringement, the District Court continued by declaring that AlexSam's indirect infringement claims "would still be dismissed" "[e]ven if AlexSam had adequately pleaded direct infringement." (Appx0033). The District Court mistakenly agreed with Aetna and found that "AlexSam ha[d] done nothing more than plead facts 'that are "merely consistent with" a defendant's liability, [and accordingly, its claims] "stop[] short of the line between possibility and plausibility of entitlement to relief."'" (Appx0001-0047), quoting *Iqbal*, 556 U.S. at 678 (internal citation omitted). As is explained below, AlexSam's allegations in the SAC were sufficient, and the District Court erred by dismissing the claims of indirect infringement.

##### i. **AlexSam properly plead indirect infringement by inducement.**

"Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). Liability under § 271(b) "requires knowledge that the induced acts constitute patent infringement." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011). "For an allegation of induced infringement to survive a motion to dismiss, a complaint must plead facts plausibly showing that the accused infringer 'specifically intended [another party] to infringe [the patent] and

knew that the [other party]'s acts constituted infringement.'" *Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372, 1379 (Fed. Cir. 2017) (alterations in original) (quoting *In re: Bill of Lading*, 681 F.3d at 1339). Circumstantial evidence may suffice to prove specific intent. *MEMC Electr. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1378 (Fed. Cir. 2005).

Here, contrary to the arguments advanced by Aetna and adopted by the District Court, AlexSam alleged that Aetna: (1) had actual knowledge of the '608 Patent and of "AlexSam's allegations of possible infringement;" and (2) nonetheless induced infringement "by providing the hardware and/or software necessary for its customers to make or use the infringing multifunction card system." (Appx0468-0470, Appx047 at ¶¶50-59, 115). Such allegations are sufficient at the pleading stage. <u>See</u>, <u>e.g.</u>, *Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325, 1343 (Fed. Cir. 2008), <u>citing</u> and <u>quoting</u> *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005) (providing instruction on how to engage in infringing use "show[s] an affirmative intent that the product be used to infringe.")

Further, AlexSam attached to the SAC notice letters to Aetna and its subsidiary PayFlex that put Aetna on notice of the '608 Patent, which Aetna (its behalf and on behalf of its subsidiary) acknowledged were claims of infringement by AlexSam. (Appx0536-0638, Appx0652-0653 at Dkt. Nos. 57-3, 57-4, 57-8).

Thus, AlexSam properly plead Aetna's knowledge of the patent and of AlexSam's claim of infringement.

In addition, AlexSam alleged that, despite its knowledge, Aetna "continue[d] to encourage, instruct, enable, and otherwise cause its customers to sell" the Accused Products. (Appx0479 at ¶116), (Appx0483 at ¶136). AlexSam also alleged that Aetna specifically intended its customers to use the … Accused Products in its infringing systems in such a way that infringes the Asserted Claims by, at a minimum, providing and supporting the … Accused Products and instructing its customers on how to use them in an infringing manner, at least through information available on Defendant's website including information brochures, promotional material, and contact information." (Id. at ¶116, ¶136).

For example, AlexSam attached Aetna's customer instructions. (See, e.g., Appx0549 at C-13) ("Using Your HSA: … The debit card will be sent to you prior to your health plan taking effect and can be used by any health care provider that accepts Visa®."); (Appx0635-0636 at D-1 to D-2) ("Use the PayFlex Card at qualified merchants where MasterCard is accepted to pay for eligible items including out-of-pocket medical, dental, prescription, hearing, and vision expenses.") Such instructions plausibly direct customers to use their debit/medical services card in an infringing manner. (See Appx0502 at Claim 32).

AlexSam also specifically alleged that Aetna provided the central components of the patented system, to wit: the card, the card data including the BIN, and the Processing Hub, which were designed by Aetna to be used over the remaining elements of the asserted claim to access Aetna's processing hub computers and associated financial and medical information databases.[5] These allegations are also consistent with, and thus supported by, an Expert Declaration of Ivan Zatkovich that was attached as an exhibit to the SAC. Appx0508-0535 (Dkt. No. 57-2). In his Declaration, Mr. Zatkovich describes the Asserted Claims generally as follows: "regarding Claims 32 and 33, which are claims directed to medical cards, the '608 Patent provides an innovative way to provide access to medical information ('608 Patent at 2:52-64) and to make payments for medical services. '608 Patent, 10:40-

---

[5] Claim 32 is a multifunction card system that includes: (1) a debit / medical services card having a BIN for use in the banking network (images of Aetna's debit cards for medical expenses are shown in Dkt. No. 57-3; (see also Appx0524-0525 at ¶59); (Appx0536-0638) (Dkt. Nos. 57-3 and 57-4 with BINs, which are used for routing messages "in the banking network)); (2) a transaction processor receiving card data (including the BIN) from a point-of-sale device (which the SAC describes as standard components of the banking network utilized by Visa and Mastercard (Appx0508-0535 at ¶¶59, 85-87, 93)); and (3) a processing hub with associated a financial database and a medical database (which is operated by and/or at the direction of Aetna to "manage the functions of each account." (Appx0457-0490 at ¶28 and ¶34 (purpose of processing hub), and ¶110 (Aetna operates processing hub), ¶118, ¶121)); (Appx0541 at C-5). In sum, by instructing its customers to use an HSA card (1) at "any provider that accepts Visa" (2) to pay qualified medical expenses (3), Aetna has provided instructions for infringement.

44." Id. This is precisely what Aetna instructed its customers to do using the Accused Products to access its processing center.

In short, the SAC sufficiently alleged that Aetna had actual knowledge of the '608 Patent and of AlexSam's claim of infringement, but it still provided instructions, support, and technical assistance to induce its customers to use the Accused Products in an infringing manner. Similar allegations have been deemed sufficient to survive a Rule 12(b)(6) motion. See, e.g., *Nalco*, 883 F.3d at 1355 (finding sufficient allegations "that [d]efendants had knowledge of the [] patent and performed various activities with specific intent to induce others . . . to infringe by, among other activities, providing instructions, support, and technical assistance for the use of the [accused product]."). The District Court erred in granting Aetna's Motion to Dismiss.

AlexSam also alleged that Aetna had a role in designing and making its card processing system. See, e.g., Appx0457-0490 (¶107) (Aetna makes the Accused Products that operate on the VISA Network); Appx0479 (¶115) (Aetna provides "the hardware and/or software necessary for its customers to make or use the infringing multifunction card system"); Appx0481 (¶127) (Mastercard same); Appx0483 (¶135) (Mastercard same). Aetna's role as the designer and/or manufacturer of the system used to process its cards is sufficient to satisfy the "intent" requirement of inducement. See, e.g., *Ricoh Co., Ltd.*, 550 F.3d at 1343 ("In particular, QSI's role

as the designer and manufacturer of the optical drives in question may evidence an intent sufficiently specific to support a finding of inducement.”), citing *Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 668-69 (Fed. Cir. 1988).

Further, as is discussed in Part 2.b. below (contributory infringement), AlexSam alleged that Aetna’s Processing Hub has no substantial non-infringing use, which is relevant to intent to infringe. *Ricoh Co., Ltd.*, 550 F.3d at 1338 (“it is entirely appropriate to presume that one who sells a product containing *a component that has no substantial noninfringing use* in that product does so with the intent that the component will be used to infringe.”) (*emphasis* in original) (citation omitted).

Finally, to the extent that AlexSam’s allegations are based on “information and belief,” such allegations are sufficient at the pleading stage because the precise flow of data through the Aetna processing system is not externally visible. See *Arista Recs., LLC,* 604 F.3d at 120. Indeed, the purpose of the new and novel processing hub is ***to be transparent,*** and its precise operation is thus not discernible at this stage. (Appx0508-0535 at ¶52 (Processing Hub “allows the multifunction card transactions to be transmitted transparently from the POS device through the banking network (to the Processing Hub) in the same fashion as standard credit or debit card transactions), ¶85 (“this new architecture implements these enhancements transparently to existing institutions, components, or transactions on the banking network”), ¶93 (“[M]ost importantly, this new, novel and inventive architecture

transmits and processes these non-standard transactions on that banking network in a manner that is transparent to existing institutions, components, or transactions on the network."). Such allegations are sufficient at this stage, especially in light of the nature of the technology at issue. See *Arista Recs., LLC*, 604 F.3d at 120; see also *Innova Hospital San Antonio, Ltd. v. Blue Cross*, 892 F.3d 719, 730 (5th Cir. 2018) ("Our holding underscores the principle that when discoverable information is in the control and possession of a defendant, it is not necessarily the plaintiff's responsibility to provide that information in her complaint.' See *Lincoln Benefit Life Co. v. AEI Life, LLC*, 800 F.3d 99, 107 n.31 (3d Cir. 2015) ('Several Courts of Appeals accept allegations "on information and belief when the facts at issue are peculiarly within the defendant's possession."). As the Second Circuit has stated, '[t]he *Twombly* plausibility standard, which applies to all civil actions, ... does not prevent a plaintiff from "pleading facts alleged upon information and belief" where the facts are peculiarly within the possession and control of the defendant... or where the belief is based on factual information that makes the inference of culpability plausible....'") (citing *Arista Recs., LLC*, 604 F.3d at 120.).

In sum, AlexSam's SAC sufficiently plead the elements of indirect infringement by inducement, and the District Court erred by granting Aetna's

Motion to Dismiss.[6] The Dismissal Order should therefore be vacated, and the case remanded for further proceedings.

**ii. AlexSam properly plead contributory infringement.**

To succeed on a contributory infringement claim, in addition to establishing that there is direct infringement, which is addressed above, the patentee must establish that: "(1) the accused infringer had knowledge of the patent, (2) the component has no substantial non-infringing uses, and (3) the component is a material part of the invention." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010).

First, "contributory infringement requires knowledge of the patent in suit and knowledge of patent infringement." *Commil USA v. Cisco Systems, Inc.*, 575 U.S. 632, 135 S.Ct.1920, 1926 (2015). This knowledge requirement demands "only proof of a defendant's knowledge, not intent, that his activity cause infringement." *Lifetime Indus., Inc.*, 869 F.3d at 1381 (quoting *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1469 (Fed. Cir. 1990)). "When a manufacturer includes in its product a component that can only infringe, the inference that infringement is intended is unavoidable." *Ricoh Co., Ltd.*, 550 F.3d at 1338. Unlike induced infringement,

[6] Notably, the "plausibility standard 'does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence' to support the plaintiff's allegations." *Nalco*, 883 F.3d at 1350 (citing *Twombly*, 550 U.S. at 556).

contributory infringement does not have a specific-intent element. *Unisone Strategic IP, Inc. v. Life Techs. Corp.*, No. 3:13-cv-1278-GPC-JMA, 2013 WL 5729487, *4 (S.D. Cal. Oct. 22, 2013).

In this case, the SAC alleges Aetna's knowledge of the '608 Patent and of AlexSam's claims of infringement. Specifically, AlexSam attached notice letters to Aetna and its subsidiary PayFlex to the SAC putting Aetna and its subsidiary on notice of the '608 Patent, which Aetna (on its behalf and on behalf of its subsidiary) acknowledged was a claim of infringement by AlexSam. (Appx0536-0638, Appx0652-0653 at Dkt. Nos. 57-3, 57-4, 57-8). In addition, AlexSam alleged that the Processing Hub utilized by Aetna for its card processing was especially made or adapted for use in the infringing system. (See, e.g., Appx0457-0490 at ¶20 ("[T]he Processing Hub was necessary for this system to work."); ¶21 (the Processing Hub is a "special-purpose computer"); ¶27 (Processing Hub functions, generally); ¶38 (Claims 32 and 33 "are tied to a particular machine – the Processing Hub"); ¶110 ("Upon information and belief, [Aetna] employs staff (e.g., an IT department) to operate the Processing Hub in order to interface with, install, configure, manage, monitor, test, and control the debit/medical services cards and other equipment in the infringing multifunction card system"); and ¶118 ("Acts by [Aetna] that contribute to the infringement of [its] customers include providing the Processing Hub, which is capable of authorizing, approving, and declining payments at

healthcare providers and pharmacies for eligible services, goods, and prescriptions.[7] The use of the Processing Hub is especially adapted for use in the infringing systems, and it has no substantial non-infringing use."). Thus, AlexSam properly plead Aetna's knowledge of the patent and of patent infringement. *Nalco*, 883 F.3d at 1357.

Second and third, the SAC alleges that at least the Processing Hub has no non-infringing uses and is a material part of the invention. (See, e.g., Appx0457-0490 at ¶20 (processing hub necessary for patented system to work); ¶¶27-28 (processing hub is the "primary innovative feature offered by the '608 Patent"); 30 (the processing hub is "the nerve center" of the patented system); and ¶118 and ¶138 ("The use of the Processing Hub computers [by Aetna] is especially adapted for use in the infringing systems, and it has no substantial non-infringing uses.")); see *Merck Sharp & Dohme Corp. v. Teva Pharms. USA, Inc.*, No. 14-874-SLR-SRF, 2015 WL 4036951, *7 (D. Del. July 1, 2015) (citing *In re: Bill of Lading*, 681 F.3d at 1339), rpt. & rec. adopted, 2015 WL 4477699 (D. Del. July 22, 2015) ("The Federal Circuit has ruled that affirmatively pleading the absence of substantial non-infringing uses renders the claim plausible if the pleadings do not undermine that allegation.")

---

[7] Notably, this ability to "authoriz[e], approv[e], and declin[e] payments" and track "eligible services, goods, and prescriptions" shows the dual-database structure of the Asserted Claims.

Moreover, AlexSam provided a plausible explanation supported by an expert declaration that explained that a Processing Hub, such as that alleged to be used by Aetna in its card system, (i) did not exist before its invention by Mr. Dorf; (ii) was ***required*** for, and indeed central to, the infringing system that processes nonstandard transactions transparently; and (iii) comprised a special purpose computer for use of the patented system. (See, e.g., Appx0457-0721); (Appx0508-0535 at ¶51 (Processing hub is a "***primary component*** of the patented system;" "…Mr. Dorf had to build the Processing Hub because ***it is a special purpose computer*** that did not exist at the time of the invention"); ¶52 (Processing Hub uses a BIN "to allow the processing of transactions that required more than just the simple transfer of funds between banks" and "allows the multifunction card transactions to be ***transmitted transparently from the POS device through the banking network*** (to the Processing Hub) in the same fashion as standard credit or debit card transactions), ¶85 ("this new architecture implements these enhancements ***transparently to existing institutions, components, or transactions on the banking network***"), ¶93 ("[M]ost importantly, this new, novel and inventive architecture transmits and processes these non-standard transactions on that banking network in a manner that is transparent to existing institutions, components, or transactions on the network.")).

In sum, AlexSam's SAC properly plead the elements of contributory infringement, that: (1) Aetna had sufficient knowledge of the '608 Patent and of its

infringement, (2) Aetna's Processing Hub has no substantial non-infringing uses, and (3) Aetna's Processing Hub is a material part of the invention.[8] The Dismissal Order should therefore be vacated and the case remanded for further proceedings.

### 2. AlexSam's SAC Sufficiently Stated A Claim For Direct Infringement.

The District Court erroneously granted the Motion to Dismiss when (i) it adopted a new heightened standard of pleading that is not consistent with settled law; and (ii) it failed to consider the entirety of the legal and factual basis for AlexSam's allegations of direct and indirect infringement. The analysis below of the first point demonstrates how the District Court erred in ruling on the Motion to Dismiss, and the analysis of the second point demonstrates how the allegations in the SAC should be reviewed *de novo*.

#### *a. The Dismissal Order prematurely dismissed AlexSam's claim of direct infringement.*

AlexSam's SAC provided a viable legal theory supported by plausible allegations of fact that were sufficient to put Aetna on notice of the infringement claim against it. That is all that is required at this stage. See, e.g., *Conley*, 355 U.S. at 47-48; *Nalco*, 883 F.3d at 1350 (citing *Twombly*, 550 U.S. at 556).

---

[8] Again, the "plausibility standard 'does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence' to support the plaintiff's allegations." *Nalco*, 883 F.3d at 1350 (citing *Twombly*, 550 U.S. at 556).

A complaint sufficiently pleads direct infringement when it puts the defendant "on notice of what activity ... is being accused of infringement." *Nalco*, 883 F.3d at 1350 (quoting *K-Tech Telecomms., Inc. v. Time Warner Cable, Inc.*, 714 F.3d 1277, 1284 (Fed. Cir. 2013)); see also *BioMérieux, S.A. v. Hologic, Inc.*, No. 18-21-LPS, 2018 WL 4603267, *3 (D. Del. Sep. 25, 2018). There is no requirement that the plaintiff "plead facts establishing that each element of an asserted claim is met." *Nalco*, 883 F.3d at 1350 (quoting *In re: Bill of Lading*, 681 F.3d at 1335). The "purpose of a motion to dismiss is to *test the sufficiency of the complaint, not to decide the merits*." Id. (adding *emphasis* and omitting citation), citing and quoting *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990).

The Federal Circuit's latest guidance on pleading standards for direct infringement comes from *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342 (Fed. Cir. 2021). The *Bot M8* Court affirmed-in-part and reversed-in-part an order dismissing direct infringement claims on four patents for failure to sufficiently plead. See id. at 1358. Critically, the opinion rejected a "blanket element-by-element pleading standard for patent infringement," favoring instead a flexible inquiry into "whether the factual allegations in the complaint are sufficient to show that the plaintiff has a plausible claim for relief." (Id. at 1352). The level of detail required to meet that standard depends on multiple factors, not limited to "the complexity of the

technology, the materiality of any given element to practicing the asserted claim(s), and the nature of the allegedly infringing device." Id. at 1353.

As is explained below, the Dismissal Order should be vacated and the case remanded because AlexSam sufficiently described the functionality of its patented multifunction card system, it identified the Accused Products that infringe its patented technology, and it explained, including a representative chart, how the Accused Products infringe. Other district courts have concluded that the foregoing is sufficient to deny a motion to dismiss. See, e.g., *Aperture Net LLC v. HTC America Inc.*, Case No. 2:19-cv-01746-RAJ-BAT (W.D. Wash. Mar. 31, 2020) (Report & Recommendation) (applying *Centillion*; concluding plaintiff sufficiently plead direct infringement "[b]ecause [plaintiff] has sufficiently described the functionality of its patented [] system, identified the Accused Products that infringe the patented technology, and explained, including a representative chart, how the Accused Products infringe.'). Such holdings are consistent with United States Supreme Court and Federal Circuit precedent. See, e.g., *Conley*, 355 U.S. at 47-48 ("The respondents … argue that the complaint failed to set forth specific facts to support its general allegations … and that its dismissal is therefore proper. ***The decisive answer to this is that the Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim***. To the contrary, all the Rules require is 'a short and plain statement of the claim' that will

give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."; "Such ***simplified 'notice pleading' is made possible by the liberal opportunity for discovery and the other pretrial procedures*** established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues. … The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." (***emphases*** added) (internal citations omitted); see also *Nalco*, 883 F.3d at 1350 (a complaint sufficiently pleads direct infringement when it puts the defendant "on notice of what activity ... is being accused of infringement."); Fed. R. Civ. P. 8(e)[9] ("Pleadings must be construed so as to do justice.")

Instead of following the foregoing law, the District Court erred by requiring the SAC to include "precise and clear detail" of facts[10, 11] and by concluding that

---

[9] Substantively cited by the Supreme Court in *Conley* as former Rule 8(f) (formerly "all pleadings shall be so construed as to do substantial justice").

[10] Appx0028.

[11] Appellant does not dispute that litigants should strive to provide precise and clear detail in all matters; however, it is not clear how this inherently subjective (and unsanctioned) standard is to be applied in the context of the notice pleading standards. But see *Nalco*, 883 F.3d at 1350 (A complaint sufficiently pleads direct infringement when it puts the defendant "on notice of what activity ... is being accused of infringement;" there no requirement that plaintiff "plead facts establishing that each element of an asserted claim is met.") (Citations omitted.).

AlexSam did not sufficiently allege direct infringement by Aetna. However, as is explained below, AlexSam plausibly asserted that Aetna directly infringed the Asserted Claims by "using" the patented system and by "making" the system; that is all that is required at this stage. *Conley*, 355 U.S. at 47-48; *Nalco*, 883 F.3d at 1350.

**i. <u>It is plausible that Aetna "uses" its card processing system.</u>**

"[T]o 'use' a system for purposes of infringement, a party must put the invention into service, <u>i.e.</u>, control the system as a whole and obtain benefit from it." *Centillion Data Sys., LLC v. Qwest Communs. Int'l, Inc.*, 631 F.3d 1279, 1284 (Fed. Cir. 2011) (<u>citing</u> *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005), abrogated on other grounds by *IRIS Corp. v. Japan Airlines Corp.*, 769 F.3d 1359, 1361 n.1 (Fed. Cir. 2014)). Direct infringement by "use" of a system claim only requires a party to use each element of the claimed system. *Centillion*, 631 F.3d at 1284. The accused infringer is not required to exercise "physical or direct control" over each individual element of the system. <u>Ibid</u>. ("The district court erred, however by holding that in order to 'use' a system under § 271(a), a party must exercise physical or direct control over each individual element of the system."). Instead, the user need only "ma[ke] them work for their patented purpose…." <u>Ibid.</u> Accordingly, "to use a system, a person must control (even if indirectly) and benefit

from each claimed component." *Intellectual Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320, 1329 (Fed. Cir. 2017).

Here, AlexSam alleged that Aetna directly infringed the Asserted Claims by "using" the patented system. (See, e.g., Appx0457-0490 at ¶111.) AlexSam also alleged that Aetna controls every element of the Asserted Claims. Id. at ¶108 (Aetna uses BIN to route transactions); ¶109 ("***Defendant*** owns, operates, or leases all equipment in the infringing system, or alternatively ***exercises direction and control over the operation of all equipment in the infringing system*** in order to provide the benefit of debit/medical card services cards to its customers.") (***emphases*** added); and ¶110 ("Upon information and belief, ***Defendant employs staff (e.g., an IT department) to operate the Processing Hub in order to*** interface with, install, configure, manage, monitor, test, and ***control the debit/medical services cards and other equipment in the infringing multifunction card system***.") (***emphases*** added). Moreover, AlexSam alleged in the SAC that the Processing Hub serves as the "nerve center" and thus controls the system. (Appx0463-0464 at ¶¶27-30). In sum, Aetna put its card processing system into service through the use and control of the Aetna Processing Hub.

AlexSam also alleged facts from which it can reasonably be concluded that Aetna obtains benefits from its use of the system. (See, e.g., Appx0457-0490 at ¶108 (VISA Accused Products "available to individuals participating in a healthcare

benefits program …”); ¶109 (“Upon information and belief, Defendant is in the business of selling and offering for sale the VISA Accused Products to its customers …”); ¶111 (Aetna “sell[s] products generated through the use of the system”); and ¶116 (“Defendant receives revenue from the provision of, sale and use of the VISA Accused Products”); Appx0508-0535 at ¶36 (describing “[s]ome of the benefits of the ‘608 Patent’s multifunction card system”); ¶37). In short, there is a reasonable inference that Aetna derives a direct benefit from its use of its card processing system in the form of revenue, sales of revenue generating products, and sales of health plans.

Through discovery and expert opinion, AlexSam will prove how Aetna specifically controls and obtains benefit from the system. However, at this stage, it is plausible that Aetna “uses” its card processing system by controlling messaging (through, for example, Aetna’s Processing Hub and associated databases, which is accessed with the card data on the Accused Products) and by benefitting from it (through, for example, the sale of cards and health plans). See, e.g., (Appx0477-0478 at ¶¶108-113); (Appx0537-0540 at C-1 to C-4). In sum, AlexSam plausibly pled facts that support its claim that Aetna “uses” the patented system by putting it “into service”. The District Court erred by granting the Motion to Dismiss.

### ii. It is plausible that Aetna "makes" its card processing system.

AlexSam pled facts that plausibly support its claims that Aetna "makes" its infringing card system by assembling a system comprised of (1) at least one debit/medical services card, and (2) a Processing Hub with associated databases that Aetna added to existing, general components of a banking network (the point-of-sale device and transaction processor) to make the infringing system. As is explained below, Aetna acts as the "final assembler" of the infringing system by adding the critical elements (the card and processing hub with associated databases) to an otherwise generic banking network.

In *Centrak, Inc. v. Sonitor Technologies, Inc.*, 915 F.3d 1360 (Fed. Cir. 2019), this Court held that "a final assembler can be liable for making an infringing combination—assuming the evidence supports such a finding—even if it does not make each individual component element." (Id. at 1372.) The District Court in *Centrak* granted summary judgment in favor of the accused infringer after finding that the plaintiff had not presented "sufficient evidence to raise a triable issue of fact as to whether [defendant] makes infringing systems." (Id. at 1371.) It was not disputed that defendant Sonitor "does not provide certain claimed elements in the accused systems, such as a backbone network, Wi-Fi access points, or server hadware." Id. The District Court relied on *Centillion* "for the proposition that to 'make' a system, a single entity must assemble the entire system itself." Id.

However, the Federal Circuit concluded that the District Court misunderstood plaintiff Centrak's argument and thus misapplied the *Centillion* decision. *Centrak*, 915 F.3d at 1371. Specifically, this Court found:

> CenTrak's infringement theory is comparing Sonitor not to the software maker Qwest, but to Qwest's customers, who completed the claimed system by installing Qwest's software onto their hardware. Qwest's customers were not named defendants in *Centillion*, and thus, according to CenTrak, Centillion does not rule out CenTrak's infringement theory. In this case, CenTrak argues that the final, missing elements are the configuration that allows the location transmitters to work with the network and the location codes that are entered into the Sonitor server. According to CenTrak, admissible evidence that Sonitor is the "final assembler" raises a triable issue of fact on infringement even though Sonitor does not "make" each of the claimed components of the accused systems.

Id. (***emphases*** added) (footnote omitted). The Court reversed the District Court's order granting summary judgment and remanded for further proceedings. Id., at 1373-74.

This Court explained the *Centrak* holding in *Acceleration Bay LLC v. 2K Sports, Inc.*, 15 F.4th 1069 (Fed. Cir. 2021):

> In *Centrak*, the accused infringer made hardware products and installed them by connecting them to an existing network. [*Centrak*,] 915 F.3d at 1371. The plaintiff there had a viable theory—called a "final assembler" theory—that the defendant directly infringed a claim because, even though the defendant did not make some of the existing network components, it "made" the claimed system when it installed its own hardware onto

> the existing network, thereby completing the claimed system. Id.

Id. at 1078.

The allegations in this case are consistent with the holding in *Centrak*. Here, even though Aetna did not make some of the existing network components, it "made" the claimed system when it installed its own hardware onto the existing network, thereby completing the claimed system. Specifically, Aetna directly infringes the Asserted Claims by configuring the system, including its Processing Hub, which is used to send and receive messages, including card data, over the standard banking network. (Appx0457-0490 at ¶20 ("[T]he Processing Hub is necessary for [Mr. Dorf's] system to work."); ¶21 (the Processing Hubb "worked with the existing banking network and … utilized a bank identification number (BIN) to allow for the use of a multi-function card."); ¶¶27-30 (role of Processing Hub, the "nerve center of the system"); ¶109 ("Defendant owns, operates, or leases all equipment in the infringing system, or alternatively exercises direction and control over the operation of all equipment in the infringing system in order to provide the benefit of debit/medical card services cards to its customers."); ¶110 ("Upon information and belief, ***Defendant employs staff (e.g., an IT department) to operate the Processing Hub in order to interface with, install, configure, manage, monitor, test, and control the debit/medical services cards and other equipment in the infringing multifunction card system***.") (***emphasis*** added); ¶111

("On information and belief, Defendant ***installed***, tested, ***configured***, and serviced ***equipment in the infringing system, thereby making*** and using ***the systems disclosed in the Asserted Claims and infringing those claims under 35 U.S.C. § 271(a)*** and ¶113).

The foregoing presents a sufficient factual basis to support AlexSam's claims because it is plausible (at least) that the Processing Hub must be updated and configured to include new cards (and their status) before use (at least), which plausibly acts as the final assembly of the system. (See, e.g., Appx0520 at ¶42 (pre-configured /pre-activated cards not safe); (Appx0546 at C-10) ("After you enroll in your [Aetna] HSA, Bank of America will send you a Welcome Kit. Your HSA Debit Card will be mailed separately. You will need to activate your HSA Card by calling the number on the sticker affixed to your Debit Card.")

More specific factual allegations are not required at this stage because such facts are in the control and possession of Aetna. See *Arista Recs., LLC,* 604 F.3d at 120; see also *Innova Hospital San Antonio, Ltd.*, 892 F.3d at 730 ("Our holding underscores the principle that when discoverable information is in the control and possession of a defendant, it is not necessarily the plaintiff's responsibility to provide that information in her complaint.' See *Lincoln Benefit Life Co.*, 800 F.3d at 107 n.31, supra. In short, it is plausible that the final assembly occurs with the configuration of the Aetna Processing Hub to recognize (at least) new Aetna cards.

AlexSam sufficiently alleged in the SAC that Aetna acted as the "final assembler" of the infringing system (e.g., by installing and configuring the Processing Hub) and that it is liable for direct infringement for "making" the system of the Asserted Claims. Therefore, AlexSam alleged a plausible legal theory of liability and presented facts that support the reasonable inference that Aetna is liable for direct infringement for "making" the infringing system as the "final assembler." The District Court erred in granting the Motion to Dismiss, and the Dismissal Order should be vacated and the case remanded for further proceedings.

**B. THE DISTRICT COURT ERRONEOUSLY FOUND THE ACCUSED MASTERCARD PRODUCTS WERE LICENSED.**

License is an affirmative defense in a patent infringement suit. E.g., *A. Natterman & CIE GmBH v. Bayer Corp.*, 428 F.Supp.2d 253, 258 (E.D. Pa. 2006) (citing *Wang Labs., Inc. v. Mitsubishi Electronics Am., Inc.*, 103 F.3d 1571 (Fed. Cir. 1997), and *Carborundum Co. v. Molten Metal Equip. Innovations*, 72 F.3d 872 (Fed. Cir. 1995)); see also *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 924 (Fed. Cir. 1984) ("In a suit for patent infringement, the burden of proving the establishment of an implied license falls upon the defendant." (citing *Bassick Manufacturing Co. v. Adams Grease Gun Corp.*, 54 F.2d 285 (2d Cir. 1931)); *Psihoyos v. Pearson Educ., Inc.*, 855 F.Supp.2d 103, 119 (S.D. N.Y. 2012) ("In cases where the existence of a license is in dispute, Defendants bear the burden of showing that there was a license." (copyright case)).

Contrary to the Dismissal Order, the Accused Products are not sublicensed by the AlexSam-MasterCard Patent License Agreement ("AMPL"). The District Court committed reversible error by finding otherwise.

### 1. The Judgment Rests on an Erroneous Interpretation of the AMPL, So It Must Be Reversed.

Section 1.3 of the AMPL defines "Licensed Transactions" as "each process of activating or adding value to an account or subaccount which is associated with a transaction that utilizes MasterCard's network or brands wherein data is transmitted between POI Device and MasterCard's financial network or reversing such process, provided that such process is covered by one of the Licensed Patents." (Appx0010 (quoting the AMPL, § 1.3)).

Aetna should have been burdened to prove its affirmative defense of license, see e.g., *Bandag*, *supra*,[12] but it never proved or even argued that its products participate in a Licensed Transaction *as defined above*. Specifically, it did not show that its Accused Products participate in a "process of activating or adding value to an account or subaccount which is associated with a transaction that utilizes MasterCard's network or brands." That "process of activating or adding value" is

[12] *Bandag* involved a claim of implied license, and Aetna asserted an express license and an implied license, making the *Bandag* assignment of burden applicable. The District Court found an express license and did not decide implied license for that reason. (Appx0021-0022).

the threshold requirement of the definition, and the language that follows in Section 1.3 depends on and derives from that requirement. AlexSam made that point below. (See Appx2474-2476, 2478 at 24:6-25:14; 26:5-27:23, 28:16-23). The point follows from the section's plain language. See id.

After stating the threshold requirement of a "process of activating or adding value," Section 1.3 further explains "Licensed Transactions" and creates sublicenses for them. (Appx0656 at 1.3). The phrase "Such Licensed Transaction" starts this additional language, and the antecedent for "Such" in that phrase is the defined "Licensed Transactions" which precedes it. See id. Those transactions require a "process of activating or adding value," as shown. The section then extends "Such Licensed Transaction" to the entire value chain, protecting third parties who participate in the transaction in the chain. See id.

Aetna and the District Court read Section 1.3 differently than that plain language. They read out the definition requiring a process of activating or adding value and found as a result *that any transaction* in the Mastercard value chain is licensed under the AMPL – specifically the transactions of the Accused Products in which there is *no activation or adding of value*.

Aetna argued solely on the basis of the "value chain" language of Section 1.3, to the exclusion of the definitional requirement on which that additional language

depends. (See Appx0756-0757, Appx0760 at 24-25, 28 n.5); (Appx2458-2459 at 8:22-9:4). That interpretation is wrong, because it gives *no effect to the definition*.

"The rules of construction of contracts require us to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, *no provision of a contract should be left without force and effect*." *Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46, 150 N.Y.S.2d 171, 174 (1956) (emphasis added). That rule of interpretation is settled.[13] "It is a well settled principle of contract law that a court should not adopt a construction of a contract 'which will operate to leave a provision of a contract . . . *without force and effect*.'" *U.S. Underwriters Ins. Co. v. Beckford*, No. 93-CV-4272 (FB), 1998 U.S. Dist. LEXIS 574, *10 (E.D. N.Y. Jan. 20, 1998) (quoting *Ruttenberg v. Davidge Data Sys. Corp.*, 215 A.D.2d 191 (N.Y. 1st Dep't 1995)) (emphasis added) (quotation marks omitted in part)). Accord *Bank of N.Y. v. First Millennium, Inc.*, 598 F.Supp.2d 550, 556 (S.D. N.Y. 2009) ("Under New York law, a contract 'should be construed so as to give full meaning and effect to all of its provisions.'" (quoting *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195 (2d Cir. 2005)).

---

[13] New York law governs according to the AMPL. (Appx0457-0721 (Dkt. No. 57) at Exh. I, § 16). "Construction of a patent 'licensing agreement is solely a matter of state law.'" *Canon Inc. v. Tesseron Ltd.*, 146 F.Supp.3d 568, 577 (S.D. N.Y. 2015).

The District Court agreed with Aetna nonetheless, and like Aetna, it gave no effect to the definition, resting its decision instead on the value chain language. See Appx0020. It erred in doing so, as demonstrated above. Because the finding of license rests on the error, the judgment for Aetna based on license must be reversed. See *Sheet Metal Div. v. Local 38 of the Sheet Metal Workers Int'l Ass'n*, 208 F.3d 18, 20-27 (2d Cir. 2000); *Quad Envtl. Techs. Corp. v. Union Sanitary Dist.*, 946 F.2d 870, 872 (Fed. Cir. 1991).

### 2. AlexSam Pled Sufficiently to Negate the Affirmative Defense.

To decide the affirmative defense for Aetna, the District Court weighed the defense against AlexSam's allegations. It tested the allegations with respect to license under the familiar standard of *Twombly/Iqbal* and found them implausible. (Appx0015-0021). It did not find that Aetna proved the defense. That is reversible error, because it wrongly relieved Aetna of its burden to prove the defense, but granted the defense nonetheless. See e.g., *Bandag, supra*; *Sheet Metal Div., supra; Quad Envtl. Techs. Corp., supra.*

But assuming *arguendo* that Aetna correctly was relieved of the burden, and that AlexSam correctly was burdened to negate the defense by plausible allegations, AlexSam did so with an allegation that the District Court ignored and failed to take as true as required. Specifically, AlexSam pled:

> Further, unlike the IDT case, Claims 32 and 33 of the '608 Patent as asserted in this case are directed to medical cards

> and do not require an activation transaction as other claims in the '608 Patent, such as Claims 57 and 58 that were asserted against IDT.

(Appx0477 at ¶105). Thus, the Plaintiff affirmatively pled that the Accused Products do not participate in a "process of activating or adding value," placing them beyond the definitional requirement of Licensed Transactions. This allegation does not expressly exclude "adding value," but the reasonable inference due from the allegation is the Accused Products are not Licensed Transactions. See *Koch v. Christie's Int'l Pub. Ltd. Co.*, 699 F.3d 141, 145 (2d Cir. 2012) ("For the purpose of reviewing the grant of a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, we accept as true the facts alleged in the Complaint, drawing all reasonable inferences in favor of the plaintiff."). To be sure, Aetna never claimed that its Accused Products are employed in "adding value" transactions, which confirms the inference for AlexSam.

Remarkably, the District Court found that, contrary to the foregoing allegation, the Accused Products *are like* the transactions and Claim 57 in the *IDT* case. (Appx0019). So, the Court did not simply ignore the allegation and refuse to take it as true (an error on its own according to the standard of review), it positively denied the allegation and found the opposite to be true. It did so after oral argument on the motion to dismiss, in which AlexSam (as follows) showed that the Accused

Products cannot be sublicensed because they are not involved in Licensed Transactions:

> All we need to do is look at the language of the license. Don't take my word for it. Don't take [defense counsel] Mr. Rohback's word for it. Let's look at the words of 1.3. We've all said 1.3 is the answer to it. Well, let's look at it. A licensed transaction. I think we have said, and *we all are in agreement, that in order for a license to be extended to Aetna it must fall within 1.3, the definition of licensed transaction*. But a licensed transaction doesn't relate to the sort of conduct that is alleged -- that is covered, I'm sorry, by claims 32 and 33.
>
> What does it relate to? It relates to other types of embodiments disclosed in the '608 patent. For example, *I point you to the first sentence, reading the phrase, "Licensed transaction means each process of activating or adding value to an account or subaccount." That's the conduct that we're talking about. That's license.*
>
> How do we know it's limited in scope? Well, we can look to the last sentence of that paragraph. It says "To the extent that these other parties" -- this is the value chain "to the extent that these parties participate in a licensed transaction, they will also be licensed under the agreement."
>
> The issue that Mr. Rohback has raised does not at all address this, which is that this limited license does not extend to the conduct that's at issue in this case. It's very simple, it's very straightforward, and it is unassailable. There is no license here.

(Appx2449--2450 at 24:6-25:14 (*emphasis* added)).

Aetna never responded – not in its briefs or at oral argument – that its Accused Products participate in a "process of activating or adding value." Its silence on that

point is a concession of the point. See e.g., *Tchernitsky v. Pigott*, No. 93-CV-4272 (FB), 2019 U.S. Dist. LEXIS 58397, *7 (E.D. N.Y. Mar. 31, 2019) ("The Court deems Defendants' silence as a concession that Defendants are abandoning their claims."). Equally certain, the District Court did not require Aetna to prove that its Accused Products participate in a "process of activating or adding value." By any measure, the District Court mistakenly failed to give effect to that threshold requirement of Sec. 1.3. The finding of license proves that. The District Court committed the mistake at every turn -- in its reading of the AMPL, by relieving Aetna of its burden, and by placing the burden on AlexSam, then denying AlexSam's allegation on the issue. The judgment must be reversed, accordingly.

### 3. The Judgment Is Compromised by Two Other Errors, Also Providing Ground for Reversal.

There is no dispute that to be licensed, the Accused Products must be used for "Licensed Transactions" as defined by the AMPL. Aetna failed that test below. The license defense was granted anyway, based on the mistakes demonstrated above. On their own, without more, those mistakes warrant reversal. However, in granting the license defense, the Court misread and misapplied two cases asserted by Aetna. Those additional mistakes, to the extent the Court relied on them to grant the defense, also warrant reversal of the judgment. They are as follows:

#### ***a. The Court Misread IDT.***

The *IDT* case involved activation transactions which licensed the accused products in that case under the AMPL. That view cannot be disputed. Even the PTAB decision Aetna submitted below, (Appx1342-1357), makes that clear. In it, the PTAB footnotes the AMPL definition of "Licensed Transactions" (*id.* at Appx1344, n.2), then recognizes that the *IDT* court gave effect to the definition by finding a license based on activation:

> In particular, the Federal Circuit determined [in *IDT*] that "[t]he district court correctly found that under the plain terms of this agreement, *any activation transaction covered by the patents in suit and taking place over the MasterCard network* was automatically 'deemed sublicensed,' without regard to the intent of either Alexsam or MasterCard regarding that particular transaction."

*Id*. at Appx1345 (*emphasis* added). The *IDT* decision itself confirms that understanding of the license finding. *See AlexSam, Inc. v. IDT Corp.*, 715 F.3d 1336, 1345 (Fed. Cir. 2013) ("We agree with the district court that the activations taking place over the SafeNet system were sublicensed under the plain language of the agreement, and therefore affirm the grant of JMPL.").

The license in *IDT* is distinguished from the license defense here by the proof and presence of activation in *IDT* and the absence of them here, as AlexSam plausibly pled. (Appx0477 at ¶ 105). But Aetna and the District Court did not credit

that difference, and it is clear why: neither of them gave effect to the definition of license in Section 1.3 requiring activation or added value.

Thus, contrary to the reading of *IDT* below, the "reasoning" of *IDT* does not warrant a finding that Aetna's Accused Products are licensed. The District Court erred in that respect. (See Appx0019-0020). The transactions one case to the other differ: activation in one (IDT) satisfies the definition of transactions licensed by the AMPL, but no activation or added value in the other (Aetna) does not satisfy it.

The District Court acknowledged the activation fact of *IDT*. (Appx0019). But it failed to apprehend that the *IDT* court addressed activation because it is a requirement in the definition of "Licensed Transactions." The District Court's view, which is incorrect, is that any transaction in the Mastercard value chain is licensed, regardless of activation or added value. (See Appx0020). That is not the reasoning of *IDT,* and it is a misread of that decision. The *IDT* court held that "certain transactions performed by IDT were sublicensed under the MasterCard-Alexsam License Agreement," (Appx1342-1357 at 5), not that any transaction in the Mastercard value chain is licensed.

***b. The Mastercard Case Does Not Support the Dismissal Order.***

To support dismissal, Aetna invoked a decision in *Mastercard* for a finding that "Aetna Inc. would have been part of the 'entire value chain,' and thus a sublicensee under the express AMPL." (Appx0016) (quoting the defense argument).

Judge Gold, the author of the *Mastercard* decision, does not say that in his decision, but the District Court may have relied on the decision for that result, along with *IDT*. It cites the two together based on Aetna's reliance on them. Id. It then held that AlexSam's allegations are implausible in light of *IDT* and granted Aetna's defense of express license for that reason, together with the other reasons AlexSam has addressed above. (See Appx0016-0021).

The Dismissal Order expressly relies on *IDT*, a mistake as shown, but Aetna invoked Judge Gold's decision alongside *IDT* to assert a sublicense on the basis of the value chain, so the support Aetna claims from *Mastercard* is due to be dispelled.

The *Mastercard* decision is reported at *AlexSam, Inc. v Mastercard Int'l Inc.*, No. 1:15-cv-02799-ILG-SMG, 2019 U.S. Dist. LEXIS 166247 (E.D. N.Y. Sep. 26, 2019). It lacks the sweeping reach and dispositive effect Aetna tried to assign here. Judge Gold did not find that Aetna, a non-party in his case, "would have been part of the 'entire value chain,' and thus a sublicensee under the express AMPL" (Aetna's contention). Aetna persuaded this District Court to grant its license defense, but that is not a finding in *Mastercard*.

There is another reason to disregard Aetna's reliance on *Mastercard*. The reliance, such as it is, is unjustly one-sided. AlexSam correctly cautioned the District Court that any license under the AMPL could be reduced in duration, or ousted altogether, by the pending claim in *Mastercard* that the AMPL terminated early, and

that the Aetna Accused Products could not claim license protection if and after that termination determination. (Appx1026) ("MasterCard has also asserted that its license terminated prior to the expiration of the term of the licensed patents. If that is true, then any infringing conduct that occurred after such alleged termination cannot be covered by MasterCard's license."); (Appx0017) (restating AlexSam's point). The *Mastercard* court recognizes that early termination of the AMPL is a question before it. See *AlexSam, Inc. v. Mastercard Int'l Inc.*, No. 1:15-cv-02799-ILG-SMG, 2021 U.S. Dist. LEXIS 2508, *4-6 (E.D. N.Y. Jan. 6, 2021). Aetna in response urged the District Court to disregard that question, and given the Dismissal Order, the Court evidently agreed. (See Appx2457-2458 at 7:22-8:10).

Aetna's use of *Mastercard* is disparate, clearly, and patently unjust: it invokes *Mastercard* for a finding which does not exist, namely that its Accused Products are licensed, while ignoring a determination pending in that case which could extinguish the license defense, namely early termination of the AMPL. The *misuse* of *Mastercard* is manifest. Aetna's arguments about it have no weight, accordingly.

**4. AlexSam Did Not Judicially Admit that Aetna Is Licensed, and AlexSam Is Not Judicially Estopped from Denying a License.**

Aetna gave two additional reasons for judgment in its favor based on license, and the Dismissal Order acknowledges them at least in part, so they are due to be dispelled.

**a.** ***The Transfer Motion Is Not an Admission of License.***

AlexSam moved unsuccessfully to transfer and consolidate this case with other cases in a MDL. It argued in that motion, under the heading "The MC Agreement Is At Issue In Each Case," that –

> MasterCard has sought declaratory judgments that the MC Agreement has terminated. See MasterCard Case, Dkt. No. 16, at Count VI and VII. If the MC Agreement was terminated, which AlexSam contends it was not, then MasterCard could potentially be liable for infringement. Likewise, a MasterCard license defense, like the one raised by Aetna and WageWorks, would be moot as well. Not only is the scope of the MC Agreement common to all the cases, but its existence is as well.

(Appx1221-1248 at 7-8 (reply brief in support of motion)).[14] It also argued that consolidation would facilitate its discovery of "(1) any agreements between MasterCard and the other Defendants and any communications surrounding those agreements, (2) liability under the MC License, and (3) how MasterCard's networks interact with the other Defendants' card systems." *Id.* at 10-11.

These arguments are sensible and consistent with AlexSam's position in this suit against Aetna. The JPML turned down an MDL for the cases, however, given

[14] This pagination, "at 7-8," is the page numbering by the party filer, at the bottom of each page, not the ECF-stripped pagination at page top which otherwise is utilized for pinpoint citations elsewhere in this appeal brief. The ECF-stripped pagination is overprinted and obscured.

the "significant differences" between them. (Appx2544-2548 at 2). Aetna opposed consolidation, *id.*, so prevailed.

Nonetheless, in its subsequent argument for dismissal, Aetna tried to suggest that the AlexSam motion for transfer is a judicial admission by AlexSam that the Aetna Accused Products are licensed, at least with respect to Claim 33. (See Appx1186) ("AlexSam recently told the Judicial Panel on Multidistrict Litigation ('JPML') that Claim 33 is asserted against MasterCard in its license dispute. AlexSam's admission *in this proceeding* while it was pending before the JPML that practicing Claim 33 falls under the MasterCard license is binding and conclusive." (exhibit citation omitted) (emphasis in original)).

To try to win that point, Aetna submitted as an exhibit Doc. 80-2 (Appx1221-1248), which is AlexSam's reply brief for its motion for an MDL. Aetna cites page 4 only of that exhibited brief for support, where Claim 33 appears only in a table of claims in the cases AlexSam sought to consolidate. It is listed that way (1) in the Mastercard case, and (2) only for the original complaint against Aetna (Appx0100-0271), not the operative Second Amended Complaint (Appx0457-0721) which is addressed by and subject to the Dismissal Order. (Appx1221-1248).

It is inexplicable that Aetna concluded from the exhibited reply brief that AlexSam admits a license for any Accused Product. Aetna did not explain the conclusion. The conclusion *defies reason* and cannot be squared with AlexSam's

actual argument for transfer, as AlexSam quotes it above. That argument is not an admission.

The authority Aetna offers for this purposed admission is no more helpful to Aetna. The court in *Purgess v. Sharrock*, 33 F.3d 134 (2d Cir. 1994), stands for a rule that an attorney statement in a motion to dismiss in a prior case *may* be admitted as evidence to a jury over hearsay objection. See id. at 143-44 (quoting *United States v. McKeon*, 738 F.2d 26 (2d Cir. 1984)). The *Purgess* court allowed that use of the statement, meaning limited as evidence to jurors, balanced by counter-evidence from the opposing party (a statement read to jurors that the prior statement is a mistake). *Id.* It did not rule that such a statement is a *conclusive* admission, which is Aetna's grossly inflated claim. (*See* Appx1187.) The prior statement at issue detailed specific patient incidents at a hospital, see 33 F.3d at 143, a subject so different and far removed from AlexSam's argument for a MDL that it is impossible to compare *Purgess* to the AlexSam reply brief Aetna exhibited. Aetna's judicial admission argument is incorrect and unavailing.

**b. *AlexSam Is Not Judicially Estopped by PTAB.***

Subsequent to its briefing in support of dismissal, Aetna suggested in another filing (Appx1182-1373) that AlexSam is judicially estopped from claiming that Aetna medical card transactions are not licensed by the AMPL, specifically that "AlexSam's current position is contradicted by AlexSam's successful argument

before the Patent Trial and Appeal Board that it is not possible for a MasterCard product to infringe Claim 33 outside the protection of the AMPL." (Appx1186). That is the sole reason Aetna gives for applying judicial estoppel. The requirements for applying it are missing from its argument, so neither the argument nor the Dismissal Order state a basis for finding that the requirements are met. *See In re: Adelphia Recovery Tr.*, 634 F.3d 678, 695-96 (2d Cir. 2011) (enumerating three requirements, plus an additional jurisdictional limit on use of judicial estoppel).

This (mere) suggestion that judicial estoppel applies is wrong. The controlling rule for applying it does not apply, not for the lone reason Aetna gives or for any other reason. The rule is:

> Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him. This rule, known as judicial estoppel, generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.

*Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 618-19 (2d Cir. 2012) (quoting *New Hampshire v. Maine,* 532 U.S. 742 (2001)).

The rule does not apply here. The PTAB concluded that the Petitioner (Mastercard) did not have standing to bring CBM petitions because it had not been charged with infringement and because the covenant not to sue "removes any

imminent possibility that [AlexSam] could bring an infringement action against [Mastercard]." (Appx1342-1357). ***The PTAB did not adopt a factual position taken by AlexSam***, much less one that was inconsistent with a factual position that AlexSam took before the District Court here.

Said another way, AlexSam did not advance an argument before the District Court that was inconsistent with or which contradicted a previous argument upon which it prevailed before the PTAB. Specifically, the PTAB never considered the scope of the AMPL license coverage, including whether the Aetna accused products (or similar products) are Licensed Transactions under the AMPL. Therefore, the threshold requirement for judicial estoppel does not apply.

## II. THE DISTRICT COURT ERRED BY CONCLUDING THAT ALEXSAM NAMED THE WRONG PARTY.

As it pertains to AlexSam's claim that Aetna is liable for the infringing activities of its subsidiaries, the District Court states in its Order that "[a] parent corporation may be liable for direct infringement under Section 271(a) by a subsidiary *if the evidence* reveals circumstances justifying disregard of the two entities "as distinct, separate corporations." (Appx0037-0038) (quoting *A. Stucki Co. v. Worthington Indus., Inc.*, 849 F.2d 593 (Fed. Cir. 1988) (emphasis added) (internal quotation marks omitted)). While the District Court's statement may be true on its face, the decision it quotes, *Stucki*, rests on the quantum and quality of

evidence obtained and presented, not on a pleading allegation. The decision is inapposite for that reason.

In *Stucki*, the district court granted defendant's *motion for directed verdict* because, according to the court, the plaintiff had adduced *no evidence* supporting its claim that defendant dominated and controlled its infringing subsidiary beyond that defendant, Worthington, acquired stock of another company, Buckeye, long after RDI's infringement had begun, and that Buckeye owned 50% of RDI's stock. The district court's grant of defendant's motion for directed verdict in that case came *after four days of trial testimony*.

The district court's ruling in *Stucki*, after weighing the evidence presented at trial, does not support the District Court's finding here, at the pleading stage, that "AlexSam fails to allege control or direction by Aetna which would warrant disregarding the corporate form." Not only is the District Court's reliance on *Stucki* misplaced, but also, the District Court's conclusion that AlexSam did not allege control or direction by Aetna is incorrect.

AlexSam alleged in its Second Amended Complaint that "According to public information, Aetna owns, operates, advertises, and/or controls the website, www.aetna.com, as well as various office locations and representatives across the country, through which Aetna sells, advertises, offers for sale, uses, or otherwise provides, including but not limited to, the following products (the "Accused

Products”): Health Savings Account (“HSA”) Visa Debit Cards, Flexible Spending Account (“FSA”) Visa Debit Cards, Health Reimbursement Account (“HRA”) Visa Debit Cards and the PayFlex Card.” (Appx0468 at ¶50).

Further, AlexSam alleged that in 2011 PayFlex Holdings, Inc. (“PayFlex”) became a wholly owned subsidiary of Aetna and that Aetna offers the PayFlex Card through its subsidiary, PayFlex. (Appx0469 at ¶¶53, 55). AlexSam also alleged in its Second Amended Complaint that on July 15, 2015, Aetna’s in-house counsel responded to the Notice Letter to Aetna and the Notice Letter to PayFlex in a single letter response on behalf of both Aetna and its subsidiary, PayFlex. (Appx0470 at ¶58). Contrary to the District Court’s ruling, AlexSam alleged that Aetna controlled and directed its infringing subsidiary, PayFlex.

The *Broadvision* case that the District Court cites to support its ruling that AlexSam did not allege control or direction by Aetna of its subsidiary is factually distinguishable from the case before this Court. Unlike here, in *Broadvision*, this Court found that BroadVision failed to allege that GE had a direct financial interest in any infringement by EmployersRe or MedPro or that there was some continuing connection between the defendant, GE, and its subsidiaries, EmployersRe or MedPro relating to the infringing activity. *Broadvision Inc. v. General Elec. Co.*, 2009 WL 1392059, *4 (S.D. N.Y. May 5,2009) That is not the case here. As set forth above, AlexSam alleged in its Second Amended Complaint with as much

particularity as possible at the pleading stage that "Aetna owns, operates, advertises, and/or controls the website, www.aetna.com, as well as various office locations and representatives across the country, through which **Aetna sells, advertises, offers for sale,** uses, or otherwise provides, including but not limited to, the following products (the "Accused Products"): Health Savings Account ("HSA") Visa Debit Cards, Flexible Spending Account ("FSA") Visa Debit Cards, Health Reimbursement Account ("HRA") Visa Debit Cards and the PayFlex Card." Further, in *Broadvision*, this Court found that the complaint did not allege any connection between GE and its subsidiaries' infringing activities. That is not the case here.

AlexSam specifically alleges a financial connection between Aetna and PayFlex and a continuing connection between Aetna and PayFlex relative to the claimed infringing activities. This is evidenced by Aetna's assertion in its Motion to Dismiss and in its Rule 26(f) report that AlexSam's claims are barred in whole or in part because Aetna is covered by the AMPL. If Aetna does not direct and control its subsidiary, PayFlex, and if Aetna has no financial connection with PayFlex and no continuing connection with PayFlex relative to the claimed infringing activities, then there would be no factual basis for Aetna even to assert a right to a license under the AMPL.

Such a factual basis is expressly alleged by AlexSam. (Appx0470 at ¶ 57 (alleging Aetna's 2012 agreement with MasterCard for MasterCard to be "the preferred payment brand for Aetna's card services")). Given this pled agreement by Aetna to operate PayFlex in the Mastercard system, AlexSam should be allowed to proceed against Aetna on the obvious inferences of control and interest which arise from the pled agreement.

The AlexSam allegations, taken as true, create reasonable inferences that Aetna has a direct financial interest in any infringement activity by its subsidiary, PayFlex, and that Aetna has a continuing connection with PayFlex relative to the infringing activity. The allegations suffice against Aetna for those reasons. See *Autronic Plastics, Inc. v. Apogee Lighting, Inc.*, 2021 U.S. Dist. LEXIS 240490, *10-24 (E.D. N.Y. Dec. 6, 2021) (explaining grounds of parent liability in parent-subsidiary context, and citing authority, including *Banff Ltd. v. Limited*, 869 F.Supp. 1103, 1110 (S.D. N.Y. 1994) ("[T]o prevail against a parent corporation on the theory of vicarious copyright infringement, the plaintiff must present evidence that the parent has done more in relation to the infringing activity than simply be the parent. In more precise terms, the plaintiff must show that the parent *has a direct financial interest in the infringing activity, and that the parent has the right and ability to supervise the subsidiary, which is evidenced by some continuing connection between the two in regard to the infringing activity*." (emphasis added)).

Aetna is the proper party in this case, and the District Court erred in concluding that "AlexSam fails to allege control or direction by Aetna." The error warrants reversal of the judgment for Aetna.

## CONCLUSION

The District Court's Dismissal Order should be reversed and vacated, and the case remanded for further proceedings.

Dated: December 27, 2022

Respectfully submitted,

*/s/ Jacqueline K. Burt*

Jacqueline K. Burt
HENINGER GARRISON DAVIS, LLC
3621 Vinings Slope, Ste. 4320
Atlanta, Georgia 30339
Email: jburt@hgdlawfirm.com
Telephone: (404) 996-0861
*Attorney for Plaintiff-Appellant, AlexSam, Inc.*

No. 22-2036

IN THE
**UNITED STATES COURT OF APPEALS**
FOR THE FEDERAL CIRCUIT

ALEXSAM, INC.,
*Plaintiff-Appellant*

v.

AETNA, INC.,
*Defendant-Appellee.*

**Appeal From The United States District Court
For The District of Connecticut In Case No. 3:19-cv-010125-VAB,
Honorable Victor A. Bolden**

# ADDENDUM

# TABLE OF CONTENTS


| | RANGE | DESCRIPTION | Dkt. No. | Date (m/d/y) |
|---|---|---|---|---|
| 1. | Appx0001-Appx0047 | Order Granting [65] Defendants' Motion to Dismiss [57] the Second Amended Complaint | 96 | 9/11/2020 |
| 2. | Appx0048-Appx0073 | ORDER (1) denying [101] Motion for Reconsideration; (2) denying without prejudice [104] Motion to Amend/Correct; (3) denying [106] Motion to Amend/Correct; (4) denying [108] Motion to Take Judicial Notice; (5) denying [111] Motion to Strike. | 115 | 7/30/2021 |
| 3. | Appx0074-Appx0083 | ORDER denying [118] Motion for Leave to Amend. | 123 | 6/24/2022 |
| 4. | Appx0120-Appx0134 | U.S. Patent No. 6,000,608 | 1-1 | 6/28/2019 |

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ALEXSAM, INC., *Plaintiff,* v. AETNA, INC., *Defendant.* | No. 3:19-cv-01025 (VAB) |

## RULING AND ORDER ON MOTION TO DISMISS

AlexSam, Inc. ("Plaintiff" or "AlexSam") has sued Aetna, Inc. ("Aetna" or "Defendant") for patent infringement related to Claims 32 and 33 of United States Patent Nos. 6,000,608 (the "'608 Patent"). Second Am. Compl., ECF No. 57 (Dec. 6, 2019). Aetna has moved to dismiss the Second Amended Complaint. Mot. to Dismiss, ECF No. 65 (Jan. 10, 2020).

For the following reasons, the motion to dismiss is **GRANTED**.

AlexSam may move for leave to file an amended pleading by **October 9, 2020,** to the extent the deficiencies identified in this ruling can be addressed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Allegations

#### 1. The Patent

AlexSam brings this patent infringement action "related to Claims 32 and 33 of Plaintiff's United States Patent Nos. 6,000,608, entitled '*Multifunction Card System,*' [or the '608 patent'] . . . . Specifically, [ ] that Defendant provides to its customers with a medical card . . . for use in a multifunction card system that operate on the VISA and MasterCard Networks."

Second Am. Compl., ECF No. 57 ¶ 1 (Dec. 6, 2019) ("SAC") (emphasis in original). Claim 32 states:

> A multifunction card system comprising:
>
> a. at least one debit/medical services card having a unique identification number encoded on it comprising a bank identification number approved by the American Banking Association for use in a baking network;
>
> b. a transaction processor receiving card data from an unmodified existing standard point-of-sale device, said card data including a unique identification number;
>
> c. a processing hub receiving directly or indirectly said card data from said transaction processor; and
>
> d. said processing hub accessing a first database when the card function as a debit card and said processing hub accessing a second database when the card functions as a medical card.

Ex. A., ECF No. 57-1 at A-11 (Dec. 6, 2019) ("Patent 6,000,608"). Relatedly, Claim 33 states: "The multifunction card system of claim 32, wherein the unique identification number further compromises a medical identification number." *Id.*[1]

The '608 Patent "was duly and legally issued by the United States Patent and Trademark Office ('USPTO') on December 14, 1999" and "was assigned to AlexSam, Inc. in 2003." SAC ¶¶ 13–14. On July 10, 2012, "[a]n *ex parte* Reexamination Certificate was issued . . . which re-affirmed a number of the claims of the '608 Patent," excluding Claims 32 and 33. *Id.* ¶ 16. "The primary purpose of the '608 Patent [allegedly] is to implement a multifunction card system, such as one that utilizes a rechargeable pre-paid card, a pre-paid card with a loyalty function, or a medical information card that will perform as [a] normal bank card . . . to purchase goods and

[1] The Court considers the '608 Patent to be a system claim. System claims "seek to patent 'several components that are used "collectively" to achieve a particular result,' and so they are often held to protect tangible items." *Captan AG Sys., Inc. v. Raven Indus., Inc.*, 228 F. Supp. 3d 1235, 1241 n.6 (D. Kan. 2017) (quoting Stephen P. Cole, *NTP v. Rim: The Diverging Law Between System and Method Claim Infringement*, 5 Pierce L. Rev. 347, 353 (2007)).

services." *Id.* ¶ 17. The inventor, Robert Dorf, allegedly sought to invent "a multifunction card system that utilized his special-purpose computer, referred to as the Processing Hub, that worked with the existing banking network and that utilized a bank identification number (BIN) to allow for the use of a multi-function card." *Id.* ¶¶ 13, 21. He allegedly "invented a new computer to avoid the limitations of the conventional systems at the time." *Id.* ¶ 22. "The '608 Patent [allegedly] provides practical technological solutions to specific problems" in point-of-sale devices and banking networks by providing "a technological solution to the existing challenges by offering a multifunction card system that (1) did not have the security problems of pre-activated cards, (2) did not require special hardware for the merchant, and (3) provided all the convenience to consumers of normal bank cards." *Id.* ¶¶ 25–26.

AlexSam alleges that:

> [t]he primary innovative feature offered by '608 Patent was to introduce a Processing Hub that: (1) operates as a compatible component of a banking network; (2) communicates with the retailers to perform the specialized multi-card transactions (such as activating the card); (3) allows these specialized functions to be performed on an existing unmodified POS device, and (4) does not interfere with normal debit/credit card functions for purchasing of goods and services at any merchant POS device.

*Id.* ¶ 27. Allegedly, "[a] unique, novel, and inventive concept of the '608 Patent is the implementation of a new Processing Hub within a banking network and the intelligence of the Processing Hub can manage the different functions of each account," *id.* ¶ 28; "[a] Processing Hub that [allegedly] is 'transparent' to the POS device, yet still intercepts and processes all the specialized transactions necessary to support multifunction cards, and still allow[s] merchants to keep their same POS devices," *id.* ¶ 29.

Mr. Dorf's invention allegedly "'serves as the nerve center of the system 108.' The Processing Hub . . . connect[s] to 'any given POS device 105' which allows a retailer to use 'the

system 108 . . . to remotely activate or add value or loyalty data to a system card.'" *Id.* ¶ 30. His solutions allegedly are "more technically difficult to implement . . . due to the specific components that must be integrated with a banking network and still maintain the compliance of the highly regulated transaction process." *Id.* (citations omitted).

While allegedly more technically complicated, "the '608 Patent is more viable to merchants, more marketable, and more user acceptable in the marketplace," *id.*, because it allegedly "addresses specific technical problems and limitations with prior art card systems," *id.* ¶ 31.[2] The '608 Patent allegedly also "describes enhancements to incentivize customers to use specific cards and/or purchase specific products and/or purchase at specific merchants using loyalty cards, by establishing a centralized database to automatically track 'loyalty points.'" *Id.* ¶ 32. Mr. Dorf allegedly provided a solution to the various technological problems "by inventing new cards, new devices, and a new system." *Id.* ¶ 33.

The Processing Hub allegedly "accepted transactions from retailer POS devices for the multifunction cards, such as card activation or recharge, and processed and/or transmitted those transactions in order to complete (authorize) those transactions or reject them if not valid." *Id.* ¶ 34. Another allegedly critical component of Mr. Dorf's system is the banking network, as "the card transaction [must] be transmitted to the Processing Hub, [and] also to other banks and financial institutions that must participate in these transactions." *Id.* ¶ 36. Specifically, "the combination of the unmodified pre-existing standard point-of-sale device, transaction processor, and Processing Hub into a system that allows for the multifunction card system to access debit

[2] The limitations allegedly occur in three areas: "(1) existing credit and debit cards could only perform a very limited set of electronic transactions; (2) the pre-paid aspect of these debit cards created security problems in stores, which required them to be activated electronically after they were purchased; and (3) there was no centralized processing center to handle the specialized transactions of these multi-function cards." SAC ¶ 31.

card databases and medical databases [allegedly] was not generic or conventional in 1997." *Id.* ¶ 37.

Claims 32 and 33 are allegedly "tied to a particular machine – the Processing Hub – and machine system – the multifunction card system." *Id.* ¶ 38. They allegedly "made possible the use of multifunction cards without the need for separate, stand-alone system and equipment thereby solving a technical problem within the medical goods and services industry." *Id.* ¶ 40. AlexSam alleges that "Claims 32 and 33 of the '608 Patent include a Processing Hub that was not previously available in the industry." *Id.* Specifically, the patented system was not available in the medical goods and services industry until 2003 or 2004; meaning "[Mr. Dorf's] invention [allegedly] pre-dated by many years the flexible spending account (FSA) and health savings account (HSA) products that are offered today." *Id.* ¶ 41.

From 1997 until 2003, Mr. Dorf allegedly "practiced his inventions and met with major retailers, MasterCard, Visa, Discover, health plans and doctors in an effort to connect them to his Processing Hub." *Id.* ¶ 42. In fact, in 1997, FSAs and HSAs allegedly "were several years away from being introduced or even permitted." *Id.* ¶ 46.

After receiving his patents, Mr. Dorf allegedly created a business, Intelligent Card Solutions, Inc. (ICS), "which offered a processing platform to process transactions for Michigan National Bank, MCI[, . . . he [allegedly] had a joint venture with Mr. Ron Lauder of RSL company[,] [and he] also owned a BIN from MasterCard." *Id.* ¶ 43. The "Processing Hub with ICS [allegedly] allowed his company to process different types of card products and transactions, such as phone cards, health cards, and gift cards." *Id.* ¶ 44.

After working to build his business, Mr. Dorf allegedly "was unable to compete with larger companies." *Id.* ¶ 48. He allegedly "founded AlexSam in 2003 to which was assigned all

rights to enforce the '608 Patent." *Id.* ¶ 48. AlexSam allegedly "has licensed the AlexSam Patents to Humana, WEX Health (formerly, Evolution Benefits) and Unitedhealthcare in the medical card industry." *Id.* ¶ 49.

**2. Aetna, Inc.**

Aetna allegedly "owns, operates, advertises, and/or controls the website, www.aetna.com" and "sells, advertises, offers for sale, uses, or otherwise provides, . . . Health Savings Account ("HSA") Visa Debit Cards, Flexible Spending Account ("FSA") Visa Debit Cards, Health Reimbursement Account ("HRA") Visa Debit Cards and the PayFlex Card." *Id.* ¶ 50.

On June 16, 2015, "AlexSam [allegedly] sent Aetna a letter . . ., informing them that 'at least the following products require a license under the '608 Patent: Aetna Health Care FSA Debit Card and Aetna HAS Visa Debit Card.'" *Id.* ¶ 52 (citing Pl.'s Ex. E, ECF No. 57-5 (Dec. 6, 2019) ("2015 Notice Letter to Aetna")).

As of 2011, AlexSam alleges that PayFlex Holdings, Inc. ("PayFlex"), "an account-based health plan administrator with its HealthHub technology platform, became a wholly owned subsidiary of Aetna." *Id.* ¶ 53.

On July 10, 2015, AlexSam allegedly sent a letter to PayFlex "informing them that 'at least the following products require a license under the '608 Patent: HSA Visa Debit Card.'" *Id.* ¶ 54 (citing Pl.'s Ex. F, ECF No. 57-6 (Dec. 6, 2019) ("2015 Notice Letter to PayFlex")). Aetna allegedly "offers the PayFlex Card through its subsidiary, PayFlex[.]" *Id.* ¶ 55.

On or about February 2012, Aetna and Mastercard allegedly "announced their agreement for MasterCard to be 'the preferred payment brand for Aetna's card services' for FSA, HSA, HRA and other prepaid stored value cards." *Id.* ¶ 57 (citation omitted).

On July 15, 2012, Aetna's in-house counsel allegedly responded to both notice letters stating, "We anticipate that it will take several weeks to complete our review and will provide you with our response as soon as it is complete." *Id.* ¶ 58 (quoting Pl.'s Ex. H, ECF No. 57-8 (Dec. 6, 2019) ("Aetna's July 2015 Reply")). AlexSam alleges that "no further response was ever received, and Aetna continued to offer its infringing products." *Id.* ¶ 59.

AlexSam alleges that "Aetna now seeks to be covered by the License Agreement between AlexSam and MasterCard[,]" *id.* ¶ 63, but that "[a]t no time prior to this case has Aetna ever claimed to be licensed for the '608 Patent under the MasterCard Agreement or any other agreement," *id.* ¶ 64.

**3. The License Agreement Between AlexSam and MasterCard**

On or about June 20005, "AlexSam and MasterCard [allegedly] entered into a License Agreement which included . . . a license to AlexSam's Patents and included MasterCard's obligation to pay royalties for certain Licenseed Transactions that utilize the MasterCard network and/or brand . . . ." *Id.* ¶ 67. Under this agreement, "MasterCard [allegedly] agreed to pay royalties for Licensed Transactions." *Id.* ¶ 68. "MasterCard [allegedly] failed to pay royalties to AlexSam for many years and has never paid any royalties to AlexSam for transactions initiated by any of Aetna's Accused Products." *Id.* ¶ 69. Nor has MasterCard ever paid "any royalties to AlexSam related in any way to Aetna and/or its products." *Id.* ¶ 70.

Under the Agreement, MasterCard allegedly is required "to pay royalties for Licensed Transactions for the 'entire value chain,' which is described in the Licensing Agreement as covering MasterCard's commercial partners." *Id.* ¶ 71. It also allegedly "requires MasterCard to pay royalties based on certain transactions, not the cards or accounts, that use the MasterCard network or brand." *Id.* ¶ 72. Lastly, the Agreement allegedly "does not cover end-users, such as

Aetna's customers/cardholders, and for this reason, AlexSam has entered into numerous license agreements with parties who offer for sale or sell a card product using a system involving the MasterCard network and they were not deemed sublicensed under the MasterCard Agreement." *Id.* ¶ 73.

Third parties, like Aetna, allegedly "have attempted to jump under the cover[age] of the MasterCard Agreement." *Id.* ¶ 79. AlexSam alleges that while "MasterCard [has] never [ ] acknowledged any sublicenses under the MasterCard Agreement, several third parties have claimed to be sublicensed." *Id.* ¶ 80.

#### 4. MasterCard License Litigation

On May 14, 2015, AlexSam "filed a [c]omplaint against MasterCard asserting a claim of breach of contract." *Id.* ¶ 76. That litigation is still pending in the Eastern District of New York. *Id.* ¶ 77. There, MasterCard has allegedly "claimed that the MasterCard Agreement is narrow and has never acknowledged that third-party activities are covered, which would include Aetna's Accused Products in this case[,] . . . [and] MasterCard has argued that the License Agreement has terminated early." *Id.* ¶ 78 (citing Pl.'s Exs. J & K, ECF Nos. 57-10–57-11 (Dec. 6, 2019)). AlexSam alleges that MasterCard has breached the Agreement "in many ways" and "[f]or years," by "its failure to pay royalties, comply with an audit request and other acts of breach." *Id.* ¶ 74. MasterCard allegedly "failed to remedy its breach of the MasterCard Agreement, refused to pay all outstanding royalties owed, and continued to intentionally breach the MasterCard Agreement." *Id.* ¶ 75.

Because of the limited interpretation of the scope of the Agreement MasterCard takes in that litigation, AlexSam allegedly "has been forced to litigate the interpretation of the MasterCard Agreement with several parties outside of the MasterCard Litigation and without

MasterCard's participation." *Id.* ¶ 81. "AlexSam and MasterCard disagree on the scope of the MasterCard Agreement and its interpretation." *Id.* ¶ 82.

AlexSam allegedly "has [ ] been forced to defend itself against claims by certain licensee[]s, . . . claiming unjust enrichment related to royalty payments made to AlexSam when it asserted that it was sublicensed under the MasterCard Agreement." *Id.* ¶ 84. These licensees include Green Dot Corporation and WEX Health. *Id.*[3]

**5. Sublicensee Litigation**

In 2007, AlexSam sued IDT Corporation ("IDT") for infringement of its '608 Patents. *Id.* ¶ 99. Ultimately, this litigation allegedly "resulted in a finding of validity of the claims asserted in that case, a finding of non-infringement related to certain accused products, and a finding that other accused products using the MasterCard network were sublicensed under the MasterCard Agreement, despite MasterCard never having paid any royalties for these IDT transactions." *Id.* ¶ 100.

This litigation allegedly "resulted in a portion of the damages awarded to AlexSam being subtracted to account for the Court's finding that certain transactions associated with IDT's SafeNet system should be covered by MasterCard." *Id.* ¶ 101. Despite this finding, "MasterCard [allegedly] has never paid AlexSam any royalties for any IDT Licensed Transactions." *Id.* ¶ 102.[4] AlexSam alleges Aetna's offering of VISA products or its license defense is not dispositive of the infringement of Claims 32 or 33 of the '608 Patent. *Id.* ¶ 104. Here, Claims 32

---

[3] AlexSam also notes previous litigation against IDT Corporation in 2007. SAC ¶ 85. "[T]he Federal Circuit determined that certain transactions using the MasterCard network were covered by the MasterCard Agreement." *Id.* MasterCard allegedly "has refused to acknowledge or accept that such IDT transactions are Licensed Transactions under the MasterCard Agreement and has therefore never paid royalties for nay IDT transactions." *Id.*

[4] The Federal Circuit affirmed the Eastern District of Texas's ruling allegedly "finding that, under the plain terms of the MasterCard Agreement, any activation transaction covered by the AlexSam Patents and taking place over the MasterCard network was automatically deemed sublicensed, regardless of whether MasterCard made royalty payments for the transactions." *Id.* at ¶ 103.

and 33 of the '608 Patent allegedly "as asserted . . . are directed to medical cards and do not require an activation transaction as other claims in the '608 Patent, such as Claims 57 and 58 that were asserted against IDT." *Id.* ¶ 105.

In 2015, AlexSam sued Green Dot Corporation ("Green Dot"), "alleging breach of the parties' license agreement." *Id.* ¶ 94. Green Dot alleged "that it was covered by the MasterCard License." *Id.* ¶ 95. MasterCard was not brought in as a party nor did the court resolve "whether Green Dot was, in fact, sublicensed." *Id.* ¶ 96. AlexSam alleges that it "was forced to litigate the scope of the MasterCard Agreement and defend against a party's sublicense claim without the benefit of having MasterCard participate in the process and/or having taken a position as to cover of Green Dot's products and services." *Id.* ¶ 97. This case settled, and allegedly "MasterCard was specifically carved out of any relief as a result of the parties' resolution." *Id.* ¶ 98.

In 2017, WEX Health sued AlexSam. *Id.* ¶ 86. WEX Health was represented by Aetna's counsel in this action. *Id.* ¶ 87. While WEX Health allegedly claimed to be a sublicensee under the MasterCard License, "MasterCard was never brought in as a third party." *Id.* ¶ 88-89. Allegedly, "[a]t no time during the WEX Litigation did AlexSam ever concede and/or agree that any of WEX Health's accused products were covered by the MasterCard License and AlexSam never agreed that WEX Health was sublicensed under the MasterCard License or any other license." *Id.* ¶ 93. This case settled. *Id.* ¶ 92.

**6. Aetna's Alleged Infringement**

AlexSam alleges that Aetna infringes on Claims 32 and 33 of the '608 Patent "because it ships, distributes, makes, uses, imports, offers for sale, sells, and/or advertises the Accused Products that operate on the VISA Network" "by providing a multifunction card system, containing at least one debit/medical services card." *Id.* ¶¶ 107–08. Furthermore, the alleged

VISA products "have a Bank Identification Number (‘BIN’) approved by the American Banking Association” and allow Aetna “to properly route payment transactions within a banking network.” *Id.* ¶ 108.

Aetna’s “VISA Accused Products are [allegedly] available to individuals participating in healthcare benefits program[s] located in [Connecticut] and through the United States.” *Id.* AlexSam also alleges that Aetna “owns, operates, or leases all equipment in the infringing system, or alternatively exercises discretion and control over the operation of all equipment in the infringing system in order to provide the benefit of debit/medical services cards to its customers.” *Id.* ¶ 109. The alleged use of the infringing networks, making and configuration of the systems, and sale of products generated through the systems infringes on either or both Claim 32 and 33. *Id.* ¶ 111.

Aetna allegedly “undertook and continues its infringing actions despite an objectively high likelihood that such activities infringed one or more of the Asserted Claims[.]” *Id.* ¶ 112. Aetna further allegedly “has intentionally induced and continues to induce infringement of the Asserted Claims and has committed contributory infringement . . . , by providing the hardware and/or software necessary for its customers to make or use the infringing multifunction card system.” *Id.* ¶ 115. By providing the Processing Hub which is capable of “authorizing, approving, and declining payments at healthcare providers and pharmacies for eligible services, goods, and prescriptions[,]” Aetna allegedly contributes to the infringement of Claims 32 or 33. *Id.* ¶ 118. Aetna allegedly continues to receive “revenue from the provision of, sale and use of the VISA Accused Products.” *Id.* ¶ 116.

At least as of June 2015 and if not earlier, Aetna allegedly "knew of the '608 Patent and performed acts that it knew, or should have known, induced and/or contributed to the direct infringement of the Asserted Claims by its customers, providers, and/or retailers." *Id.* ¶ 122.

With respect to Claim 33, AlexSam alleges that Aetna's MasterCard Accused Product infringes on Claim 33 "by providing a multifunction card system, containing at least one debit/medical services card." *Id.* ¶ 128. Aetna allegedly "owns, operates, or leases all equipment in the infringing system, or alternatively exercises discretion and control over the operation of all equipment in the infringing system in order to provide the benefit of debit/medical services cards to its customers." *Id.* ¶ 129.

In AlexSam's view, it is highly likely Aetna knew by June 2015, if not earlier, "that its actions [allegedly] constituted and continue to constitute infringement of claims of the '608 Patent and that the '608 Patent is valid." *Id.* ¶ 132. Aetna's infringement allegedly continues "by providing the hardware and/or software necessary for its customers to make or use the infringing multifunction card system." *Id.* ¶ 135. Aetna allegedly "has specifically intended its customers to use the MasterCard Accused Products in its infringing systems in such a way that infringes Claim 33 by, at a minimum, providing and supporting the MasterCard Accused Products and instructing its customers on how to use them in an infringing manner[.]" *Id.* ¶ 136.

AlexSam alleges that Aetna "knew or should know that [using the Processing Hub computers for use in the infringing systems] contribute[s] to its customers' infringement of Claim 33[,]" *id.* ¶ 138, and that Aetna "knew that its actions . . . would induce, have induced, and will continue to induce infringement by its customers by continuing to sell, support, and instruct its customers on using the MasterCard Accused Products," *id.* ¶ 140. For example, "providing the POS devices and bank Processing Hub computers which are capable of initiating the

activation and loyalty point crediting processes" that then causes the retailers' infringement of Claim 33. *Id.* ¶ 141.

**B. Procedural History**

On June 28, 2019, AlexSam filed a Complaint for patent infringement against Aetna Inc. Compl., ECF No. 1 (June 28, 2019).

On October 4, 2019, AlexSam filed an Amended Complaint. Am. Compl., ECF No. 27 (Oct. 4, 2019).

On November 18, 2019, Aetna moved to dismiss the Amended Complaint. First Mot. to Dismiss, ECF No. 47 (Nov. 18, 2019).

On December 6, 2019, AlexSam filed a Second Amended Complaint. Second Am. Compl., ECF No. 57 (Dec. 6, 2019) ("SAC").

On January 10, 2020, Aetna moved to dismiss the Second Amended Complaint. Second Mot. to Dismiss, ECF No. 65 (Jan. 10, 2020) ("Def.'s Mot."); *see also* Mem. in Supp. of Mot. to Dismiss, ECF No. 66 (Jan. 10, 2020) ("Def.'s Mem."); Exs. A–Q, ECF Nos. 66-1–66-17 (Jan. 10, 2020).

On February 3, 2020, AlexSam filed an emergency motion to stay proceedings pending a determination by the judicial panel on multidistrict litigation. Emergency Mot., ECF No. 67 (Feb. 3, 2020).

On February 4, 2020, the Court granted AlexSam's emergency motion for a stay in proceedings. Order, ECF No. 68 (Feb. 4, 2020).

On February 4, 2020, Aetna filed a response to AlexSam's emergency motion and filed an emergency motion to vacate the order's previous grant of a stay. Resp., ECF No. 70 (Feb. 4,

2020); Emergency Mot. to Vacate, ECF No. 69 (Feb. 4, 2020). AlexSam filed a memorandum in opposition to Aetna's motion to vacate. Pl.'s Opp'n Mem., ECF No. 71 (Feb. 4, 2020).

On April 9, 2020, the Court partially lifted the stay to allow counsel to complete the briefing schedule for the pending motion to dismiss. Order, ECF No. 74 (Apr. 9, 2020).

On April 30, 2020, AlexSam filed a response to the motion to dismiss. Mem. in Opp'n, ECF No. 77 (Apr. 30, 2020) ("Pl.'s Opp'n").

On May 14, 2020, Aetna filed a reply. Def. Reply, ECF No. 80 (May 14, 2020).

On August 17, 2020, Aetna filed a notice of supplemental authority in support of its motion to dismiss the Second Amended Complaint. Notice, ECF No. 91 (Aug. 17, 2020).

On August 25, 2020, the Court held a telephonic motion hearing. Minute Entry, ECF No. 94 (August 25, 2020).

## II. STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "two working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted) (alteration in original)).

Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

## III. DISCUSSION

The Court first will consider the claims against Aetna related to the MasterCard Networks, and then move to the claims against Aetna related to the Visa Networks. Finally, the Court will consider AlexSam's request for declaratory judgment.

### A. The Alleged Patent Infringement on the MasterCard Networks

"A patent grants its owner the right to exclude others from making, using, or selling the patented invention." *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, 72 F.3d 872, 878 (Fed. Cir. 1995) (citing 35 U.S.C. § 154 (1988)). The right to exclude may be waived, in part or totally, "by granting a license, which may be express or implied." *Id.* (citation omitted). Either an express or implied license is a defense to patent infringement. *Id.*

#### 1. Express License

Aetna first argues that "Alex[S]am cannot state an actionable claim for patent infringement with respect to the PayFlex MasterCard card because the [AlexSam-MasterCard Patent License Agreement ("AMPL")] expressly covers any alleged infringement of Claim 33 of the '608 Patent involving the MasterCard network." Def.'s Mem. at 15. This is because "Aetna['s] [ ] alleged commercial relationship with Mastercard and its alleged use of the MasterCard network" fell under the MasterCard sublicense agreement "to the extent [Aetna] practiced Claim 33 of the '608 patent with respect to the PayFlex MasterCard card." *Id.* at 16.

Aetna cites to prior Federal Circuit decisions that "affirmed that the AMPL sublicenses each participant in the 'entire value chain' of a Licensed Transaction[,]" *id.* (citing *AlexSam, Inc.*, 715 F.3d at 1346) and a pending case in the Eastern District of New York, Mem. & Order, 1:15-cv-02799-ILG-SMG, ECF No. 226, at 2–3 (Sept. 226, 2019). Under either the Eastern District of New York's or the Federal Circuit's interpretation, "Aetna Inc. would have been part of the 'entire value chain,' and thus a sublicensee under the express AMPL," making it "not plausible that Aetna Inc. could have infringed Claim 33 with the PayFlex MasterCard and not have been licensed under the AMPL." Def.'s Mem. at 17 (emphasis omitted).

AlexSam responds that "Aetna's argument that its MasterCard Accused Products are covered completely by the MasterCard Agreement is" incorrect and premature. Pl.'s Opp'n at 11. There are unanswered threshold questions that must be answered: (1) when did the MasterCard Agreement terminate?; (2) is Aetna a sublicensee under the MasterCard Agreement?; and (3) If Aetna is a sublicensee, then what is the scope of its coverage? AlexSam argues that the date of termination of the agreement is relevant because Aetna may "be liable for infringement for its MasterCard Accused Products from at least the date of termination until the patents expired," a point supported by litigation over MasterCard's alleged failure to make royalty payments. *Id.* at 11–12. Without establishing if Aetna was an express sublicensee, AlexSam argues that it cannot be determined whether Aetna was covered under the agreement or infringed the agreement. *Id.* at 12–13. Finally, "there are numerous factual issues surrounding the scope of coverage, if any, provided to Aetna by the MasterCard Agreement." *Id.* at 14.

AlexSam argues further that, contrary to Aetna's argument, Aetna can infringe if not sublicensed "because it does not meet another requirement to be a Licensed Transaction." *Id.* at 15. In its view, whatever the coverage of the MasterCard Agreement, "Claim 33 of the '608 Patent is not included because, infringement of Claim 33 excludes the use of the MasterCard network and/or brand, which is a requirement to be a Licensed Transaction under the MasterCard agreement." *Id.* at 21–22. Specifically, AlexSam argues that there "is simply no use of the MasterCard network and/or brand to conduct this eligibility check in Claim 33 using the number assigned by Aetna, not MasterCard," meaning "Aetna's MasterCard Accused Products do not meet the requirements to be a Licensed Transaction under the MasterCard Agreement." *Id.* at 17.

Finally, AlexSam argues that whether the MasterCard Agreement is unambiguous is still at issue. *Id.* They contend that resolving this ambiguity on a motion to dismiss is improper. *Id.* at 18.[5]

Aetna replies that a previous court has "held that the AMPL is unambiguous and cover[s] the entire value chain." Def. Reply at 2. Aetna argues that the Second Amended Complaint is judged on the adequacy of its factual allegation, not these hypothetical questions raised by AlexSam. Aetna continues that the notice letters only refer to Visa and, in its view, "is a tacit admission that MasterCard cards were licensed (express or implied), and that Aetna Inc. is a third-party beneficiary." *Id.* at 3.

With respect to Claim 33, Aetna argues that either "(1) the MasterCard Accused Products do not practice Claim 33, or (2) the MasterCard Accused Products use the MasterCard network, and Aetna Inc. is therefore licensed as part of the entire value chain." *Id.* at 3. "Aetna Inc. cannot practice Claim 33 without necessarily practicing all the elements of Claim 32 because Claim 33 depends from Claim 32[,]" meaning "if Aetna Inc. is using the MasterCard network to practice Claim 32, it must still be using the MasterCard network when it practices the additional element of Claim 33." *Id.* at 4. Aetna also notes that AlexSam previously admitted "that Claim 33 is asserted against MasterCard in its license dispute." *Id.* Finally, Aetna concludes that "AlexSam's current position is contradicted by AlexSam's successful argument before the Patent Trial and Appeal Board that it is not possible for a MasterCard product to infringe Claim 33 outside the protection of the AMPL." *Id.*

The Court agrees.

---

[5] AlexSam also notes that "[r]egardless of whether Aetna is a sublicensee for any Licensed Transactions, which AlexSam contends it is not, AlexSam has no affirmative obligation to plead facts negating Aetna's expected (not yet pled) affirmative defense based on the MasterCard Agreement." Pl.'s Opp'n at 17.

The Agreement between AlexSam and MasterCard defines "Licensed Transaction" as follows:

> 1.3 Licensed Transaction. The phrase "Licensed Transaction" means each process of activating or adding value to an account or subaccount which is associated with a transaction that utilizes MasterCard's network or brands wherein data is transmitted between POI Device and MasterCard's financial network or reversing such process, provided that such process is covered by one of the Licensed Patents. Such Licensed Transaction includes the entire value chain and all parts of the transaction and may involve other parties including but not limited to: issuing banks, acquiring banks, processors, merchants, card vendors and third party marketing firms. To the extent that these other parties participate in a Licensed Transaction, they will also be licensed under this Agreement, but only to the extent of such parties' participation in a Licensed Transaction.

Pl.'s Ex. I, ECF No. 57-9 at P.02 (Dec. 6, 2019) ("AMPL" or "MasterCard Agreement"). MasterCard retained the right to grant sub-licenses. *Id.* at P.03; *see id.* ("Unless otherwise sublicensed as permitted hereunder, all Licensed Transactions shall be deemed sublicensed under an implied sublicense granted hereunder to all participating parties.").

Upholding a district court ruling, the Federal Circuit determined "that under the plain terms of [the] agreement, any activation transaction covered . . . and taking place over the MasterCard network was automatically 'deemed sublicensed,' without regard to the intent of either Alexsam or MasterCard regarding that particular transaction." *Alexsam, Inc. v. IDT Corp.*, 715 F.3d 1336, 1346 (Fed. Cir. 2013). That same reasoning should apply here.

Although the case in *IDT Corp.* involved activation transactions, those transactions are similar to these Claims. *See id.* at 1339 (quoting Claim 57 from the '608 Patent; "A multifunction card system comprising: a. at least one card having a unique identification number encoded on it, . . . b. a transaction processor *receiving card activation data from an unmodified existing standard retail point-of-sale device*, . . . c. a processing hub receiving directly or

indirectly said activation data from said transaction processor; and d. said processing hub activating an account . . . .” (emphasis in original)). Indeed, Claim 32 contains some of the exact language as Claim 57.

As a result, any transaction covered by Claim 32 or 33 “taking place over the MasterCard network [would be] automatically ‘deemed sublicensed,’ without regard to the intent of either Alex[S]am or Mastercard regarding that particular transaction.” *Id.* at 1346. Because the phrase “value chain” incorporates these transactions, they fall within the scope of a sublicense.

AlexSam argues that “MasterCard [has] never acknowledge[d] any sublicenses under the MasterCard Agreement,” SAC ¶ 80; and that “[a]t no time prior to this case has Aetna ever claimed to be licensed for the ‘608 Patent under the MasterCard Agreement or any other agreement,” *id.* ¶ 64. But any previous claim is not relevant to the licensing inquiry or whether the transactions fall under the AMPL.

Under the plain language of the AMPL, the relevant transactions on multifunction cards provided by Aetna fall within the scope of a sublicensing agreement with MasterCard, and nothing in AlexSam’s Second Amended Complaint requires a different result. To the extent a “real possibility” exists “that Aetna *does* infringe, . . . but Aetna is not sublicensed for this conduct because it does not meet another requirement to be a Licensed Transaction[,]” Pl.’s Opp’n at 15, AlexSam’s “real possibility” argument fails. As discussed further below, the U.S. Supreme Court’s decisions in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) govern. As a result, AlexSam must plead “more than a sheer possibility that [Aetna] has acted unlawfully.” *Iqbal*, 556 U.S. at 678.

Indeed, “[w]here a complaint pleads facts that are merely consistent with a defendant’s liability, it stops short of the line between possibility and plausibility of entitlement to relief.” *Id.*

(citations and internal quotation marks omitted). Having raised nothing more than the "real possibility" of infringement, AlexSam's Second Amended Complaint does "not permit the court to infer more than the mere possibility of misconduct, [thus] the complaint has alleged – but it has not show[n] – that the pleader is entitled to relief." *Id.* at 679 (citations and internal quotation marks omitted) (second alteration in original).

Accordingly, the motion to dismiss will be granted on the express license issue.

**2. Implied License**

"In patent law, an implied license merely signifies a patentee's waiver of the statutory right to exclude others from making, using, or selling the patented invention." *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1580 (Fed. Cir. 1997); *see also Zenith Elecs. Corp. v. PDI Commc'n Sys., Inc.*, 522 F.3d 1348, 1360 (Fed. Cir. 2008) ("The implied license defense is typically presented 'when a patentee or its licensee sells an article and the question is whether the sale carries with it a license to engage in conduct that would infirnge the patent owner's rights.'" (quoting *Jacobs v. Nintendo of Am., Inc.*, 370 F.3d 1097, 1100 (Fed. Cir. 2004)). "[I]mplied licenses arise by acquiescence, by conduct, by equitable estoppel (estoppel in pais), or by legal estoppel." *Wang Labs., Inc.*, 103 F.3d at 1580 (citation omitted).

To establish an implied license (1) "the product sold by the patentee or its licensee 'must have no noninfringing uses'" and (2) "the circumstances of sale must 'plainly indicate that the grant of an implied license should be inferred." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 99 F.3d 1160 (Table), at *2 (Fed. Cir. 1996) (quoting *Met-Coil Sys. Corp. v. Korners Unlimited, Inc.*, 803 F.2d 684, 686 (Fed. Cir. 1984)).

"The 'noninfringing use' doctrine applies when a patentee or its licensee sells an article and the question is whether the sale carries with it a license to engage in conduct that would

infringe the patent owner's rights." *Jacobs*, 370 F.3d at 1100. In this context, "absent an express agreement between the parties, determining whether the sale conveys with it the implied right to use the article in an infringing manner may depend on whether there is any noninfringing use for the article." *Id.*

Aetna argues that, even if no express license was present, "Aetna Inc. would benefit from an implied license" in so far as "it practices Claim 33 with respect to PayFlex MasterCard cards." Def. Mem. at 18. In Aetna's view, "the AMPL 'goes much further' and is intended to grant protection to MasterCard's customers." *Id.* at 19 (citing *Jacobs*, 370 F.3d at 1101–02).[6]

In discussing direct infringement, AlexSam argues that "while Aetna may very well be a commercial partner in the 'entire value chain' its infringing conduct under Claim 33 does not satisfy the definition of a Licensed Transaction, . . . and therefore no sublicense, implied or expressed, would apply." Pl.'s Opp'n at 15.

The Court disagrees.

Because the Court already has determined that an express license existed for the PayFlex Accused Products, and that is the only Accused Product covered by an implied license, the Court need not reach the issue of whether there is an implied license.

[6] Aetna also argues that "Alexsam's actions demonstrated its understanding that the PayFlex MasterCard card was a licensed product to the extent it practiced any claims of the '608 patent" and that it was not until October, 4 2019, after amending its Complaint in this case, that the MasterCard multifunction card systems were infringing upon Claims 32 and 33. *Id.* at 20. The AMPL "contains a broad license and sublicense grant that, . . . cover 'all transactions for basically all cards other than credits[,]" meaning that "either the PayFlex MasterCard card did not practice Claim 33, and therefore there was no infringement; or this card practiced Claim 33, and therefore it was a licensed product and there was no infringement." *Id.* at 21.

**B. Patent Infringement on The Visa Network**

Before addressing the alleged patent infringement claims with respect to Aetna on the Visa Network, two underlying principles are worth noting.

First, the Court considers the '608 Patent to be a system patent, based on the language of the patent itself. '608 Patent; *see id.* at A-4 ("The present invention relates generally to debit card systems, both bank-issued and non bank-issued, and more particularly to a multifunction card system that can be accessed by a variety of standard point-of-sale devices, by phone, by fax, or over the Internet."); *see also Centillion Data Sys., LLC v. Qwest Commc'ns In'tl, Inc.*, 631 F.3d 1279, 1284 (Fed. Cir. 2011) (a claimed system "is the place at which the system as a whole is put into service, *i.e.*, the place where control of the system is exercised and beneficial use of the system obtained" (quoting *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1316–17 (Fed. Cir. 2005), *abrogated on other grounds by* IRIS Corp. v. Japan Airlines Corp., 769 F.3d 1359 (Fed. Cir. 2014))).

Second, before December 1, 2015, Form 18 under Rule 84 of the Federal Rules of Civil Procedure governed pleading in patent infringement cases. After this date, amendments to the Federal Rules of Civil Procedure changed the pleading standard, and the applicable law makes clear that patent infringement claims, just like any other claim brought in federal court, are governed by the standard set forth in the Supreme Court's decisions in *Iqbal* and *Twombly. See Lyda v. CBS Corp.*, 838 F.3d 1331, 1337 n.2 (Fed. Cir. 2016) ("The Appendix of Forms, including Form 18, and Federal Rule of Civil Procedure 84, which provides that the forms 'suffice under these rules,' were both eliminated from the Federal Rules of Civil Procedure following changes that took effect on December 1, 2015."); *see id.* (even though the amended

complaint was filed in 2014, Form 18 did not apply to claim for joint patent infringement and so *Iqbal*/*Twombly* was the appropriate pleading standard to apply).

**1. Direct Infringement**

35 U.S.C. § 271(a) provides "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent therefor, infringes the patent." "Under this form of liability, a defendant's mental state is irrelevant. Direct infringement is a strict-liability offense." *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1926 (2015); *see also Applera Corp. v. MJ Research Inc.*, 305 F. Supp. 2d 170, 172 (D. Conn. 2004) ("Determining patent infringement requires determining whether someone (1) without authority (2) makes, uses, offers to sell, sells, or imports (3) the patented invention (4) within the United States, its territories, or its possession (5) during the term of the patent." (citations omitted)).

"Direct infringement can be found when a defendant makes a product containing 'each and every limitation set forth in claim.'" *Centrak, Inc. v. Sonitor Techs., Inc.*, 915 F.3d 1360, 1371 (Fed. Cir. 2019) (quoting *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005)). The patentee bears the burden of "prov[ing] infringement by a preponderance of the evidence." *Amstar Corp. v. Envirotech Corp.*, 823 F.2d 1538, 1545 (Fed. Cir. 1987).

**i. Single-Party Direct Infringement**

"[F]or a party to be liable for direct patent infringement under 35 U.S.C. § 271(a), that party must commit all the acts necessary to infringe the patent, either personally or vicariously." *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1362 (Fed. Cir. 2013). The "single actor" rule finds "[d]irect infringement under § 271(a) occurs where all steps of a

claimed method are performed by or attributable to a single entity." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015) ("*Akamai V*").

Aetna argues that AlexSam appears to bring a claim for joint infringement, Def.'s Mem. at 25, but that it fails to state a claim for either single-party direct infringement or divided direct infringement. *Id.* at 26, 28. With respect to single-party direct infringement, Aetna contends that the "boilerplate allegations" here are the same as in AlexSam's two prior Complaints, the "Second Amended Complaint contains conclusory allegations about 'loyalty point crediting processes' as factual infringement of Claims 32 or 33," and that AlexSam fails to "allege facts showing that Aetna Inc., standing alone, made, used, sold, or offered for sale the 'multifunction card system' of Claims 32 and 33." *Id.* at 26–27.[7]

Furthermore, in its view, the "Accused Visa Products are debit cards that access certain types of financial accounts," like HSAs, FSAs, and HRAs, but these "financial accounts are distinct from the health insurance plans offered by an Aetna entity identified in the exhibits to the [Second Amended Complaint]." *Id.* at 28. They conclude that the Second Amended Complaint does not provide "a plausible basis to believe that Aetna Inc. made, used, sold or offered for sale a 'multifunction card system' that met all of the limitations of Claim 32 or Claim 33 or the '608 patent." *Id.*

AlexSam responds[8] that Aetna's arguments "are premised on the wrong line of cases[,]" as those cases rely on method claims and system claims. Pl.'s Opp'n at 25–26. AlexSam

---

[7] Aetna also notes that the Accused Visa Products attached to the Second Amended Complaint are immaterial to the lawsuit as the "'608 Patent does not claim a health insurance plan" and "a health insurance plan [is not] an element of the 'multifunction card system' claimed in the asserted claims of the '608 Patent." Def.'s Mem. at 27.

[8] AlexSam does not separate its argument by single-party direct infringement or divided direct infringement, but argues that it "has plausibly alleged [both] direct single actor and vicarious liability for Aetna." Pl.'s Opp'n at 29. The Court will summarize AlexSam's argument in Section B.2.i only, and then proceed to analyze both theories of infringement in the applicable section.

continues that the "Second Amended Complaint identifies the exact VISA Accused Products, including relevant pictorial representations of the products from Aetna's website and marketing materials, that are accused of infringing AlexSam's patent, and AlexSam explains exactly how the VISA Accused Products are used to meet the core limitations of these two claims (Claim 32 and 33) of the '608 Patent." *Id.* at 27 (citing SAC ¶¶ 6–8). AlexSam contends that their allegations "are sufficient to put Aetna on notice of [the infringement claims] . . . . and the grounds upon which the claims rest." *Id.* at 27–28.

In its view, the Second Amended Complaint also "clearly defines the Visa Accused Products" and "articulates each element of Claim 32 and 33 as they apply to each of the Accused Products." *Id.* at 28. AlexSam alleges "that Aetna directly infringes because it makes or uses the VISA Accused Products[,]" and to the extent Aetna employees use the offered HSA, HRA, and FSA products "it is plausible that Aetna employees use the debit/medical services cards offered by Aetna, which constitutes infringement." *Id.* AlexSam believes it has "plausibly demonstrate[d] that Aetna directs and controls how and where the customers can use the card, subject to its terms and conditions and federal regulations" and that "Aetna directs and controls various financial institutions . . . *via* its control of MasterCard." *Id.* at 29 (emphasis in original).

Aetna replies that "Alex[S]am has not given adequate notice of its infringement theories." Def.'s Reply at 5. Aetna argues that the Federal Circuit's decision in *Disc Disease Sols., Inc. v. VGH Sols., Inc.*, 888 F.3d 1256 (Fed. Cir. 2018) has not changed *Twombly*'s pleading standards and that unlike the technology at issue in that case—a back-brace—AlexSam's use of a picture does not capture the "multifunction card system—claimed to include an unmodified point of sale device, a banking network, a processing hub, and the ability to access multiple databases . . . ." *Id.*

Aetna further argues that "Alex[S]am has identified the four Visa products that it contends are part of an allegedly infringing system, but it has failed to plead facts plausibly demonstrating that *Aetna Inc.* is responsible." *Id.* at 6 (emphasis in original). In its view, "Alex[S]am offers only conclusory assertions that Aetna Inc. *presently* makes or uses the accused products to allege *past* infringement." *Id.* at 6 (emphases in original).

The Court agrees.

AlexSam has alleged that this Court has jurisdiction, SAC ¶¶ 7–9, that AlexSam owns the rights to the '608 Patent, *id.* ¶ 3, and has demanded damages, *id.* ¶ 154. AlexSam, however, has not plausibly alleged that Aetna has infringed by making, selling, or using the '608 Patent. *See id.* ¶ 50 (naming the Visa Debit FSA, HSA, and HRA Cards as infringing products); ¶¶ 108–09 ("Defendant's VISA Accused Products infringe the Asserted Claims by providing a multifunction card system, containing at least one debit/medical services card. . . . Defendant owns, operates, or leases all equipment in the infringing system, or alternatively exercises direction and control over the operation of all equipment in the infringing system in order to provide the benefit of debit/medical services cards to its customers."); ¶ 128 ("MasterCard Accused Products infringe Claim 33 by providing a multifunction card system, containing at least one debit/medical services card."); ¶ 130 ("Defendant employs staff . . . to operate the Processing Hub in order to interface with, install, configure, manage, monitor, test, and control the debit/medical services cards and other equipment in the infringing multifunction card system.").[9]

[9] The Court notes that the cases AlexSam relies on for pleading standards are unhelpful in this case. They either deal with the production, or "make," prong of Section 271(a), *Lifetime Indus. Inc. v. Trim-Lock Inc.*, 869 F.3d 1372 (Fed. Cir. 2017); method claims, *Nalco Co v. Chem-Mod, LLC*, 883 F.3d 1337 (Fed. Cir. 2018), or simple technologies, *Disc Disease Sols. Inc.*, 888 F.3d 1256—none of which are relevant to this case.

AlexSam's claim thus rests largely on Aetna selling allegedly infringing products and administering information technology support to third-party users, their customers, and then generating revenue for Aetna. SAC ¶¶ 1, 32, 50, 73, 107, 111, 113, 116, 118, 127, 131, 133, 135–36, 138. Aetna may provide the physical cards and technical support, but the ultimate user, the user allegedly causing the infringement, is a third-party customer.

In a systems claim, infringement is assumed "by the sale of a system." *Omega Patents, LLC v. CalAmp Corp.*, 920 F.3d 1337, 1345 (Fed. Cir. 2019). The question then becomes, "whether 'all of the elements of the claim . . . [are] present in the accused system[s]' allegedly sold." *Id.* (alterations in original). AlexSam has alleged the sale of its system, but its Second Amended Complaint is vague or conclusory and does not link Aetna's actions to allegedly infringing conduct.

AlexSam's allegations do not state "more than a sheer possibility that [Aetna] has acted unlawfully." *Iqbal*, 556 U.S. at 678. AlexSam does not articulate exactly how Aetna's use is infringing, beyond its provisions of hardware and use of the Processing Hub. AlexSam appears to conflate the health insurance plans offered by Aetna with the alleged "multifunction card system." While AlexSam argues that its Second Amended Complaint "includes preliminary infringement contention-level detail," the Second Amended Complaint lacks this specificity.

Indeed, the Second Amended Complaint lacks precise and clear detail as to any allegedly infringing conduct and instead relies on broad, speculative generalizations. *See, e.g.*, SAC ¶ 108 ("Defendant's VISA Accused Products infringe the Asserted Claims by providing a multifunction card system, containing at least one debit/medical services card."); ¶ 111 ("By using the infringing networks, making and configuring the systems, and selling products generated through the use of the systems, Defendant has directly infringed one or both of the

Asserted Claims.”); ¶ 121 (“Acts by Defendant that contribute to the infringement of these retailers include providing the POS devices and bank Processing Hub computers which are capable of initiating the activation and loyalty point crediting processes.”); ¶ 130 (“Defendant employs staff . . . to operate the Processing Hub in order to interface with, install, configured, manage, monitor, test, and control the debit/medical services cards and other equipment in the infringing multifunction card system.”). It is also unclear how these cards would operate without the assistance of Visa (or MasterCard, if not covered by the licensing agreement)—neither of which is a defendant in this case—or the other subsidiary companies that also provide or offer these products. AlexSam thus has only pled facts “that are ‘merely consistent with’ a defendant’s liability, [and accordingly, its claims] ‘stop[] short of the line between possibility and plausibility of entitlement to relief.’” *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

Accordingly, Aetna’s motion to dismiss on the grounds of single-party direct infringement will be granted.[10]

**ii. Divided Direct Infringement**

“Where more than one actor is involved in practicing the [infringing] steps, a court must determine whether the acts of one are attributable to the other such that a single entity is responsible for the infringement.” *Akamai V*, 797 F.3d at 1022. A single entity may be responsible “(1) where that entity directs or controls others’ performance, and (2) where the actors form a joint enterprise.” *Id*. “*Akamai* ‘broaden[ed] the circumstances in which others’ acts may be attributed to an accused infringer to support direct-infringement liability for divided infringement, relaxing the together constraints on such attribution reflected in [the Federal

[10] Because the Court finds that AlexSam has not alleged single-party direct infringement, the Court will not consider whether AlexSam’s 2015 letters provided sufficient notice of infringement.

Circuit's] earlier precedents." *Nalco Co. v. Chem-Mod, LLC.*, 883 F.3d 1337, 1351 (Fed. Cir. 2018) (quoting *Travel Sentry, Inc. v. Tropp*, 877 F.3d 1370, 1381 (Fed. Cir. 2017)).[11] "[A]llegations of joint infringement require elements beyond those for the more typical act of direct infringement to which Form 18 is directed[,]" and so are governed by the pleading standard of *Iqbal* and *Twombly*, rather than Form 18. *Lyda*, 838 F.3d at 1339.[12]

Aetna argues that AlexSam also fails to state a claim for divided direct infringement. Def.'s Mem. at 28. In its view, AlexSam's Complaint lacks any "plausible allegations that can give rise to a theory of vicarious liability for direct infringement by 'acts through an agent (applying traditional agency principles) or contracts with' a third party 'to perform one or more steps' of a patent." *Id.* (quoting *Akamai*, 797 F.3d at 1023). Specifically, AlexSam fails to "identify which steps a third party performed or name the third parties that were allegedly involved." *Id.* at 28–29. "Nor has AlexSam alleged that Aetna Inc. somehow 'conditions

---

[11] AlexSam suggests that *Centillion* and *Lyda* demand a different outcome than *Akamai*. While the two lines of cases distinguish method and system claims, the Court finds *Centillion* to be narrower than AlexSam would suggest—mainly, that infringing "use" of a system claim under Section 271(a) includes a "customer [who] puts the system as a whole into service, *i.e.*, controls the system and obtains benefit from it." *Centillion*, 631 F.3d at 1285; *see id.* (the customer can cause "the system as a whole to perform this processing and obtain[ ] the benefit of the result, [accordingly] the customer has 'used' the system under § 271(a)."). After considering infringing use, the analysis then ends. Consequently, a customer's use does not implicate the defendant processor. *See id.* ("It makes no difference that the back-end processing is physically possessed by [defendant]. The customer is a single 'user' of the system and because there is a single user, there is no need for the vicarious liability analysis from *BMC* or *Cross Medical*."). Furthermore, the similarity between systems and method claims also suggests that the pleading standards of *Akamai* would be relevant to systems claims. *See Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1341 (Fed. Cir. 2013) (noting "system claims [ ] closely track method claims and are grounded by the same meaningful limitations [and] will generally rise and fall together. . . . [S]ystem claim[s] essentially implement[ ] the process of the method claim on a general purpose computer").

[12] Despite AlexSam's arguments to the contrary, the Federal Circuit's decision in *Disc Disease* did not change the pleading standard. The court in *Disc Disease* reversed a dismissal where plaintiff sufficiently pleaded factual allegations "under the plausibility standard of *Iqbal/Twombly*" where the underlying technology was simple and the asserted patents "consist[ed] of only four independent claims." *Disc Disease*, 888 F.3d at 1260. The complaint also "specifically identified the three accused products—by name and by attaching photos of the product packaging as exhibits—and alleged that the accused products meet 'each and every element of at least one" of the claims. *Id.* The Federal Circuit has since stated that *Disc Disease* did not result in a lesser pleading standard, just that, in the facts of that case and the allegations made, the plausibility standard required by *Iqbal* and *Twombly* were met. *Artrip v. Ball Corp.*, 735 F. App'x 708, 714 (Fed. Cir. 2018) (summarizing the plausibility standard and noting that the court "applied these requirements in *Disc Disease*.").

participation in an activity or receipt of a benefit upon performance [of the patent] and establishes the manner or timing of that performance.'" *Id.* at 29 (quoting *Akamai Techs., Inc.*, 797 F.3d at 1023).

To the extent "AlexSam contends a third party directly infringed based on a divided infringement theory, . . . . it has neither identified nor alleged that any third party directed or controlled each of the entities, including Aetna Inc., that allegedly provided the different elements of these claims." *Id.* at 35. Similarly, Aetna argues that AlexSam has not "made a plausible factual allegation that Aetna Inc. knew that any alleged components are especially made or especially adapted for use in infringement." *Id.* (citing *In re Bill of Lading*, 681 F.3d at 1337).

In reply, Aetna argues that "[i]t is facially implausible that Aetna Inc. controls all banks and retailers, plus MasterCard and Visa," and accordingly, that the claim should be dismissed. Def.'s Reply at 7.

The Court agrees.

First, applying the definition of use established in *Centillion*, for Aetna to be liable, it would need to "put the claimed invention into service, *i.e.*, control the system and obtain benefit from it." *Centillion*, 631 F.3d at 1286. Or, put differently, "to prove an infringing 'use' of a system under § 271(a), a patentee must demonstrate 'use'—that is, 'control' and 'benefit'—of the claimed system by an accused direct infringer." *Intellectual Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320, 1328 (Fed. Cir. 2017).

"[T]o use a claimed system, what must be 'used' is each element." *Id.* at 1329 (citing *Centillion*, 631 F.3d at 1284). AlexSam may only establish "use" by Aetna "if [Aetna] is vicariously liable for the actions of its customers such that 'use' by the customers may be

attributed to [Aetna].” *Centillion*, 631 F.3d at 1286. AlexSam cannot establish such use. “In a situation where a ‘back-end system[]’ is used for processing certain data or information, the party collecting the information may still be said to be using the system because, ‘[i]f the user did not make the request, then the back-end processing would not be put into service,’ demonstrating ‘control’ of the system.” *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1239 (Fed. Cir.2017) (alterations in original) (quoting *Centillion*, 631 F.3d at 1285).

Significantly, while AlexSam argues that Aetna improperly relies on method claim caselaw, AlexSam relies on method claim caselaw to demonstrate, in contrast, that it has “plausibly demonstrate[d] that Aetna directs and controls how and where the customers can use the card, subject to . . . federal regulations[,] . . . . [and] directs and controls various financial institutions, . . . *via* its control of MasterCard.” Pl.’s Opp’n at 28–29 (comparing the Second Amended Complaint to *W. Express Bancshares, LLC v. Green Dot Corp.*, 2019 WL 4857330 (S.D.N.Y. Oct. 2, 2019)) (emphasis in original).[13]

Accordingly, because AlexSam does not allege how Aetna controls each element of its claim, Aetna’s motion to dismiss as to divided infringement will be granted.

**2. Indirect Infringement**

“Absent direct infringement, there can be neither contributory nor induced infringement.” *Everpure, Inc. v. Cuno, Inc.*, 705 F. Supp. 725, 732 (D. Conn. 1988). “To state a claim for indirect infringement, therefore, a plaintiff need not identify a *specific* direct infringer if it pleads facts sufficient to allow an inference that at least one direct infringer exists.” *In re Bill of Lading*, 681 F.3d at 1336 (emphasis in original).

[13] The decision in *W. Express* further suggests dismissal here is appropriate as AlexSam argues, only in vague and conclusory manner, that Aetna “directs or controls [ ] [another] entity whose involvement is essential for the claims’ steps.” 2019 WL 4857330, at *4.

Aetna begins by noting that either an induced infringement or contributory infringement by AlexSam must fail because "AlexSam does not plausibly allege *direct* infringement by a third party." Def.'s Mem. at 30 (emphasis in original). Specifically, "AlexSam does not plausibly allege that the holding company Aetna Inc. had customers, and AlexSam pleads no facts to show how customers who bought health insurance from Aetna Inc.'s subsidiaries might have, for example, used or sold a system that included an 'unmodified pre-existing standard point-of-sale device,' a 'transaction processor,' and a 'Processing Hub.'" *Id*. at 30–31. In its view, any letters sent by AlexSam "are inadequate to plausibly allege the requisite knowledge of infringement." *Id*. at 32.

AlexSam responds to Aetna's specific arguments regarding induced and contributory infringement, but the Court has already found AlexSam has failed to plead alleged direct infringement.

Accordingly, AlexSam's claims for indirect infringement cannot proceed and will be dismissed.

Even if AlexSam had adequately pleaded direct infringement, these claims still would be dismissed.

**i. Induced Infringement**

35 U.S.C. § 271(b) states: "Whoever actively induces infringement of a patent shall be liable as an infringer." This provision "requires knowledge that the induced acts constitute patent infringement." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011). Specifically, "that the alleged inducer knew of the patent, knowingly induced the infringing acts, and possessed a specific intent to encourage another's infringement of the patent." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1328 (Fed. Cir. 2009) (citing *DSU Med. Corp. v. JMS Co.*,

471 F.3d 1293, 1304 (Fed. Cir. 2006)); *see also Commil*, 135 S. Ct. at 1926 ("[L]iability for inducing infringement attaches only if the defendant knew of the patent and that 'the induced acts constitute patent infringement.'" (citation omitted)). "Intent can be shown by circumstantial evidence, but the mere knowledge of possible infringement will not suffice." *Vita-Mix Corp.*, 581 F.3d at 1328 (citing *DSU Med. Corp.*, 471 F.3d at 1305–06)). "[L]iability for induced infringement under § 271(b) 'must be predicated on direct infringement.'" *Eli Lilly and Co. v. Teva Parenteral Meds. Inc.*, 845 F.3d 1357, 1363–64 (Fed. Cir. 2017) (quoting *Limelight Networks, Inc. v. Akamai Techs., Inc.* 572 U.S. 9155, 920 (2014)).

Aetna argues that (1) "there are no plausible allegations that a third-party has infringed Claims 32 or 33"; (2) "there are no factual allegations to show that Aetna Inc. knew that the acts of any third party would have infringed Claims 32 and 33 of the '608 Patent"; and (3) "AlexSam fails to plausibly allege that Aetna Inc. induced the allegedly infringing actions of a third-party." Def.'s Mem. at 31, 33.

AlexSam argues that, under the burdens imposed by existing caselaw, it has adequately "pled direct infringement and factual allegations supporting specific elements for induced and contributory infringement." Pl. 's Opp'n at 26. Specifically, "AlexSam plausibly alleged direct infringement by Aetna's 'customers,' Aetna's knowledge of the '608 Patent based on the 2015 Letter, and specific intent to infringe the patent under *Twombly/Iqbal*, thereby meeting the pleading standard for indirect infringement." *Id.* at 29. It alleged direct infringement by Aetna's customers, alleged Aetna's knowledge of the '608 Patent and Assorted Claims through the June 2015 letter, and "adequately pled specific intent." *Id.* at 30–31.

Aetna replies that "a patentee cannot rely on vague letters to allege the requisite knowledge, as AlexSam does." Def.'s Reply at 7. Aetna argues that "ÁlexSam does not plausibly

allege that Aetna Inc. provides specific instruction or encouragement to practice the 'system' of Claims 32 or 33" nor do their factual allegations "identify any particular statement or material that plausibly suggests Defendant[] intend to induce infringement". *Id.* at 7–8 (quoting *DoDots Licensing Sols. LLC v. Lenovo Holding Co.*, C.A. No. 18-098, 2018 WL 66229709, at *4–5 (D. Del. Dec. 19, 2018)).

The Court agrees.

Again, AlexSam has done nothing more than plead facts "that are 'merely consistent with' a defendant's liability, [and accordingly, its claims] 'stop[] short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557); *see Protegrity Corp. v. Paymetric, Inc.*, No. 3:13-CV-01549 (VLB), 2014 WL 3849972, at *4 (D. Conn. Aug. 5, 2014) (granting motion to dismiss where the complaint failed "to allege any facts regarding the customers, clients, or suppliers who [defendant] allegedly induced to infringe [plaintiff's] patents, and [was] devoid of a single fact to raise the reasonable inference that the [d]efendant knowingly induced infringement and possessed specific intent to encourage another's infringement").

Accordingly, the motion to dismiss as to induced infringement would have to be granted.

**ii. Contributory Infringement**

Contributory infringement exists "to protect patent rights from subversion by those who, without directly infringing the patent themselves, engage in acts designed to facilitate infringement by others." *Dawson Chem. Co. v. Rohm and Haas Co.*, 448 U.S. 176, 188 (1980). It is of particular importance "where enforcement against direct infringers would be difficult, and where the technicalities of patent law make it relatively easy to profit from another's invention without risking a charge of direct infringement." *Id.* (citation omitted). "Contributory

infringement occurs if a party sells or offers to sell, a material or apparatus for use in practicing a patented process, and that 'material or apparatus' is material to practicing the invention, has no substantial non-infringing uses, and is known by the party 'to be especially made or especially adapted for use in an infringement of such patent.'" *In re Bill of Lading*, 681 F.3d at 1337 (quoting 35 U.S.C. § 271(c)).

"To state a claim for contributory infringement, therefore, a plaintiff must, among other things, plead facts that allow an inference that the components sold or offered for sale have no substantial non-infringing uses." *Id.* (citation omitted). "[N]on-infringing uses are substantial when they are not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." *Vita-Mix Corp.*, 581 F.3d at 1327. "When the holder of a patent with system claims accuses a customer of direct infringement based on the customer's making, using, or selling of an allegedly infringing system in which a supplier's product functions as a material component, there may be an implicit assertion that the supplier has indirectly infringed the patent." *Arris Group, Inc. v. British Telecommunications PLC*, 639 F.3d 1368, 1376 (Fed. Cir. 2011).

Aetna characterizes AlexSam's claim for contributory infringement as "limited to the allegation that Aetna Inc. provided a 'processing hub' component, 'hardware and/or software,' and 'POS devices' for use in an infringing system." Def.'s Mem. at 34 (quoting SAC ¶¶ 115, 118, 121). In its view, "the conclusory allegations that *one* of these components, the processing hub, 'has no substantial non-infringing use'" fails under *Iqbal* and *Tombly*. *Id.* (quoting SAC ¶¶ 115, 118, 121). Furthermore, the Second Amended Complaint lacks "a plausible, factual allegation of infringement by a third party" and "fails to allege that any third party made, used, or sold the entire 'multifunction card system.'" *Id.* at 35.

AlexSam argues that it (1) "has plausibly and adequately pled direct infringement[,]" (2) "has pled Aetna's pre-suit knowledge of combination[,]" (3) "adequately alleged that the Processing Hub has no substantial non-infringing uses and is a material part of the invention." Pl.'s Opp'n at 32. Because it "is plausible that the software and hardware components of the Processing Hub are unique to the infringing functionality," AlexSam believes its Complaint "adequately support[s] claims of contributory infringement." *Id.* at 33.

Aetna reiterates that "AlexSam cannot state a claim for contributory infringement without alleging direct infringement." Def.'s Reply at 8. "While AlexSam argues that unspecified and unalleged 'software and hardware components are unique to the infringing functionality,' the test is whether there are no substantial non-infringing uses, and it is implausible that 'any computer' has no substantial non-infringing uses." *Id.* (quoting Pl.'s Opp'n at 33).

The Court agrees.

Because the Court has determined that AlexSam has not plausibly alleged Aetna's direct infringement, with respect to the claim of contributory infringement, AlexSam's claim fails. Moreover, as to contributory infringement specifically, once again, AlexSam has simply plead facts "that are 'merely consistent with' a defendant's liability, [and accordingly, its claims] 'stop[] short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557)

Accordingly, Aetna's motion to dismiss for contributory infringement would have to be granted.

**C. Claims for Alleged Acts of Subsidiaries**

A parent corporation may be liable for direct infringement under Section 271(a) by a subsidiary "if the evidence reveals circumstances justifying disregard of" the two entities "as

distinct, separate corporations." *A. Stucki Co. v. Worthington Indus., Inc.*, 849 F.2d 593, 596 (Fed. Cir. 1988). "[T]he plaintiff must show that the parent has a direct financial interest in the infringing activity, and that the parent has the right and ability to supervise the subsidiary, which is evidenced by some continuing connection between the two in regard to the infringing activity." *Broadvision Inc v. General Elec. Co.*, 2009 WL 1392059, at *4 (S.D.N.Y. May 5, 2009) (quoting *Banff Ltd. v. Limited, Inc.*, 869 F. Supp. 1103, 1110 (S.D.N.Y. 1994).

Aetna argues that "[t]here are no plausible allegations that would allow Alex[S]am to sue Aetna Inc. for the alleged acts of its (unidentified) subsidiaries here." Def.'s Mem. at 35. Aetna points to both the PayFlex MasterCard and subsidiaries tied to the Visa Accused products. *Id.* at 35–36; *see id.* at 36 ("Nor has Alex[S]am alleged facts that would lead to liability for Aetna Inc. for the alleged acts of subsidiaries that may be involved with the Visa Accused Products."). Aetna contends that all "claims [that] pertain to the acts of unnamed subsidiaries [ ] should therefore be dismissed with prejudice." *Id.*

AlexSam argues that "Aetna has independent liability for the acts of infringement alleged in the complaint." Pl.'s Opp'n at 33. AlexSam contends "that Aetna has 'alter ego' liability for the conduct of its subsidiaries, including PayFlex." *Id.* at 34. As an example, AlexSam explains that when it first "notified PayFlex that it was using AlexSam's patented technology and that it required a license. . . . Aetna deliberately inserted itself into the dispute and took complete control of and responsibility for its resolution." *Id.* at 34–35. AlexSam also notes that Aetna offers third-party access "to an infringing system utilizing cards with the Aetna brand and logo," infringes through the same way through its employees, and that use of "Aetna's cards to access the Aetna system" by customers infringes on AlexSam's patent. *Id.* at 35.

The Court disagrees.

AlexSam alleges that PayFlex is a "wholly owned subsidiary of Aetna" and that Aetna responded to the June 2015 Letter sent to PayFlex. SAC ¶¶ 53-54, 58. AlexSam fails to allege control or direction by Aetna which would warrant disregarding the corporate form. To the extent there are relevant to unnamed subsidiaries, the same analysis applies.

Accordingly, the motion to dismiss will be granted on this basis.

### D. Willful Infringement

35 U.S.C. § 284 allows a court to "increase the damages up to three times the amount found or assessed." "[S]uch enhanced damages are appropriate where a district court finds, in its discretion, the case before it to be an 'egregious case[ ] of misconduct beyond typical infringement.'" *Novartis Vaccines & Diagnostics, Inc. v. Regeneron Pharms., Inc.*, C.A. No. 18-cv-2434, 2018 WL 5282887, at *2 (S.D.N.Y. Oct. 24, 2018) (quoting *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1935 (2016)). "[C]ulpability is generally measured against the knowledge of the actor at the time of the challenged conduct." *Halo Elecs.*, 136 S. Ct. at 1933.

"The subjective willfulness of a patent infringer, intentional or knowing, may warrant enhanced damages, without regard to whether his infringement was objectively reckless." *Id.*; *see also WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1340 (Fed. Cir. 2016) ("[A]n infringer's subjective bad faith alone may support an award of enhanced damages." (citing *Halo Elecs.*, 136 S. Ct. at 1933)). Consequently, "the entire willfulness determination is to be decided by the jury." *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods.*, 879 F.3d 1332, 1353 (Fed. Cir. 2018); *see also Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*, 946 F.3d 1367, 1378 (Fed. Cir. 2020) ("Under *Halo*, the concept of 'willfullness' requires a jury to find no more than deliberate or intentional infringement. . . . The question of enhanced damages is addressed by the

court once an affirmative finding of willfulness has been made. It is at this second stage at which the considerations of egregious behavior and punishment are relevant." (citations omitted)).

Aetna argues that the Second Amended Complaint does not state a claim for willful infringement because (1) "Alex[S]am has not stated a plausible claim for either direct or indirect infringement against Aetna Inc., and thus a claim for willful infringement cannot stand" and (2) "Alex[S]am does not plead facts sufficient to show that Aetna Inc. had a subjective intent to infringe or committed an egregious act of infringement with respect to MasterCard or Visa cards." Def.'s Mem. at 36.

AlexSam argues that it has "plausibly and adequately pled direct and indirect infringement." Pl.'s Opp'n at 37. In its view, its previous letters to Aetna and Payflex identifying the '608 Patent and accused products "asserted that Aetna's products were using the technology covered by the '608 Patent without authorization." *Id.*

Aetna replies that caselaw has since developed and many courts have held "that allegations of knowledge alone are not sufficient to state a claim for willful infringement." Def.'s Reply at 9 (quoting Order on Mot. to Dismiss, *Document Sec. Sys., Inv. V. Nichia Corp.*, No. CV 19-098172 JVS (JEMx) at 4–5 (C.D. Cal. Mar. 4, 2020)). In its view, "AlexSam does not even allege garden-variety infringement, much less an 'egregious case[] of culpable behavior' to warrant damages." *Id.* at 10 (quoting *Halo*, 136 S. Ct. at 1926).

Because AlexSam's underlying infringement claims will be dismissed, its claim of willful infringement also must be dismissed. In any event, as it has throughout the Second Amended Complaint, AlexSam has plead facts "that are 'merely consistent with' a defendant's liability, [and accordingly, its claims] 'stop[] short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). On this claim,

AlexSam has failed "to plead either the necessary subjective intent of infringement or egregiousness." *Novartis Vaccines and Diagnostics Inc. v. Regeneron*, 18-cv-2434 (DLC), 2018 WL 5282887, at *3 (S.D.N.Y. October 24, 2018); *see also id.* ("Novartis peppers language that mirrors the standard for willful infringement throughout its [First Amended Complaint]. Novartis's references to these terms cannot alone state a claim for willful infringement.").

Accordingly, AlexSam's claim for willful infringement would have to be dismissed.

**E. Declaratory Judgment**

28 U.S.C. § 2201 provides that federal courts with jurisdiction over a case "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." "[A] district court possesses discretion in deciding whether to entertain a declaratory judgment action." *Gianni Sports Ltd. v. Metallica*, No. 00 Civ. 0937 (MBM), 2000 WL 1773511, at *4 (S.D.N.Y. Dec. 4, 2000) (citing *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995)).

The Declaratory Judgment Act, of course, is still limited by the other constraints of Article III jurisdiction: there must be a case or controversy that is justiciable. U.S. Const., Art. III § 2; *see also Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 406 (S.D.N.Y. 2002), *aff'd* 346 F.3d 357 (2d Cir. 2003) ("As a threshold issue, DJA actions are justiciable only in cases in which an 'actual controversy' exists. The relevant inquiry for this prerequisite is coextensive with the analysis applicable to the 'case or controversy' standard embodied in Article III of the United States Constitution.").

As part of this limitation, a court therefore must determine whether the declaratory judgment action is ripe for review. *See, e.g. Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 58 &

n.18 (1993) (noting that, because ripeness is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction" the court could raise it *sua sponte*). "The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree" and the courts have generally avoided drawing a bright line rule. *Md. Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

The Second Circuit requires that "[t]he standard for ripeness in a declaratory judgment action is that 'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 388 (92d Cir. 2005) (quoting *Md. Cas. Co.*, 312 U.S. at 273). District courts must ask: "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Id.* at 389.

Aetna argues that AlexSam's declaratory judgment claim is duplicative because (1) "it is duplicative of claims Alex[S]am has pursued in other courts" and "Alex[S]am's declaratory judgment claim is duplicative of the infringement claim that Alex[S]am is pursuing in this case." Def.'s Mem. at 22–23. Specifically, Aetna's liability for infringement of Claim 33 hinges on a factfinder's determination "both that Aetna Inc. practiced Claim 33 and that it was not licensed—leaving nothing more for the Court to declare." *Id.* at 23.

AlexSam argues that it has adequately pled its declaratory judgment claim. Pl.'s Opp'n at 20. AlexSam first notes that Aetna has no claims in this case and the declaratory judgment claim "is the *only* claim in this case currently addressing this issue; [and] Aetna has no asserted claims or affirmative defenses pending." *Id.* at 20–21 (emphasis in original). In its view, the claim is

ripe because "after a decision on the merits, the Parties will know whether Aetna is liable to AlexSam," *id.* at 22; the claim is not duplicative because "the scope of the MasterCard License is far from clearly determined, and whether it provides any coverage to Aetna for its MasterCard Accused Products is equally unclear," and because "Aetna's assertion of being licensed is only a defense to AlexSam's infringement claim, [and] is separate and distinct from the infringement claims," *id.* at 23. AlexSam argues that, ultimately, the declaratory judgment claim "will provide the answer to the question of whether Aetna is liable to AlexSam for its MasterCard Accused Products." *Id.* at 24.

Aetna replies that "'whether Aetna is liable to AlexSam for its MasterCard Accused Products'. . . . is already embedded in Count II of the [Second Amended Complaint], which alleges that Aetna Inc. practiced Claim 33 'without authority and/or license . . . . '" Def.'s Reply at 4 (quoting Pl.'s Opp'n at 24; SAC ¶ 143).

The Court agrees.

"To find a suit duplicative '[t]here must be the same parties, or at least, such as represent the same interests; there must be the same right asserted and the same relief do not significantly differ between the two actions." *Oliphant v. State of Conn. Dep't of Transp.*, 2004 WL 3249237, at *5 (D. Conn. Aug. 25, 2004) (quoting *Watson v.* Jones, 80 U.S. 679, 715 (1871) (alteration in original)). "For a second action to be duplicative, it is not necessary that the parties be identical." *Howard v. Klynveld Peat Marwick Goerdeler*, 977 F. Supp. 654, 664 (S.D.N.Y. 1997). AlexSam seeks declaratory judgment on claims and issues that will be resolved as this case proceeds.

Accordingly, the Court will dismiss AlexSam's declaratory judgment claims. *See U.S. Bank Nat'l Ass'n ex rel. Lima Acquisition LP v. PHL Variable Ins. Co.*, Nos. 12 Civ. 6811 (CM) (JC), 13 Civ. 1580 (CM) (JCF), 2014 WL 998358, at *5 (S.D.N.Y. Mar. 14, 2014) (dismissing a

claim of the implied covenant of good faith and fair dealing where the majority of the allegations were "duplicative of [a] breach of contract claim"); *Burgeson v. Downing*, 2009 WL 185593, at *1 (D. Conn. Jan. 22, 2009) ("Declaratory relief is not intended to provide plaintiff 'a second cause of action for the determination of identical issues.'" (quoting *In re MTBE Prods. Liab. Litig.*, 457 F. Supp. 2d 455, 466–67 (S.D.N.Y. 2006)); *cf. Myers Indus., Inc. v. Schoeller Arca Sys., Inc.*, 171 F. Supp. 3d 107, 124 (S.D.N.Y. 2016) ("In New York, duplicative claims arise from the same facts and allege the same damages." (citation omitted)).

**F. Leave to Amend**

Rule 15 of the Federal Rules of Civil Procedure provides that parties may either amend once as a matter of course or, once the period has elapsed, move for leave to file an amended complaint. Fed. R. Civ. P. 15(a). Parties who fail to file an amended complaint within 15(a)(1)'s time period, or who seek additional amendments, may seek the consent of their opposing party of the court's leave to amend. Fed. R. Civ. P. 15(a)(2). The "court should freely give leave when justice so requires." *Id.*

The decision to grant leave to amend under Fed. R. Civ. P. 15 is within the discretion of the court, but the court must give some "justifying reason" for denying leave. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Reasons for denying leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Id.*; *see also Lucente v. IBM Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (noting leave to amend may be denied when amendment is "unlikely to be productive," such as when an amendment is "futile" and "could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." (internal citations omitted)); *Park B. Smith, Inc. v.*

*CHF Indus. Inc.*, 811 F. Supp. 2d 766, 779 (S.D.N.Y. 2011) ("While mere delay, absent a showing of bad faith or undue prejudice, is not enough for a district court to deny leave to amend, the longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice." (internal quotation marks and citations omitted)).

At the same time, "[a]n amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Lucente*, 310 F.3d at 258; *see also Donovam v. Am. Skandia Life Assurance Corp.*, 217 F.R.D. 325, 325 (S.D.N.Y. 2003) ("Where a proposed amend complaint cannot itself survive a motion to dismiss, leave to amend would be futile and may clearly be denied."), *aff'd*, 96 F. App'x 779 (2d Cir. 2004). "A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint. To survive such a motion, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Protegrity Corp. v. AJB Software Design, Inc.*, No. 3:13-cv-01484, 2015 WL 461041, at *1 (D. Conn. Feb. 2, 2015) (citing *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted). While factual allegations are accepted as true, a complaint "must offer more than 'labels and conclusion[s],' or 'a formulaic recitation of the elements of a cause of action' or 'naked assertion[s]' devoid of 'further factual enhancement.'" *Bentley v. Greensky Trade Credit, LLC*, 156 F. Supp. 3d 274, 283 (D. Conn. 2015) (quoting *Twombly*, 550 U.S. at 55, 557) (second alteration in original).

"Dismissal with prejudice is a harsh sanction." *Igidi v. State of Conn. Dep't of Corr.*, No. 3:13-CV-1338 (RNC), 2015 WL 7428527, at *3 (D. Conn. Nov. 20, 2015); *cf. Neitzke v. Williams*, 490 U.S. 319, 328 (1989) ("When a complaint raises an arguable question of law which the district court ultimately finds is correctly resolved against the plaintiff, dismissal on Rule 12(b)(6) grounds is appropriate, but dismissal on the basis of frivolousness is not."); *Thrall*

*v. Central N. Y. Regional Transp. Auth.*, 399 F. App'x 663, 665 (2d Cir. 2010) ("Rule 41(b) dismissal [is] 'a harsh remedy to be utilized only in extreme situations.'" (alteration in original) (quoting *LeSane v. Hall's Sec. Analyst, Inc.*, 239 F.3d 206, 209 (2d Cir. 2001)).

Aetna argues that AlexSam has had "three chances to plead a claim for relief that is plausible on its face." Def.'s Mem. at 40. The Second Amended Complaint "repeat[s] verbatim many of the deficient allegations from its prior complaints." *Id.* Aetna argues, therefore, "[f]urther amendment would be futile, and the dismissal of the Second Amended Complaint should be with prejudice." *Id.* (citing *Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978)).

AlexSam responds that, should the Court conclude that it has failed to satisfy pleading standards, it "requests leave to amend its Complaint." Pl.'s Opp'n at 38. It argues that leave to amend would not be futile as any deficiencies could be remedied, *id.* at 39, and has attached a Third Amended Complaint. *Id.*

Aetna replies that "AlexSam should be precluded . . . from filing a Third Amended Complaint." Def.'s Reply at 10.

The Court disagrees.

Although AlexSam's voluminous filings have not amounted to viable claims, the Court has yet to conclude definitively that there would be futility, precluding the filing of one last amended pleading. Indeed, the mere filing of numerous complaints alone is not a basis for denying leave to amend. *Cf. Nalco Co.*, 883 F.3d at 1342 (reversing dismissal of Fourth Amended Complaint and remanding for further proceedings). To the extent that AlexSam can

remedy the deficiencies identified in this ruling, AlexSam may move for leave to file an amended pleading with any proposed amended pleading attached as an exhibit.[14]

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED**.

AlexSam may move for leave to file an amended pleading by **October 9, 2020**, to the extent the deficiencies identified in this ruling can be addressed**.**

**SO ORDERED** at Bridgeport, Connecticut, this 11th day of September, 2020.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE

[14] The Court, however, will grant Aetna's motion to strike the proposed Third Amended Complaint attached to one of AlexSam's filings in a separate ruling. That pleading lacks the benefit and guidance of this decision. *See Dietz v. Bouldin*, 136 S. Ct. 1885, 1892 (2016) ("[D]istrict courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases.").

**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ALEXSAM, INC.,<br>*Plaintiff,*<br><br>v.<br><br>AETNA, INC.,<br>*Defendant.* | No. 3:19-cv-01025 (VAB) |

**RULING AND ORDER ON PENDING MOTIONS**

AlexSam, Inc. ("Plaintiff" or "AlexSam") sued Aetna, Inc. ("Aetna" or "Defendant") for patent infringement related to Claims 32 and 33 of United States Patent Nos. 6,000,608 (the "'608 Patent"). Second Am. Compl., ECF No. 57 (Dec. 6, 2019). Aetna moved to dismiss the Second Amended Complaint. *See* Mot. to Dismiss, ECF No. 65 (Jan. 10, 2020).

On September 11, 2020, the Court granted Aetna's motion to dismiss and allowed AlexSam until October 9, 2020 to move for leave to file an amended pleading to the extent the deficiencies identified by the Court could be addressed. Ruling and Order on Mot. to Dismiss, ECF No. 96 (Sept. 11, 2020) ("Dismissal Order").

AlexSam now has moved for reconsideration of the Court's Dismissal Order. Notice of Mot. for Reconsideration of the Ct.'s Order Granting Def.'s Mot. to Dismiss, ECF No. 101 (Sept. 18, 2020) ("Mot. Reconsideration"). AlexSam also has moved to amend or correct the Complaint, Pl.'s Mot. for Leave to File a Third Am. Compl., ECF No. 104 (Oct. 9, 2020) ("Mot. Amend"), and has filed a supplement to the motion to amend, Suppl. to Pl.'s Mot. for Leave to File a Third Am. Compl., ECF No. 106 (Oct. 30, 2020) ("Suppl. Mot. Amend").[1] Finally,

[1] The Court construes the supplemental motion to amend as the proposed Third Amended Complaint, and therefore considers it alongside AlexSam's motion to amend.

AlexSam has moved the Court to take judicial notice of certain evidence relating to its motion for reconsideration. Pl.'s Req. for Judicial Notice in Supp. of its Mot. for Reconsideration, ECF No. 108 (Nov. 4, 2020) ("Mot. for Judicial Notice").

Aetna has opposed each of AlexSam's motions. *See* Def. Aetna Inc.'s Opp'n to Pl. AlexSam Inc.'s Mot. Seeking Reconsideration and Other Relief, ECF No. 103 (Oct. 9, 2020) ("Def. Opp'n Reconsideration"); Def. Aetna Inc's Opp'n to Pl. AlexSam, Inc.'s Mot. for Leave to File a Third Am. Compl., ECF No. 107 (Oct. 30, 2020) ("Def. Opp'n Amend"); Def. Aetna Inc.'s Opp'n to Pl. AlexSam, Inc.'s Req. for Judicial Notice in Supp. of its Mot. for Reconsideration, ECF No. 109 (Nov. 9, 2020) ("Def. Opp'n Notice").

AlexSam has replied to Aetna's opposition to its motion for reconsideration and motion to amend the Complaint. Pl.'s Reply in Supp. of Mot. for Reconsideration of the Ct.'s Order Granting Def.'s Mot. to Dismiss, ECF No. 105 (Oct. 23, 2020) ("Reconsideration Reply"); Pl.'s Reply in Further Supp. of Its Mot. for Leave to File a Third Am. Compl., ECF No. 110 (Nov. 13, 2020) ("Amend Reply").

Aetna also has moved to strike the exhibits to AlexSam's reply to Aetna's opposition to the motion to amend or, in the alternative, to file a sur-reply in opposition. Def. Aetna Inc.'s Mot. to Strike, or in the Alternative, for Permission to File a Sur-Reply in Opp'n to Pl. AlexSam Inc.'s Mot. for Leave to File a Third Am. Compl., ECF No. 111 (Nov. 18, 2020); Def. Aetna Inc.'s Mem. of L. in Supp. of its Mot. to Strike, or in the Alternative, for Permission to file a Sur-Reply in Opp'n to Pl. AlexSam Inc.'s Mot. for Leave to File a Third Am. Compl., ECF No. 112 (Nov. 18, 2020) ("Mot. Strike").

For the foregoing reasons, the Court will enter the following orders:

AlexSam's motion for reconsideration will be **DENIED**, and to the extent the motion set

forth a cognizable motion to amend, that motion will be **DENIED as moot** in light of AlexSam's later motion to amend;

AlexSam's motion for judicial notice will be **DENIED**;

AlexSam's motion for leave to amend will be **DENIED** without prejudice to renewal to the extent that AlexSam can file, by **August 20, 2021**, a motion to amend the Complaint that addresses the deficiencies in the Court's Dismissal Order and includes as an exhibit a proposed Third Amended Complaint;

AlexSam's supplemental motion for leave to amend will be **DENIED**; and

Aetna's motion to strike will be **DENIED** without prejudice to renewal.

## I. STANDARD OF REVIEW[2]

### a. Motion for Reconsideration

Under Federal Rule of Civil Procedure 59(e), a party may move to "alter or amend a judgment . . . no later than 29 days after the entry of judgment." Fed. R. Civ. P. 59(e). Courts consider a motion made under Rule 59(e) to be a motion for reconsideration. *See Krohn v. N.Y.C. Police Dep't*, 341 F.3d 177, 179 (2d Cir. 2003) (noting that a party timely filed for reconsideration under Fed. R. Civ. P. 59(e) and 60(b)).

"Reconsideration motions are 'a mechanism for extraordinary judicial relief invoked only if the moving party demonstrates exceptional circumstances.'" *Wachovia Mortg., FSB v. Toczek*, 841 F. App'x 267, 272 (2d Cir. 2021) (quoting *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008)). Indeed, "[t]he standard for granting [a motion for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be

[2] The Court assumes familiarity with the underlying factual and procedural background of this case, also recited in the Court's Dismissal Order.

expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995); *see also Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) ("The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." (internal quotation marks omitted)); D. Conn. L. Civ. R. 7(c) ("Motions for reconsideration shall not be routinely filed and shall satisfy the strict standard applicable to such motions. Such motions will generally be denied unless the movant can point to controlling decisions or data that the court overlooked in the initial decision or order"). "[A] motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." *Shrader*, 70 F.3d at 257.

"A motion for reconsideration is committed to the sound discretion of the court." *Nygren v. Greater N.Y. Mut. Ins. Co.*, No. 3:07-cv-462 (DJS), 2010 WL 3023892, at *2 (D. Conn. Aug. 2, 2010); *see also Lesch v. United States*, 372 F. App'x 182, 182 (2d Cir. 2010) ("The standard of review of a district court order granting or denying a motion for [reconsideration] is whether the order constituted an abuse of discretion." (citing *Devlin v. Transp. Commc'ns Int'l Union*, 175 F.3d 121, 132 (2d Cir. 1999))).

**b. Motion to Amend**

Under Federal Rule of Civil Procedure 15(a), "[a] party may amend its pleading once as a matter of course within: (A) 21 days after serving it; (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The Court should freely give leave when justice so requires." Fed.

R. Civ. P. 15(a)(2).

The district court has broad discretion to decide a motion to amend. *See Local 802, Assoc. Musicians of Greater N.Y. v. Parker Meridien Hotel*, 145 F.3d 85, 89 (2d Cir. 1998). If a court chooses to deny leave to amend, however, it must give some "justifying reason" for doing so. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Reasons for denying leave to amend include "undue delay, bad faith[,] or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Id.*; *see also Lucence v. Int'l Bus. Mach. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (leave to amend may be denied when amendment is "unlikely to be productive," such as when an amendment is "futile" and "could not withstand a motion to dismiss [under] Fed. R. Civ. P. 12(b)(6)").

But where a party seeks leave to amend after the deadline to amend pleadings has passed, the Court has greater discretion to deny leave to amend. *See Lyddy v. Bridgeport Bd. of Educ.*, No. 3:06-cv-1420 (AHN), 2008 WL 5117679, at *1 (D. Conn. Dec. 4, 2008) ("In other words, when the court issues a pretrial scheduling order [under] Fed. R. Civ. P. 16 that establishes a time table for amending pleadings, a plaintiff's ability to amend the complaint is governed by Rule 16, not Rule 15(a).") (citing *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007); *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000); *Carnrite v. Granada Hosp. Grp. Inc.*, 175 F.R.D. 439, 446 (W.D.N.Y. 1997)). In these cases, a moving party may be required to demonstrate that there is "good cause" both to amend the scheduling order and to amend their pleading. *See Parker*, 204 F.3d at 340 ("[D]espite the lenient standard of Rule 15(a), a district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good

cause."). "[A] finding of 'good cause' depends on the diligence of the moving party." *Id.*

In exercising their discretion under Rule 16(b), courts "also may consider other relevant factors including, in particular, whether allowing the amendment of the pleading at this stage of the litigation will prejudice defendants." *Kassner*, 496 F.3d at 243; *see also Lacher v. C.I.R.*, 32 F. App'x 600, 603 (2d Cir. 2002) (noting that undue prejudice to the opposing party is "typically the most important consideration in evaluating a motion to amend a pleading").

**c. Motion to Strike**

Under Federal Rule of Civil Procedure 12(f), the Court "may strike from a pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Resolution of a 12(f) motion is within the discretion of the district court, and such motions are generally disfavored and should be infrequently granted. *Tucker v. Am. Int'l Grp., Inc.*, 936 F. Supp. 2d 1, 15-16 (D. Conn. 2013). Indeed, the Second Circuit has long held that courts "should not tamper with the pleadings unless there is a strong reason for so doing." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976). Thus, the party moving to strike "bears a heavy burden" and ordinarily must show that "(1) no evidence in support of the allegations would be admissible; (2) the allegations have no bearing on the issues in the case; and (3) permitting the allegations to stand would result in prejudice to the movant." *Tucker*, 936 F. Supp. at 16.

## III. DISCUSSION

The Court will discuss the motion for reconsideration, the motion to amend, the motion for judicial notice, and the motion to strike in turn.

### A. The Motion for Reconsideration

AlexSam sets forth several primary arguments as to why the Court should reconsider its

Dismissal Order. *See* Mot. Reconsideration.

First, AlexSam argues that "[t]he Court's finding that the MasterCard Agreement provided coverage for Aetna's [allegedly] infringing activities is in error." *Id.* at 7 (emphasis omitted). In AlexSam's view, the Court's conclusion that the alleged acts of patent infringement fell within the scope of the MasterCard Agreement constitutes a "manifest error of law and fact." *Id.* (citing *MCI Healthcare, Inc. v. United Health Grp., Inc.*, No. 3:17-cv-01909 (KAD)). Specifically, AlexSam argues that "Aetna's accused products are not 'licensed transactions' under the MasterCard agreement," *id.* at 7-10 (emphasis omitted); that "whether the MasterCard agreement terminated early, as MasterCard contends, remains undecided," *id.* at 10-12 (emphasis omitted); and that "the Court improperly resolved factual issues, including a stated license defense, on a motion to dismiss," *id.* at 12-14.

Aetna argues that AlexSam has not set forth anything "that the Court overlooked – [t]he *sine qua non* of reconsideration," but instead is "trying to relitigate issues addressed in the briefing on the Motion to Dismiss, and the Court's [Dismissal] Order." Def. Opp'n Reconsideration at 4-5 (emphasis and citations omitted). Aetna argues further that "[t]he Court did not commit error, much less 'clear error,' in dismissing AlexSam's SAC [Second Amended Complaint," nor did the Dismissal Order "create 'manifest injustice'" such that reconsideration of this issue is warranted. *Id.*

The Court agrees.

As an initial matter, AlexSam's arguments as to whether Aetna's products are "licensed transactions" under the MasterCard Agreement, and that the MasterCard Agreement's termination date should be resolved before dismissal, already were raised in AlexSam's briefing opposing the motion to dismiss. *See, e.g.*, AlexSam, Inc.'s Opp'n to Def. Aetna Inc.'s Mot. to

Dismiss the Second Am. Compl., ECF No. 77, at 9-14 (Apr. 30, 2020) ("MTD Opp'n") (contending that Aetna's motion to dismiss was premature because "several threshold questions," including "when . . . the MasterCard Agreement terminate[d]," whether "Aetna [was] a sublicensee under the MasterCard Agreement," and the "scope of [the] coverage" "[i]f Aetna is a sublicensee," needed to be resolved through discovery). These arguments were fully considered by the Court in its order dismissing AlexSam's Second Amended Complaint. *See, e.g.*, Dismissal Order at 17 (referencing AlexSam's claims against Aetna related to the MasterCard networks, specifically AlexSam's argument that there are "unanswered threshold questions that must be answered," including "(1) when did the MasterCard Agreement terminate?; (2) is Aetna a sublicensee under the MasterCard Agreement? and (3) [i]f Aetna is a sublicensee, then what is the scope of its coverage?"); *id.* (referencing AlexSam's claim that "Aetna's argument that its MasterCard Accused Products are covered completely by the MasterCard Agreement is incorrect and premature"); *id.* (referencing AlexSam's claim that "Aetna's MasterCard Accused Products do not meet the requirements to be a Licensed Transaction under the MasterCard Agreement"); *id.* at 20 (determining that any transaction covered by Claim 32 or 33 "taking place over the MasterCard network" would be "automatically 'deemed sublicensed,'" and "[b]ecause the phrase 'value chain' incorporates these transactions, they fall within the scope of a sublicense").

AlexSam attempts to revive its argument that "Aetna's accused products are not 'licensed transactions' under the MasterCard Agreement," Mot. Reconsideration at 8 (emphasis omitted), by referring the Court to Paragraph 1.3 of the MasterCard Agreement and quoting select portions of the Court's hearing on the motion to dismiss, specifically a statement from Aetna's counsel summarizing the Complaint and a statement from AlexSam's counsel contending that the definition of a "licensed transaction" could not extend to the card at issue in this matter. *Id.* at 9-

10. None of this allegedly additional support, however, represents a "controlling decision[] or data" that the Court overlooked, *Shrader*, 70 F.3d at 257; or an "intervening change of controlling law[] [or] the availability of new evidence," *Virgin Atl. Airways, Ltd.*, 956 F.2d at 1255, that would warrant reconsideration.

To the extent AlexSam argues that the Court's decision that the alleged acts of patent infringement fall within the scope of the MasterCard Agreement is factual or legal error, based on the additional support it provides, any such potential error is not so "clear," nor potential injustice so "manifest," to compel the Court to reconsider its conclusion as to this issue in its order of dismissal. *See id.*; *see also Talyosef*, 2020 WL 3064229, at *3 ("In the context of a motion for reconsideration, 'manifest injustice' is defined as an error committed by the trial court that is direct, obvious, and observable." (quoting *Corpac v. Rubin & Rothman, LLC*, 10 F. Supp. 3d 349, 354 (E.D.N.Y. 2013)); *Corsair Special Situations Fund, L.P. v. Nat'l Res.*, 595 F. App'x 40, 44 (2d Cir. 2014) ("The manifest injustice standard is, by definition, deferential to district courts and provide[s] relief only in the proverbial rare case.")).

Moreover, even if this Court construes AlexSam's arguments on reconsideration as in some way distinct from the arguments raised by AlexSam in its motion to dismiss briefing, AlexSam has offered "no reason for [its] failure to raise the[se] arguments," and "a judgment in a civil case does not constitute 'manifest injustice' where the movant's arguments for relief were available to the [party]" and the party "proffer[s] no reason for [its] failure to raise" them. *Mirlis v. Greer*, No. 3:18-cv-2082 (MPS), 2021 WL 1711649, at *3 (D. Conn. Apr. 30, 2021) (citing *In re Johns-Manville Corp.*, 759 F.3d 206, 219 (2d Cir. 2014)) (second and fifth alterations in original) (internal quotation marks omitted); *see also Corsair Special Situations Fund, L.P.*, 595 F. App'x at 44 ("Where a party with all the necessary time and resources fails to raise an obvious

challenge to a writ of garnishment, we do not find the imposition of a higher monetary judgment than the party deems appropriate to constitute a 'manifest injustice.'"); *Mirlis*, 2021 WL 1711649, at *3 (denying motion for reconsideration where the party attempted to "offer evidence that was indisputably available to her during the litigation" and did not "demonstrate[] that the [evidence] w[as] unavailable to her" or "that she could not have obtained the documents before judgment entered").

AlexSam's argument that the Court's failure to "resolve the threshold issue of whether the MasterCard Agreement is valid and enforceable, including whether any license coverage could apply for the entire damages period" constitutes "manifest injustice" fails for similar reasons. Mot. Reconsideration at 11-12. The Court considered this argument in the Dismissal Order, noting AlexSam's contention that the termination date of the MasterCard Agreement had not been decided, *see* Dismissal Order at 17, but nonetheless concluding that "the relevant transactions on multifunction cards provided by Aetna fall within the scope of a sublicensing agreement with MasterCard, and nothing in AlexSam's Second Amended Complaint requires a different result," *id.* at 20. And while AlexSam argues that "the issue of whether Aetna's accused products are 'Licensed Transactions' is irrelevant if the MasterCard Agreement was terminated during the period of enforceability of the AlexSam Patents," Mot. Reconsideration at 11, and suggests that "it is manifestly unjust for the Court to not resolve the threshold issue of whether the MasterCard Agreement is valid and enforceable," this conclusory statement, without more, does not represent an argument that would "reasonably be expected to alter the conclusion reached by the [C]ourt," *Shrader*, 70 F.3d at 257.

AlexSam's attempted resuscitation of each of these previously-raised arguments, already addressed by the Court, is best viewed as a second bite at the apple, an attempt to "relitigate an

issue already decided."[3] *Id.* And where "the moving party seeks solely to relitigate an issue already decided, the court should deny the motion for reconsideration and adhere to its prior decision." *Morneau v. Connecticut*, 605 F. Supp. 2d 372, 373 (D. Conn. 2009); *see also 4 Pillar Dynasty LLC v. New York & Co., Inc.*, 933 F.3d 202, 216 (2d Cir. 2019) ("A Rule 59(e) motion 'may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.'").

As to AlexSam's argument that the Court "improperly resolved factual issues, including a stated license defense, on a motion to dismiss," Mot. Reconsideration at 12 (emphasis omitted), this too fails. AlexSam primarily relies on a handful of district court cases from across the country to argue that resolution of issues pertaining to express and implied licenses, is "procedurally [im]proper at this time, and . . . requires resolution of fundamental" questions of fact. Mot. Reconsideration at 13-14 (collecting cases). In AlexSam's view, "[w]hether the license agreement at issue is express or implied, the issue is still premature at the motion to dismiss stage." *Id.* at 13.

As an initial matter, while AlexSam argues that "Aetna did not cite any authority for the proposition that a court can resolve the issue of an express or implied license on a motion to dismiss," *id.* at 12, AlexSam fails to note that it, too, had an opportunity to argue in opposition to the motion to dismiss that any issues as to express and implied licenses, both of which were raised by Aetna, were procedurally improper at the motion to dismiss stage. AlexSam, in fact, raised this argument in similar form in its opposition to the motion to dismiss:

[3] Because the Court finds that reconsideration is not warranted on this basis, it need not, and does not, address Aetna's argument as to AlexSam's treatment of the alleged 2007 amendment of Section 1.3 of the MasterCard Agreement. *See* Def. Opp'n Reconsideration at 4-5. The Court, however, reminds the parties that though it will give "the benefit of the doubt in this instance," "candor in [the] briefs" is essential, and the parties are "cautioned to exercise great[] care to ensure that [their] briefs accurately set forth the relevant facts going forward." *Morales v. Berryhill*, No. 3:17-cv-0927 (MPS), 2018 WL 3748159, at *5 (D. Conn. Aug. 7, 2018).

> **<u>Aetna's Arguments Related To The MasterCard Agreement Are Procedurally Premature.</u>**
>
> Under the Iqbal/Twombly standard, the Court should accept all of Plaintiff's allegations as true. Here, AlexSam has alleged that Aetna is operating and committing acts of infringement without a license. *See* Dkt. No. 57. Regardless of whether Aetna is a sublicensee for any Licensed Transactions, which AlexSam contends it is not, AlexSam has no affirmative obligation to plead facts negating Aetna's expected (not yet pled) affirmative defense based on the MasterCard Agreement. *See Construction Cost Data, LLC v. Gordian Grp., Inc.*, No. 4:16-cv-114, 2017 WL 2266993, *6 (S.D. Tex. Apr. 24, 2017), *adopted*, 2017 WL 2271491 (May 22, 2017); *see also Perlman v. Bank of Am., N.A.*, 561 Fed.Appx. 810, 813 (11th Cir. 2014) ("As a general matter, a plaintiff is 'not required to negate an affirmative defense in [a] complaint.'"). However, as AlexSam's operative complaint makes clear, Aetna is not covered under the MasterCard Agreement, and thus, Aetna is liable for the MasterCard Accused Products. *See* Dkt. No. 57. Therefore, Aetna's Motion should be denied, and discovery should be allowed.

MTD Opp'n at 17, and the Court explicitly referenced this argument in its order of dismissal, *see* Dismissal Order at 18 ("Finally, AlexSam argues that whether the MasterCard agreement is unambiguous is still at issue. They contend that resolving this ambiguity on a motion to dismiss is improper."); *id.* at 18 n.5 ("AlexSam also notes that '[r]egardless of whether Aetna is a sublicensee for any Licensed Transactions, which AlexSam contends it is not, AlexSam has no affirmative obligation to plead facts negating Aetna's expected (not yet pled) affirmative defense based on the MasterCard Agreement.'"). Therefore, to the extent AlexSam's argument on reconsideration can be construed as the same argument is already has raised to the Court regarding the alleged procedural impropriety of the Court's findings as to express and implied licenses, AlexSam again has offered "no reason for [its] failure to" cite its newly-added case law in its motion to dismiss briefing.[4] *See In re Johns-Manville Corp.*, 759 F.3d at 219.

---

[4] To the extent AlexSam argues that Aetna – not AlexSam – carries the burden of proving the applicability of its license defense, *see* Mot. Reconsideration at 12-13, this does not permit AlexSam to abdicate its responsibility to rebut Aetna's arguments or provide sufficient support for its arguments at every stage of briefing. In relevant part,

On reconsideration, AlexSam revives – and expands – its argument to licensing issues more broadly, suggesting that "[c]ourts routinely deny a defendant's motion to dismiss . . . based on a license defense because it is procedurally improper." Mot. Reconsideration at 12-13. But allowing AlexSam to present this argument now contravenes the purpose of the strict standard applicable to motions for reconsideration. *See Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) (a motion for reconsideration is "not a vehicle for . . . presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple'"); *see also Universitas Educ., LLC v. T.D. Bank*, No. 15-CV-5643 (SAS), 2016 WL 80210, at *1-2 (S.D.N.Y. Jan. 5, 2016) (noting that a motion for reconsideration is not "an opportunity for making new arguments that could have been previously advanced" and finding as untimely an argument raised for the first time in a motion for reconsideration (internal quotation marks and citations omitted)). In any event, all but one of AlexSam's cited cases were available to AlexSam at the time of its briefing on the motion to dismiss, *see* Mot. Reconsideration at 12-15, and AlexSam has offered no reason for its failure to raise them to the Court earlier in the proceedings.

Moreover, even if the Court were to consider AlexSam's cited cases on the merits, they do not amount to "controlling decisions or data" the Court overlooked, or compel the Court to conclude that its treatment of the licensing issue constitutes "manifest injustice" to AlexSam. As a threshold matter, none of these cases are controlling either in general on this Court or specifically for the proposition that arguments as to licensure could not be resolved on a motion

the inquiry on a motion for reconsideration is whether the parties had an opportunity to raise arguments, or present evidence, before the challenged judgment was rendered. *See 4 Pillar Dynasty LLC*, 933 F.3d at 216 ("A Rule 59(e) motion 'may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.'"). AlexSam has shown no reason for why, given its earlier assertion that arguments as to the MasterCard Agreement were "procedurally improper," it could not have provided as support the cases it now provides on reconsideration in that briefing.

to dismiss. *See* Mot. Reconsideration at 12-13. On a closer look, however, these cases also largely are distinguishable on the facts.

For example, in *Panagene, Incorporated v. Bio-Synthesis, Incorporated*, the Eastern District of Texas considered the defendant's arguments that the plaintiffs' claims should be dismissed because they were "barred by a covenant not to sue that resulted from the settlement of an earlier action." No. 2:14-CV34-JRG-RSP, 2015 U.S. Dist. LEXIS 41208, at *2 (E.D. Tex. Mar. 11, 2015). The court did not categorically rule that any challenge based on the covenant was premature, but instead specifically analyzed the plaintiffs' response and the defendant's reply, which "set[] forth a number of positions challenging" the plaintiffs' claims to ultimately conclude that "all of the[se] positions require[d] factual and legal analysis that extends far beyond the face of the pleadings and documents referenced therein." *Id.*

Similarly, in *Luminex Corporation v. Diatherix Laboratories, Incorporated*, the Northern District of Alabama considered the defendants' argument that even if the plaintiffs' patents were not exhausted, they had an "express license" to use certain of Luminex's products. No. 5:13-cv-2054, 2015 WL 12803776, at *8 (N.D. Ala. Sept. 8, 2015). The court in *Luminex*, like the court in *Panagene*, also did not conclude as a general matter that any and all license defenses were premature at the motion to dismiss stage, but specifically analyzed the pleadings to conclude that "[w]hen considered in the light most favorable to the plaintiff, . . . neither the allegations contained in the complaint nor the product documentation attached to the defendants' brief establish that Diatherix had a license to use Luminex's patents for commercial use." *Id.* The court in *Luminex*, in fact, specifically evaluated the terms of the Luminex product's documentation, as well as the license agreement, and concluded "[b]ecause the [relevant] language . . . is ambiguous, it does not support Defendants' motion to dismiss Luminex's patent

infringement claims on the grounds that Diatherix had a license to use the Luminex instrument." *Id.* at *9; *see also id.* ("The Court finds that the language in the product documentation accompanying the instrument and the beads is ambiguous as to the scope of the license granted to Diatherix. Accordingly, the Court denies the defendants' motion to dismiss . . . . on the basis that Diatherix had a license to use the technology."). Similarly, in *MLR, LLC v. Motorola, Incorporated*, No. 2:08-cv-00357, 2008 U.S. Dist. LEXIS 135181, at *8 (E.D. Va. Dec. 15, 2008) the Court concluded that there was a "genuine dispute concerning the proper interpretation" of relevant terms in the license agreement, and found it it "[t]herefore . . . possible that [the plaintiff]'s interpretation of the definition . . . is the correct interpretation."[5]

These cases, therefore, do not stand for the proposition that the Court was not permitted to consider Aetna's arguments as to licensure at this stage of the proceedings.[6] Instead, they support the familiar proposition, stated by the Court in its Dismissal Order, that the Court should view the allegations in the light most favorable to the plaintiff and draw all inferences in the plaintiff's favor, *see Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013), but a plaintiff also must plead "more than a sheer possibility that [a defendant] has acted unlawfully,"

---

[5] The Court is unclear as to AlexSam's intent in citing to *Stanley Works Israel Limited v. 500 Group, Incorporated*, 332 F. Supp. 3d 488, 500-01 (D. Conn. Aug. 1, 2018), a case that discusses ambiguity in contract terms. *See* Mot. Reconsideration at 13. The case, however, reinforces the proposition that a court may, "[a]t the motion to dismiss stage, . . . dismiss a breach of contract claim," but may do so "only if the terms of the contract are unambiguous." *Stanley Works Israel Ltd.*, 332 F. Supp. 3d at 501. Moreover, to the extent AlexSam wishes to revive the issue of ambiguity, this already was raised at the motion to dismiss stage. *See* MTD Opp'n at 17-18.

[6] In *Bayer Cropscience AG v. Dow Agrosciences LLC*, 288 F.R.D. 84 (D. Del. 2012), also cited by AlexSam, the District of Delaware considered the defendants' argument that "its actions in connection with" the use of the plaintiff's technology were "validly licensed, and therefore, it [could not] infringe [the plaintiff]'s patents," and concluded, without an analysis of the contents of the relevant licensure agreement, that the argument was "a factual defense, . . . not an attack on the pleadings," and therefore was "misplaced within the context of a 12(b)(6) motion." *Id.* at 86. To the extent that the *Bayer* court's brief analysis supports AlexSam's contention that resolution of the licensing issue in this matter "is not procedurally proper at this time," Mot. Reconsideration at 14, it does notoutweigh binding precedent on this Court that permits it to grant a motion to dismiss where a complaint does "not permit the court to infer more than the mere possibility of misconduct, [thus] the complaint has alleged – but it has not show[n] – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 678; Dismissal Order at 20-21 (citing *Iqbal*).

and "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief," *Iqbal*, 556 U.S. at 678.[7] *See* Dismissal Order at 20-21. The Court acted in accordance with this principle in its Dismissal Order, ultimately concluding that because "[u]nder the plain language of the AMPL, the relevant transactions on multifunction cards provided by Aetna fall within the scope of a sublicensing agreement with MasterCard, and nothing in AlexSam's Second Amended Complaint requires a different result," AlexSam had "raised nothing more than the 'real possibility' of infringement," a level of pleading insufficient to survive a motion to dismiss. *Id.*

AlexSam next argues that "the Court committed error in applying the [*AlexSam, Inc. v.*] *IDT* [*Corp.*, 715 F.3d 1336 (Fed. Cir. 2013)] court's rationale and decision in this case." *Id.* at 14-17. Because, in AlexSam's view, the *IDT* litigation "was limited to activation transactions," those products "are factually distinct" from those at issue here. Mot. Reconsideration at 15. Specifically, AlexSam argues that "while the *IDT* [o]pinion held that IDT's infringement of Claims 57 and 58 was licensed based on its use of the MasterCard Network to activate those gift cards or phone cards," *id.* at 17 (emphasis omitted), Aetna's accused products "are not activated using the MasterCard Network," and "are not activated at a point-of-sale device." *Id.* at 17. AlexSam also argues that the Court erred "in only comparing Claim 57 to Claim 32," and Claim 33 is an "independent claim[]"; in AlexSam's view, the Court erred "in finding that Claim 33 was similar to Claim 57." *Id.* at 15-17.

---

[7] AlexSam also claims that "Aetna has not carried its burden to prove this defense given that the factual statements in the operative Complaint must be credited and viewed in a light most favorable to AlexSam and that Aetna is not licensed under the MasterCard Agreement for one of several possible reasons must be accepted." Mot. Reconsideration at 14. AlexSam, however, raised this argument to the Court in its opposition to the motion to dismiss. *See* MTD Opp'n at 17 ("Under the *Iqbal/Twombly* standard, the Court should accept all of Plaintiff's allegations as true. . . . [A]s AlexSam's operative complaint makes clear, Aetna is not covered under the MasterCard Agreement, and thus, Aetna is liable for the MasterCard Accused Products."). Because a motion for reconsideration is "not a vehicle for . . . securing a rehearing on the merits" or otherwise taking "a second bite at the apple," *Analytical Surveys, Inc.*, 684 F.3d at 52, this argument does not merit reconsideration.

Aetna responds that the Court "did not overlook the *IDT* opinion," and argues that AlexSam has "provide[d] no reason for the Court to revisit [its] old arguments." Def. Opp'n Reconsideration at 6. Aetna also argues that AlexSam's view that the *IDT* court held that the MasterCard Agreement covered only phone and gift cards is "erroneous," because the court "never had occasion to declare that other cards were not covered by the MasterCard License Agreement," and instead held "that the protection of the License extended, not just to 'the entire value chain,' but to 'all parts of the transaction.'" *Id.* at 6-7 (quoting *IDT Corp.*, 715 F.3d at 1346). In Aetna's view, "[u]nder either the amended or unamended version of Section 1.3, the exchange of information involving medical cards and the MasterCard network would be a Licensed Transaction, and Aetna would be part of the entire value chain." *Id.* at 7.

The Court agrees.

The Court already considered the *IDT* litigation both as a general matter and specifically as to whether its holding relating to activation transactions was applicable to the transactions at issue here. *See, e.g.*, Dismissal Order at 19-20 ("Although the case in *IDT Corp.* involved activation transactions, those transactions are similar to these Claims."). Though the Court noted that "Claim 32 contains some of the exact language as Claim 57," *id.* at 20, the Court's consideration encompassed both claims, and referred to the similarity in language between Claims 32 and 57 as an illustrative example rather than the sole basis for its holding. Indeed, the Court explicitly found that the *IDT* litigation's "reasoning should apply here." *Id.*

Furthermore, AlexSam previously raised, at the motion to dismiss phase, the argument that Claims 32 and 33 were not "activation transactions." *See, e.g.*, Tr. Mot. Hrg., ECF No. 95, at 26:16-27:7 (Sept. 8, 2020) ("There are types of debit[] cards that you can buy for an incremental value . . . and you can actually refill them. . . . So it's the activating of that card – right? . . .

These are not issues with respect to claim 32 which involves an entirely different type of card. And nowhere in claim 32 or 33 does the concept of activating or adding value ever appear."); *id.* at 27:11-23 ("[A]ctivating or . . . adding of value, would be covered by this license, but you absolutely cannot extend the license to include other uncovered, unlicensed conduct in the manner in which Aetna is suggesting."); *id.* at 28:16-18 ("But you see . . . there is no mention at all of activating or adding value. It simply isn't conduct that is claimed in claim 32. And looking at claim 33, we see, in fact, that it's not present there either.").

The Court therefore considered – and addressed – both the *IDT* litigation and AlexSam's argument that without activation, the debit/medical services cards at issue are not licensed transactions under the MasterCard Agreement. As a result, AlexSam's disagreement with the Court's analysis of the *IDT* litigation, and the scope of its application of the case to the Court's analysis of Claims 32 and 33, does not merit reconsideration. *See Shrader*, 70 F.3d at 257 ("[A] motion to reconsider should not be granted where the moving party seeks to relitigate an issue already decided.").[8]

Finally, AlexSam argues that "the Court should permit leave to amend with respect to the

---

[8] For these reasons, AlexSam's motion for judicial notice also will be denied. AlexSam argues that the Court should take judicial notice of a letter purportedly from MasterCard to AlexSam dated July 2, 2007. Mot. Judicial Notice at 1. As an initial matter, the letter is not independently verifiable, as it does not bear an official court seal or docket number, *see id.* Ex. 5 at 1-5, and therefore is not a fact that can be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned," and does not provide "the necessary information" to take judicial notice, *see* Fed. R. Evid. 201; *see also Richardson v. N.Y.C. Bd. of Educ.*, 711 F. App'x 11 (2d Cir. 2017) ("Under Federal Rule of Evidence 201(b)(2), courts may judicially notice facts that are 'not subject to reasonable dispute because [they] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." (alterations in original)). Furthermore, AlexSam has not offered any support for its contention that this letter is properly before the Court on a motion for reconsideration. AlexSam has not explained any reason for failing to include the letter in its earlier filings; argued that this letter is new evidence discovered after the Court's order of dismissal; or explained its failure to include or reference this letter in its motion for reconsideration. The Court therefore sees no reason to consider this letter as a "controlling decision[] or data" that the Court overlooked, *Shrader*, 70 F.3d at 257, such that reconsideration is warranted. Moreover, even if this Court were to consider this request for judicial notice as a second motion for reconsideration, such a request would be untimely. *See* D. Conn. L. Civ. R. 7(c) (noting that motions for reconsideration "shall be filed and served within seven (7) days of the filing of the decision or order from which such relief is sought").

MasterCard Agreement." *Id.* at 18 (emphasis omitted). As AlexSam subsequently filed another motion to amend/correct the Complaint, *see* Mot. Amend, the Court will, to the extent AlexSam intended to set forth a separate motion to amend in this filing, ECF No. 104, deny this motion as moot in light of AlexSam's later filing, ECF No. 106.

Accordingly, AlexSam's motion for reconsideration will be denied, and to the extent the motion set forth a cognizable motion to amend, that motion will be denied as moot in light of AlexSam's later motion to amend.

### B. The Motion to Amend

In the Dismissal Order, the Court permitted AlexSam until October 9, 2020 to "move for leave to file an amended pleading . . . to the extent the deficiencies identified in this ruling can be addressed." Dismissal Order at 47.

AlexSam argues that it has moved to amend under the "Court's permission after it dismissed AlexSam's Second Amended Complaint." Mot. Amend at 3. Though AlexSam's brief does not clearly outline the proposed scope of its amendments, a review of AlexSam's proposed Third Amended Complaint appears to suggest three primary changes: first, the addition of Aetna Life Insurance Company ("Aetna Life") as a defendant, *see* Third Am. Compl., ECF No. 106-1 at 1,[9] which AlexSam alleges is an "alter ego" or "agent" of Aetna; a new allegation that Aetna Life and Aetna ("Defendants") "provided their employees and customers with a multifunction card system that allowed them to use Flexible Spending Accounts ('FSAs'), Health Savings Accounts ('HSAs'), and/or [] Health Reimbursement Accounts ('HRAs') cards," *id.* ¶ 2, allegedly in violation of the 608 patent, *id.* ¶¶ 54-72, 83-137; and the removal of all claims

[9] ECF No. 106-1 is the redline version of the Third Amended Complaint.

relating to the MasterCard Network, *see id.* ¶¶ 54-106; 131-36,[10] and AlexSam's request for a declaratory judgment, *see id.* ¶¶ 141-47.

AlexSam argues that its amendment is not futile because it "has adequately pled that Aetna is liable," including that it has "adequately pled" direct, willful, contributory and induced infringement. Mot. Amend at 4-10. AlexSam argues that leave to amend will not prejudice Aetna, as it "already has been given ample time to investigate the allegations in the operative Complaint," and "[a]t this early stage of the case, Aetna should not have to expend significant additional resources to conduct discovery or prepare for trial, if AlexSam's proposed Third Amended Complaint is allowed." *Id.* (emphasis omitted). Finally, AlexSam argues that "the proposed Third Amended Complaint is actually simpler in its scope" than the Second Amended Complaint, as "[t]here are no new causes of action, and some causes of action in the Second Amended Complaint do not appear in the Third Amended Complaint." *Id.* at 11.

Aetna argues that "AlexSam has gone beyond trying to fix the deficiencies in its Second Amended Complaint," specifically by "trying to add an entirely new party-defendant, Aetna Life." Def. Opp'n Amend at 1. In Aetna's view, AlexSam "has failed to offer any good faith basis for the Court to allow the addition of a party after the deadline to add parties passed close to a year ago." *Id.* Aetna argues that "AlexSam has known from the outset, when it brought this case sixteen months ago, that Aetna Inc. and Aetna Life are different entities," *id.* at 5, and argues further that the Court has not granted AlexSam leave to add new parties after the time to do so expired, *id.* at 7. Specifically, Aetna argues that AlexSam's motion to add Aetna Life as a defendant "is subject to Rule 16's stringent good cause standard," which AlexSam has not met, as its motion fails to "explain[] how AlexSam has been diligent in its effort to add a new party,"

[10] These citations refer to deleted paragraphs, as numbered in the redlined Third Amended Complaint.

and AlexSam's earlier-filed Complaints "explicitly reference Aetna Life over ten times," *id.* at 7-8. Aetna also addresses the merits of AlexSam's attempts to add Aetna Life, arguing that AlexSam has not plausibly alleged facts that would meet "the legal standard for disregarding the corporate form" to permit "the imposition of alter ego liability." *Id.* at 8-12. Finally, Aetna argues that the proposed Third Amended Complaint "fails to address the Court's [dismissal order]," as its "repackaging of the same old allegations, now made against 'Defendants' collectively, does nothing to clarify who did what" or remedy any of the deficiencies previously identified by the Court.

The Court agrees.

Though the Court permitted AlexSam to move for leave to file an amended pleading, it did so only "to the extent the deficiencies identified in this ruling can be addressed." Dismissal Order at 47. AlexSam's proposed Third Amended Complaint, however, goes well beyond the scope of the deficiencies identified in the Court's ruling, as the nature of the action has entirely changed to focus on an alter ego theory of liability between Aetna and its alleged subsidiary, Aetna Life, who AlexSam seeks to add as a defendant. *See* Third Am. Compl.

Under the operative scheduling order, the deadline for AlexSam to amend the Complaint to add parties without leave of the Court was December 6, 2019. Scheduling Order, ECF No. 39 (Nov. 4, 2019). Because AlexSam's attempt to add Aetna Life out of time would require a modification of the scheduling order, AlexSam's motion is subject to analysis under Rule 16 of the Federal Rules of Civil Procedure. *See Lyddy*, 2008 WL 5117679, at *1 ("In other words, when the court issues a pretrial scheduling order [under] Fed. R. Civ. P. 16 that establishes a time table for amending pleadings, a plaintiff's ability to amend the complaint is governed by Rule 16, not Rule 15(a)."). AlexSam therefore must establish that there is "good cause" to amend

the scheduling order and amend its pleading. *Parker*, 204 F.3d at 340 ("[D]espite the lenient standard of Rule 15(a), a district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause."). To establish good cause, AlexSam must set forth evidence of its "diligence," *id.*; *see also Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 266-67 (2d Cir. 2009); *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003), meaning that, despite its diligent efforts, "the applicable deadline could not have been reasonably met," *Sokol Holdings, Inc. v. BMB Munai, Inc.*, No. 05-cv-3749, 2009 WL 2524611, at *7 (S.D.N.Y. Aug. 14, 2003). "A party fails to show good cause," however, when the proposed amendment rests on information 'that the party knew, or should have known, in advance of the deadline.'" *Perfect Pearl Co., Inc. v. Majestic Pearl & Stone, Inc.*, 889 F. Supp. 2d 453, 457 (S.D.N.Y. 2012) (quoting *Sokol Holdings, Inc.*, 2009 WL 2524611, at *8); *see also Owens v. Conn. Judicial Branch*, No. 3:17-CV-1451 (KAD), 2018 WL 460972, at *2 (D. Conn. Jan. 17, 2018) (same) (quoting *Williams v. Town of Hempstead*, No. 16CV1992 (ADS) (AYS), 2017 WL 4712219, at *2 (E.D.N.Y. Oct. 18, 2017).

While diligence is the "primary consideration," the Court also may consider other relevant factors, including "whether allowing the amendment of the pleading at this stage of the litigation will prejudice defendants." *Kassner*, 496 F.3d at 243. Compliance with Rule 16 "is a threshold matter which may obviate the Rule 15 analysis." *Id.*

AlexSam does not, either in its initial brief or reply, offer any reason for its previous failure to add Aetna Life, or any reason why, despite diligence, the December 2019 deadline to

add Aetna Life as a defendant could not have been reasonably met.[11] On this basis alone, the Court could decline to consider "the merits of [AlexSam's] proposed amendment." *EMA Fin., LLC v. NFusz, Inc.*, 509 F. Supp. 3d 18, 37 (S.D.N.Y. Dec. 22, 2020); *see also Ruotolo v. City of New York*, No. 03CV5045 (SHS), 2006 WL 2372236, at *2 (S.D.N.Y. Aug. 16, 2006), *aff'd*, 514 F.3d 184 (2d Cir. 2008) ("A court may deny a motion to amend when the movant knew or should have known of the facts upon which the amendment is based when the original pleading was filed, particularly when the movant offers no excuse for the delay."). AlexSam instead argues, without support, that Rule 16 is "inapplicable" to its motion to amend, "given the Court's Order giving AlexSam express permission to amend." Amend Reply at 3.

Nothing in the Court's order authorizing the filing of a motion for leave to amend, however, permitted AlexSam leave to join an additional party defendant, an issue which should have been resolved by the deadline in December 2019, or to somehow skirt the requirements set forth in Rule 16 governing the modification of a scheduling order. Indeed, a Rule 16 analysis should be conducted before evaluating AlexSam's motion under Rule 15. *See, e.g.*, *Premier Comp Sols., LLC v. UPMC*, 970 F.3d 316, 319 (3d Cir. Aug. 12, 2020) ("[W]hen a party moves to amend or add a party after the deadline in a district court's scheduling order has passed, the 'good cause' standard of Rule 16(b)(4) . . . applies. A party must meet this standard before a district court considers whether the party also meets Rule 15(a)."); *see also Parker*, 204 F.3d at 340 ("We now join these courts in holding that despite the lenient standard of Rule 15(a), a district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause.").

---

[11] In fact, AlexSam's only reference to Aetna Life in its opening brief is a single sentence, arguing that it "has pled facts that Aetna has 'alter ego' liability for the conduct of its subsidiaries, including Aetna Life Insurance Company." Mot. Amend at 7.

AlexSam knew or should have known of Aetna Life's identity, and potential involvement in this matter, well before the Court dismissed the case, as documents AlexSam appended to each of its original, First Amended, and Second Amended Complaints referenced Aetna Life. *See, e.g.* Compl., Ex. E, ECF No. 1-5 (June 28, 2019); Am. Compl., Ex. C, ECF No. 27-3 (Oct. 4, 2019); Am. Compl., Ex. H, ECF No. 27-8 (Oct. 4, 2019); Second Am. Compl., Ex. C, ECF No. 57-3 (Dec. 6, 2019); Ex. H, ECF No. 57-8 (Dec. 6, 2019); *see also Perfect Pearl Co., Inc.*, 889 F. Supp. 2d at 457 (good cause not met when "that the party knew, or should have known" of the relevant information in advance of the deadline).

The Court also disagrees with AlexSam that the amendment would not prejudice Aetna. In considering prejudice, the Second Circuit has looked at "whether the untimely filing would require the opposing party to make additional expenditures to conduct discovery and to prepare for trial." *United States v. Cohan*, No. 3:11-CV-412 (CSH), 2012 WL 4758142, at *1 (D. Conn. Oct. 5, 2012) (citing *Brown v. Gen. Nutrition Cos., Inc.*, 356 F. App'x 482, 487 (2d Cir. 2009)). Were Aetna Life to be added this juncture, it "would need time to plead, and additional discovery would have to be conducted by all the parties," which would delay this case proceeding to trial in a timely fashion. *Kunajukr v. Lawrence & Mem. Hosp., Inc.*, No. 3:05CV01813 (JCH), 2008 WL 1848897, at *2 (D. Conn. Apr. 25, 2008); *see also Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993) (undue prejudice may exist where the opposing party would be required to "expend significant additional resources to conduct discovery and prepare for trial" or "the amendment will significantly delay resolution of the dispute"). AlexSam has known, or should have known, each step of the way, that Aetna Life was a potential defendant in this matter; indeed, it "has had more than ample time to bring these individuals and entities into this case."

*Kunajukr*, 20018 WL 1848897, at *2.[12]

The Court therefore will deny AlexSam's motion for leave to amend to add Aetna Life as a party defendant. As AlexSam's proposed Third Amended Complaint refers throughout to "Defendants" – namely, both Aetna Life and Aetna – the Court, will, rather than untangle which portions of the proposed Third Amended Complaint may survive in the absence of Aetna Life as a defendant, permit AlexSam to re-file a proposed Third Amended Complaint that does not name Aetna Life.[13] The Court cautions AlexSam, however, that the scope of this grant is narrow, as any proposed Third Amended Complaint may be filed only "to the extent the deficiencies identified in [the Dismissal Order] can be addressed," and no more.[14]

Accordingly, AlexSam's motion for leave to amend will be denied without prejudice to renewal to the extent that AlexSam can file a Third Amended Complaint, by **August 20, 2021**, that addresses the deficiencies in the Court's Dismissal Order.[15]

## IV. CONCLUSION

For the foregoing reasons, the Court enters the following orders:

AlexSam's motion for reconsideration is **DENIED**, and to the extent the motion set forth a cognizable motion to amend, that motion is **DENIED as moot** in light of AlexSam's later

---

[12] In any event, given AlexSam's failure to satisfy the diligence prong, its motion to amend to add Aetna Life would be denied. *See Chrebet v. Cnty. of Nassau*, No. 09 CV 4249 (DRH) (AKT), 2014 WL 1836835, at *21 (E.D.N.Y. May 8, 2014) (noting that the absence of prejudice is not alone a sufficient reason to find that good cause exists).

[13] Given the Court's denial of AlexSam's motion for reconsideration, the Court also need not, and does not, address AlexSam's argument that it could "reserve[] the right to accuse Aetna branded MasterCard debit/medical services cards." Mot. Amend at 11 n.2.

[14] AlexSam's motion for leave to amend also should clearly indicate the scope of its proposed amendment and should attach as an exhibit a proposed Third Amended Complaint.

[15] In light of this Order, the Court also will deny without prejudice to renewal Aetna's motion to strike, though it cautions AlexSam that "[a]rguments may not be made for the first time in a reply brief." *Benjamin v. Oxford Health Ins., Inc.*, No. 3:16-cv-00408 (AWT), 2017 WL 77328, at *3 (D. Conn. Feb. 28, 2017).

motion to amend;

AlexSam's motion for judicial notice is **DENIED**;

AlexSam's motion for leave to amend is **DENIED** without prejudice to renewal to the extent that AlexSam can file, by **August 20, 2021**, a motion to amend the Complaint that addresses the deficiencies in the Court's Dismissal Order and includes as an exhibit a proposed Third Amended Complaint;

AlexSam's supplemental motion for leave to amend is **DENIED**; and

Aetna's motion to strike is **DENIED** without prejudice to renewal.

**SO ORDERED** at Bridgeport, Connecticut, this 30th day of July, 2021.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ALEXSAM, INC.,<br>*Plaintiff*,<br><br>v.<br><br>AETNA, INC.,<br>*Defendant.* | No. 3:19-cv-01025 (VAB) |

## RULING AND ORDER ON MOTION FOR LEAVE TO AMEND

AlexSam, Inc. ("Plaintiff" or "AlexSam") has sued Aetna, Inc. ("Defendant") for alleged patent infringement related to Claims 32 and 33 of United States Patent Nos. 6,000,608 (the "'608 Patent"). Second Am. Compl., ECF No. 57 (Dec. 6, 2019).

On January 10, 2020, Aetna, Inc. moved to dismiss the action. *See* Def. Aetna Inc.'s Mot. to Dismiss the Second Am. Compl., ECF No. 65 (Jan. 10, 2020). On September 11, 2020, the Court granted Aetna, Inc.'s motion and allowed AlexSam to move for leave to file an amended pleading to the extent the deficiencies identified by the Court could be addressed. Ruling and Order on Mot. to Dismiss, ECF No. 96 (Sept. 11, 2020) ("Dismissal Order"); *see also AlexSam, Inc. v. Aetna, Inc.*, No. 3:19-CV-01025 (VAB), 2020 WL 5502323 (D. Conn. Sept. 11, 2020) ("*AlexSam I*").

AlexSam now has moved, following a denial of reconsideration of the Court's order in *AlexSam I*, to amend the Complaint. *See* Pl.'s Mot. for Leave to File a Third Am. Compl., ECF No. 118 (Sept. 10, 2021) ("Mot. to Amend"); *see also* Ruling and Order on Pending Mots., ECF No. 115 (July 30, 2021) ("Reconsideration Order"); *AlexSam, Inc. v. Aetna, Inc.*, No. 3:19-CV-01025 (VAB), 2021 WL 3268853 (D. Conn. July 30, 2021) ("*AlexSam II*").

For the following reasons, the motion for leave to amend will be **DENIED with prejudice**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Court assumes the parties' familiarity with the underlying factual and procedural history of this case up to the Court's denial of reconsideration of its decision on Aetna Inc.'s motion to dismiss. *See* Dismissal Order at 1–14; Reconsideration Order at 1–2; *AlexSam I*, 2020 WL 5502323, at *1–*7; *AlexSam II*, 2021 WL 3268853, at *1–*2.

On September 10, 2021, the Court denied AlexSam's motion for reconsideration of the dismissal of the Second Amended Complaint. *See* Reconsideration Order at 1–26; *AlexSam II*, 2021 WL 3268853, at *1–*13. In that decision, the Court also rejected a proposed Third Amended Complaint. *See* Reconsideration Order at 1–26; *AlexSam II*, 2021 WL 3268853, at *1–*13.

In accordance with the Court's decision, and following an extension of time, *see* Order, ECF No. 117 (Aug. 17, 2021), AlexSam filed a motion for leave to file a Third Amended Complaint on September 9, 2021, *see* Mot. to Amend.

On October 15, 2021, Aetna, Inc. filed a memorandum in opposition to the renewed motion for leave to file a Third Amended Complaint. Def. Aetna, Inc.'s Opp'n to AlexSam's Second Mot. for Leave to File a Third Am. Compl., ECF No. 121 (Oct. 15, 2021) ("Opp'n").

On October 29, 2021, Plaintiff filed a reply in further support of its motion for leave to amend. *See* Pl.'s Reply in Supp. of its Mot. for Leave to File a Third Am. Compl., ECF No. 122 (Oct. 29, 2021) ("Reply").

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 15(a), "[a] party may amend its pleading once as a

matter of course within: (A) 21 days after serving it; (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The Court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).

The district court has broad discretion to decide a motion to amend. *See Local 802, Assoc. Musicians of Greater N.Y. v. Parker Meridien Hotel*, 145 F.3d 85, 89 (2d Cir. 1998). If a court chooses to deny leave to amend, however, it must give some "justifying reason" for doing so. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Reasons for denying leave to amend including "undue delay, bad faith[,] or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment . . . ." *Id.*; *see also Lucence v. Int'l Bus. Mach. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (leave to amend may be denied when amendment is "unlikely to be productive," such as when an amendment is "futile" and "could not withstand a motion to dismiss [under] Fed. R. Civ. P. 12(b)(6)").

But where a party seeks leave to amend after the deadline to amend pleadings has passed, the Court has greater discretion to deny leave to amend. *See Lyddy v. Bridgeport Bd. of Educ.*, No. 3:06-CV-1420 (AHN), 2008 WL 5117679, at *1 (D. Conn. Dec. 4, 2008) ("In other words, when the court issues a pretrial scheduling order [under] Fed. R. Civ. P. 16 that establishes a time table for amending pleadings, a plaintiff's ability to amend the complaint is governed by Rule 16, not Rule 15(a)." (citing *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007); *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000); *Carnrite v.*

*Granada Hosp. Grp. Inc.*, 175 F.R.D. 439, 446 (W.D.N.Y. 1997))). In these cases, a moving party may be required to demonstrate that there is "good cause" both to amend the scheduling order and to amend their pleading. *See Parker*, 204 F.3d at 340 ("[D]espite the lenient standard of Rule 15(a), a district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause."). "[A] finding of 'good cause' depends on the diligence of the moving party." *Id.*

In exercising their discretion under Rule 16(b), courts "also may consider other relevant factors including, in particular, whether allowing the amendment of the pleading at this stage of the litigation will prejudice defendants." *Kassner*, 496 F.3d at 244; *see also Lacher v. C.I.R.*, 32 F. App'x 600, 603 (2d Cir. 2002) (noting that undue prejudice to the opposing party is "typically the most important consideration in evaluating a motion to amend a pleading").

## III. DISCUSSION

As a preliminary matter, following the Federal Circuit's decision in *Bot M8 LLC v. Sony Corporation of America*, 4 F.4th 1342 (Fed. Cir. 2021), the Court clarifies the appropriate standard of review. This decision did not supplant the plausibility standard articulated in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell v. Twombly*, 550 U.S. 544 (2007). Rather, it clarified that the appropriate "'notice and plausibility' standard to evaluate the sufficiency of complaints" in the patent context. *Power Density Sols. LLC v. United States*, 159 Fed. Cl. 208, 218–19 (2022) (internal citations omitted).

To state a claim for relief under the standard articulated by the Federal Circuit, a complaint must be facially plausible under the *Iqbal*/*Twombly* standard, and, at the same time, it must "place the alleged infringer 'on notice of what activity . . . is being accused of

infringement.'" *Id*. (citing, *inter alia*, *Bot M8 LLC*, 4 F.4th at 1352). As a result, after *Bot M8 LLC*, a complaint in a patent case must contain "some factual allegations that, when taken as true, articulate why it is plausible that the accused product infringes the patent claim" to survive a motion to dismiss. *Bot M8 LLC*, 4 F.4th at 1353; *see also JG Techs., LLC v. United States*, 156 Fed. Cl. 691, 714 (2021) (dismissing complaint where the court found lacking "adequate factual support that ties the accused instrumentalities to [the defendant's] use" (citing *Bot M8 LLC*, 4 F. 4th at 1352)).

In *AlexSam I*, the Court permitted AlexSam until October 9, 2020 to "move for leave to file an amended pleading . . . to the extent the deficiencies identified in this ruling can be addressed." Dismissal Order at 47; *AlexSam I*, 2021 WL 3268853, at *1, *24. Then, in *AlexSam II*, the Court denied AlexSam's motion for leave to amend the Complaint, which alleged an alter-ego theory of liability against Aetna Life and sought to add Aetna Life as a party defendant. Reconsideration Order at 19–26; *AlexSam II*, 2021 WL 3268853, at *10–*13.

In response, AlexSam has moved for leave to file a revised version of its Third Amended Complaint, which seeks to add factual allegations about Aetna, Inc.'s accused products, direct infringement, induced infringement, contributory infringement, willful infringement, and Aetna, Inc.'s control of its subsidiaries. Mot. to Amend at 1–2. In addition, AlexSam has pled facts to support its contention that Aetna, Inc. has alter ego liability for the conduct of an alleged subsidiary, Aetna Life.[1] Ex. 1 to Pl.'s Mot. for Leave to File a Third Am. Compl. ¶ 77, ECF No. 118 (Sept. 10, 2021) ("Third Am. Compl.").

---

[1] These allegations include that Aetna Life allegedly lacks a "distinct website"; that "Aetna Life uses the Aetna trademark and brand name in marketing and advertising"; that "locations . . . ostensibly affiliated with its subsidiaries [ ] are portrayed on Aetna's website as being part of a single unified entity under the umbrella of Aetna, located 151 Farmington Avenue in Hartford, CT"; and that "Aetna's website offers a single unified contact point for employer inquiries, support inquiries, employment inquiries, product information, and company news updates." Third Am. Compl. ¶ 77.

Aetna, Inc. argues that leave to amend should be denied, where AlexSam has replead an alter ego theory, without sufficient factual allegations to support such a claim, and in direct contradiction to the Court's past decisions. Opp'n at 4–11. In Defendant's view, Plaintiff's new factual allegations regarding a shared website, brand name, trademark, address, and office space are insufficient to remedy this deficiency. *Id*. at 7–10. Furthermore, Aetna, Inc. argues that, in the absence of a viable alter ego theory, AlexSam cannot plausibly allege that Aetna, Inc. committed acts of infringement. *Id*. at 11–33.

In reply, AlexSam argues that its alter ego theory is viable, at least at the pleadings stage, in keeping with the Federal Circuit's decision in *Bot M8 LLC*. Reply at 4–7. Further, it argues that, regardless of whether veil piercing is proper, it has sufficiently alleged that the corporate parent, Aetna, Inc., may be held independently liable for indirect infringement. *Id*. at 8–10.

The Court disagrees.

Here, as in past versions of the pleadings, AlexSam has failed to plausibly allege that Aetna, Inc. has "alter ego" liability for the conduct of its subsidiary, Aetna Life. As the Court explained in *AlexSam I*, it is well settled[2] that disregard of corporate formalities, such as between a parent and subsidiary, should occur only where there is an indication that one corporation's owner exercises "total and exclusive domination of the corporation." *S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 139 (2d Cir. 2010) (quoting *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1221 (2d Cir. 1987)). The allegations regarding a shared office space,

---

[2] In analyzing issues of alter ego liability, the Federal Circuit follows the law of the other courts of appeals. *Insituform Techs., Inc. v. CAT Contracting, Inc.*, 385 F.3d 1360, 1380 (Fed. Cir. 2004). The parties have not briefed in any detail which law should govern the alter ego analysis here. Aetna, Inc. suggests that the Court should follow the law of Connecticut or Pennsylvania. *See* Opp'n at 7–8. Where federal common law and Connecticut law regarding veil-piercing appears to be essentially the same as the law of Pennsylvania, however, and does not appear to conflict with federal policy underlying the patent laws, Connecticut law will be applied. *See Jacobs Vehicle System, Inc. v. Pacific Diesel Brake Co.*, 424 F. Supp. 2d 388, 392 (D. Conn. 2006); *see also In re Pocius*, 556 B.R. 658, 671 (Bankr. E.D. Pa. 2016) (noting that "a very high showing of domination and control is necessary to establish alter-ego liability" under Pennsylvania law (internal citation and quotation marks omitted)).

website, trademark, and brand names in the Third Amended Complaint are insufficient to satisfy this standard. *Compare Burnett v. AT&T Inc.*, No. 3:17-CV-741 (DJS), 2018 WL 11206383, at *3 (D. Conn. Mar. 16, 2018) (finding no alter ego relationship between AT&T and AT&T Mobility despite allegations of shared website, trademarks, and brand), *with Avant Cap. Partners, LLC v. Strathmore Dev. Co. Michigan, LLC*, No. 3:12-CV-1194 (VLB), 2013 WL 5435083, at *13 (D. Conn. Sept. 30, 2013) (finding sufficient allegation of alter-ego liability where "[the plaintiff] has alleged that [the defendant], controlled by the sole president and manager . . . , organized and registered [alleged alter egos] . . . , with the explicit purpose of utilizing the entities to enter into a mortgage agreement" (internal quotation marks omitted)); *see also Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1458 (2d Cir. 1995) (collecting cases).

As to the issue of whether, in the absence of a plausible alter-ego liability theory, AlexSam has alleged an independent claim for indirect liability against the parent company, Aetna, Inc., the Court faces the same predicament as in *AlexSam II*. Plaintiff has, once again, drafted its pleadings such that the Court cannot untangle which portions of the proposed Third Amended Complaint may survive to state a claim against Aetna, Inc. independently. *See AlexSam II*, 2021 WL 3268853, at *12. In this version of the pleadings, as in the previous version, the liability of one entity is attributed entirely to the other.

Faced with this situation in *AlexSam II*, the Court offered AlexSam the opportunity to "re-file a proposed Third Amended Complaint that does not name Aetna Life." *Id*. Where AlexSam has failed to do so and has insisted on re-pleading its alter-ego liability theory, the Court has discretion to deny leave to amend and close this case. *See Davis*, 371 U.S. at 182 ("justifying reason[s]" for denying leave to amend include "repeated failure to cure deficiencies by amendments previously allowed"); *see also Starker v. Adamovych*, No. 15-CV-3691 (AJN),

2020 WL 5849219, at *6 (S.D.N.Y. Oct. 1, 2020) (stating that "plaintiff's wholly insufficient reasoning for failing to follow the Court's order itself weighs heavily against granting Plaintiff leave to amend"). And the Court will exercise that discretion here.

The proposed amended pleading represents AlexSam's sixth opportunity to state a viable claim.[3] The deficiencies in AlexSam's Complaint remain nearly three years to the day of this case's initial filing, and after being afforded multiple opportunities to cure them. Under these circumstances, AlexSam's inability to remedy the deficiencies in its Complaint in a timely fashion warrants denial of further leave to amend. *See United States v. Exelis, Inc.*, 824 F.3d 16, 28 (2d Cir. 2016) (affirming district court denial of leave to amend where plaintiff "filed numerous pleadings over a period of three years and [was] aware of the deficiencies in his pleadings[,]" but remained "unable to cure these deficiencies"); *see also Grabcheski v. Am. Int'l Grp., Inc.*, 687 F. App'x 84, 88 (2d Cir. 2017) (summary order) (finding that the "district court [ ] did not abuse its discretion in dismissing the case with prejudice" based on "failure to plead a plausible [ ] claim," where amended pleading represented a "fifth bite at the apple" (emphasis omitted)).

Due to the age of this case, leave to amend further would prejudice Aetna, Inc., which has

[3] AlexSam filed its initial Complaint on June 28, 2019. *See* Compl., ECF No. 1 (June 28, 2019). Approximately three months later, AlexSam filed a second attempted pleading: the Amended Complaint. *See* Am. Compl., ECF No. 27 (Oct. 4, 2019). After Aetna, Inc. moved to dismiss, *see* Mot. to Dismiss on Behalf of Def. Aetna Inc., ECF No. 47 (Nov. 18, 2019), AlexSam filed its third attempted pleading, the Second Amended Complaint, *see* Second Am. Compl., ECF No. 57 (Dec. 6, 2019). When Aetna, Inc. moved to dismiss the Second Amended Complaint, *see* Def. Aetna Inc.'s Mot. to Dismiss the Second Am. Compl., ECF No. 65 (Jan. 10, 2020), AlexSam attached a fourth attempted pleading, the Third Amended Complaint, to its opposition memorandum, *see* Ex. 3 to AlexSam Inc.'s Opp'n to Def. Aetna, Inc.'s Mot. to Dismiss the Second Am. Compl., ECF No. 77-3 (Apr. 30, 2020) (Third Amended Complaint, first version). In *AlexSam I*, the Court offered AlexSam another chance to plead a plausible claim. *See* Dismissal Order. In response, AlexSam filed a motion for reconsideration, followed by a fifth attempted pleading: another proposed Third Amended Complaint. *See* Ex. 1 to Pl.'s Mot. for Leave to File a Third Am. Compl., ECF No. 104-1 (Dec. 9, 2020) (Third Amended Complaint, second version). In *AlexSam II*, the Court permitted AlexSam to re-file the proposed Third Amended Complaint, without naming Aetna Life. *See* Reconsideration Order at 25. Here, in its sixth attempted pleading, AlexSam has filed a revised version of the Third Amended Complaint. *See* Third Am. Compl. (Third Amended Complaint, third version).

already incurred significant costs in litigation as a result of AlexSam's dilatory tactics.[4] *See Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990) (noting that the "court plainly has discretion . . . to deny leave to amend where the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice the defendant").

Even if this were not the case, the denial of further leave to amend is appropriate under Federal Rule of Civil Procedure 16. The deadline for AlexSam to amend the Complaint was December 6, 2019. *See* Scheduling Order, ECF No. 39 (Nov. 4, 2019). AlexSam, once again, has failed to provide any basis for "good cause" to modify the scheduling order, or otherwise demonstrated the existence of new facts necessitating amendment. *Cf. AlexSam II*, 2021 WL 3268853, at *11–*12; *see also Ruotolo v. City of New York*, No. 03CV5045 (SHS), 2006 WL 2372236, at *2 (S.D.N.Y. Aug. 16, 2006), *aff'd*, 514 F.3d 184 (2d Cir. 2008) ("A court may deny a motion to amend when the movant knew or should have known of the facts upon which the amendment is based when the original pleading was filed, particularly when the movant offers no excuse for the delay.").

In addition to the prejudice faced by Defendants as a result of the delay in this already lengthy litigation, *see AlexSam II*, 2021 WL 3268853, at *11–*12, the absence of "good cause" further supports the Court's decision to exercise its discretion to deny leave to amend, *see Parker*, 204 F.3d at 340 ("[D]espite the lenient standard of Rule 15(a), a district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the

---

[4] AlexSam has previously amended its Complaint on more than one occasion in an apparent attempt to avoid dismissal of the Complaint. *See supra* note 3. Such dilatory tactics provide further grounds to deny leave to amend. *See Am. Med. Ass'n v. United Healthcare Corp.*, No. 00 Civ. 2800 (LMM), 2006 WL 3833440, at *5 (S.D.N.Y. Dec. 29, 2006) ("When it appears that leave to amend is sought in anticipation of an adverse ruling on the original claims . . . the court is free to deny leave to amend." (internal citations omitted)).

scheduling order where the moving party has failed to establish good cause."); *see also Bot M8 LLC,* 4 F.4th at 1357–58 ("Even if we might have reached a different decision if asked to consider the matter in the first instance, we do not find that the district court abused its discretion in denying leave to amend a second time.").

Accordingly, the motion for leave to amend will be denied with prejudice.

## IV. CONCLUSION

For the foregoing reasons, the motion for leave to amend is **DENIED with prejudice**.

The Clerk of the Court respectfully is directed to close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 24th day of June, 2022.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE

US006000608A

# United States Patent [19]

**Dorf**

[11] **Patent Number: 6,000,608**

[45] **Date of Patent: Dec. 14, 1999**

[54] **MULTIFUNCTION CARD SYSTEM**

[76] Inventor: **Robert E. Dorf**, 904 Bromley Way, Raleigh, N.C. 27615

[21] Appl. No.: **08/891,261**

[22] Filed: **Jul. 10, 1997**

[51] **Int. Cl.**[6] .......... **G06K 5/00**

[52] **U.S. Cl.** .......... **235/380**; 235/375

[58] **Field of Search** .......... 235/380, 375, 235/381, 382, 492, 493; 902/1, 2, 8, 10, 12, 22, 24, 25, 26, 27

[56] **References Cited**

U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 4,491,725 | 1/1985 | Pritchard | 235/375 |
| 4,700,055 | 10/1987 | Kashkashian, Jr. | 235/379 |
| 4,731,818 | 3/1988 | Clark, Jr. et al. | 379/144 |
| 4,831,647 | 5/1989 | D'Avello et al. | 379/91 |
| 4,900,903 | 2/1990 | Wright et al. | 235/380 |
| 4,951,308 | 8/1990 | Bishop et al. | 379/91 |
| 4,963,722 | 10/1990 | Takeuchi | 235/382.5 |
| 4,990,904 | 2/1991 | Wright et al. | 235/381 |
| 5,101,098 | 3/1992 | Naito | 235/475 |
| 5,144,649 | 9/1992 | Zicker et al. | 379/59 |
| 5,146,067 | 9/1992 | Sloan et al. | 235/381 |
| 5,147,021 | 9/1992 | Maruyama et al. | 194/217 |
| 5,212,369 | 5/1993 | Karlisch et al. | 235/380 |
| 5,227,612 | 7/1993 | Le Roux | 235/379 |
| 5,243,174 | 9/1993 | Veeneman et al. | 235/381 |
| 5,264,689 | 11/1993 | Maes et al. | 235/492 |
| 5,310,997 | 5/1994 | Roach et al. | 235/375 |
| 5,352,876 | 10/1994 | Watanabe et al. | 235/381 |
| 5,409,092 | 4/1995 | Itako et al. | 194/210 |
| 5,440,108 | 8/1995 | Tran et al. | 235/381 |
| 5,450,938 | 9/1995 | Rademacher | 194/206 |
| 5,469,497 | 11/1995 | Pierce et al. | 379/115 |
| 5,491,326 | 2/1996 | Marceau et al. | 235/381 |
| 5,500,514 | 3/1996 | Veeneman et al. | 235/381 |
| 5,504,808 | 4/1996 | Hamrick, Jr. | 379/144 |
| 5,511,114 | 4/1996 | Stimson et al. | 379/114 |
| 5,513,117 | 4/1996 | Small | 364/479 |
| 5,524,073 | 6/1996 | Stambler | 380/24 |
| 5,530,232 | 6/1996 | Taylor | 235/380 |
| 5,542,081 | 7/1996 | Geronimi | 395/800 |
| 5,557,516 | 9/1996 | Hogan | 364/406 |
| 5,559,885 | 9/1996 | Drexler et al. | 380/23 |
| 5,563,934 | 10/1996 | Eda | 379/144 |
| 5,572,004 | 11/1996 | Raimann | 235/380 |
| 5,577,109 | 11/1996 | Stimson et al. | 379/112 |
| 5,578,808 | 11/1996 | Taylor | 235/380 |
| 5,621,787 | 4/1997 | McKoy et al. | 379/144 |
| 5,652,421 | 7/1997 | Veeneman et al. | 235/381 |
| 5,682,027 | 10/1997 | Bertina et al. | 235/380 |
| 5,815,561 | 9/1998 | Nguyen et al. | 379/115 |


*Primary Examiner*—Thien Minh Le
*Assistant Examiner*—Daniel Felten
*Attorney, Agent, or Firm*—Stroock & Stroock & Lavan LLP

[57] **ABSTRACT**

Disclosed is a multifunction card system which provides a multifunction card capable of serving as a prepaid phone card, a debit card, a loyalty card, and a medical information card. Each card has an identification number comprising a bank identification number which assists in establishing communications links. The card system can be accessed from any existing point-of-sale (POS) device. The POS device treats the card as a credit or debit card and routes transaction data to a processing hub using the banking system. The processing hub coordinates the various databases corresponding to the various functions of the card.

**66 Claims, 2 Drawing Sheets**



*FIG. 1*


103
Processing Hub
104
Prepaid Phone Card Issuer Hub
101
Intelligent Card™
106
Sponsor Bank Processor
102
108
Approved
Debit
Credit
Clear
Enter
POS Device

FIG. 2




Case 3:19-cv-01025 Document 1-1 Filed 06/28/19 Page 4 of 16

# MULTIFUNCTION CARD SYSTEM

## FIELD OF THE INVENTION

The present invention relates generally to debit card systems, both bank-issued and non-bank-issued, and more particularly to a multifunction card system that can be accessed by a variety of standard point-of-sale devices, by phone, by fax, or over the Internet.

## BACKGROUND OF THE INVENTION

I. Debit Cards

Banking institutions often issue debit cards to their customers to give them access to funds from their savings or checking accounts. Such a debit card might be an on-line debit card or an off-line debit card. On-line debit cards, often referred to as automatic teller machine (ATM) cards, require a personal identification number (PIN) to be entered into an ATM or point-of-sale (POS) device in order to authorize the transaction. Once completed, the transaction clears the bank account immediately. Off-line debit cards function like credit cards, and usually carry the VISA® or MasterCard® logo. A retailer processes the card like a credit card and the customer signs a receipt. The funds then clear the bank account in one to three days.

While such debit cards are extremely useful and provide convenience for bank depositors, they generally do not serve a plurality of functions. Therefore, there is a need in the art for a debit/credit card capable of performing a plurality of functions, such as an electronic gift certificate card, a prepaid phone card, and a loyalty card, all in a real-time secure environment. There is also a need in the art for a system which can provide a card substitute for travelers checks and money orders which can be accepted by any POS device or ATM for financial transactions. Further, there is a need for a processing center which can manage such a multifunction card system.

II. Prepaid Phone Cards

Prepaid card systems are used by the telephone industry to allow customers to prepurchase long distance calling time. Such cards are typically purchased in predefined value increments. The card provides the customer with an amount of long distance calling time equivalent to the predefined value increment.

Each of the cards has an identification number printed or magnetically stored on it. The identification number is also stored in a record in a database maintained by the card issuer. This record also stores the predefined value of the card. When the cards are sent to the retail location from which they will be sold, the corresponding records in the database are activated, thus allowing the card to be used immediately by a customer. To use the card, the customer dials a toll free number to access the card issuer's system, enters the identification number, and then makes the desired long-distance call. During the call, the value of the card in the database is decremented accordingly. When the value of the card is exhausted, the call terminates. If the customer ends the call before the value of the card is exhausted, the remaining value may be used for additional calls. Once the entire value of the card has been used, it is discarded.

These prior art prepaid phone card systems have several disadvantages. First, since the cards are active while on the shelf in the retail location, they may be stolen by a thief and easily used. Second, the prior art systems do not allow the customer to purchase a card having any given value, nor do they allow the customer to recharge the value of the cards once the are depleted.

One way to address some of the drawbacks of prior art prepaid phone card systems would be to install activation



terminals unique to the prepaid card issuer. This is referred to as a "closed system." U.S. Pat. No. 5,577,109 to Stimson et al. discloses such a closed system. In the Stimson system, the cards are not preactivated. Each of the retail locations from which cards are to be sold is provided with a dedicated activation terminal which allows the retail operator to set the value of the card at the time of the sale. The activation terminal connects to the card issuer's system to pass along the value amount and to request activation of the card. Depleted cards can be recharged in the same manner as they are sold. A serious disadvantage of the Stimson system is that it requires single-function dedicated hardware to be installed in each retail location, resulting in a very inflexible and expensive system.

Thus, there is a need in the art for a prepaid phone card activating system which is easily and inexpensively deployed, and which allows cards to be purchased in varying amounts and to be recharged without requiring the use of a closed system to handle the transactions.

III. Loyalty Cards

Loyalty cards are used to reward consumers for purchasing goods or services. For instance, airlines commonly reward frequent fliers with points for each mile flown with that airline. When the consumer accumulates a certain number of points, he or she is rewarded with free or discounted air fare. In this and other similar systems, the loyalty card issuer directly participates in the sale transaction. Such systems, however, do not allow a manufacturer of a product which is sold by an unrelated retailer to immediately reward the ultimate purchaser of the product with loyalty points. Since the manufacturer does not know of the ultimate sale until much later, if ever, it is difficult for such a manufacturer to conduct a loyalty program. Thus, there is presently no method for creating a product-specific loyalty card as opposed to a retailer-specific card. Nor is there a system for communicating loyalty data to databases not located at the retail establishment.

Furthermore, prior art loyalty programs generally do not credit the consumer's loyalty account in real-time as a purchase transaction takes place. Therefore, the consumer is unable to enjoy the benefits of their added loyalty points immediately. Finally, prior art loyalty programs commonly require significant startup efforts and expenses before the system is operational. Therefore, there is a need in the art for a real-time loyalty card system which is easily deployed, and which is capable of providing a product-specific loyalty card as well as a retailer-specific card. There is also a need for a system which can reward customers automatically for their loyalty and communicate this loyalty reward to databases other than at a retail location.

IV. Information Retrieval

Often, it is important to access certain types of information in a very fast and convenient manner. For example, a person's medical history can be extremely important in assessing the propriety of certain medical procedures during a medical emergency. Presently, in order to obtain a patient's medical history, the patient or his or her doctor must request the appropriate files from the patient's previous doctor(s). It often takes a number of days to receive the requested information. In a medical emergency, this delay is often far too long. Thus, there is a need for patients to have control over their own medical history data. Further, there is a need for this data to be instantly available to the patient, or the patient's doctor if the patient is incapacitated.

V. Multifunction Card

Due to the proliferation of various types of cards (e.g., credit/debit, long-distance calling, loyalty, etc.) over the last

couple of decades, it has become increasingly difficult to keep track of each individual card. There is a need for a card system which can serve a number of functions, thus allowing the consumer to have one card which may act as their card for financial transactions, long-distance telephone calls, loyalty information, and medical information.

## SUMMARY OF THE INVENTION

The present invention solves the problems associated with prior art card systems by providing an improved multifunction card system. The multifunction card system comprises at least one electronic gift certificate card having a unique identification number encoded on it, the identification number comprising a bank identification number corresponding to the multifunction card system; means for receiving electronic gift certificate card activation data from an existing standard retail point-of-sale device when the electronic gift certificate card is swiped through the point-of-sale device, the electronic gift certificate card activation data comprising the unique identification number of the electronic gift certificate card and an electronic gift certificate activation amount; means for activating an account corresponding to the electronic gift certificate card with a value equal to the electronic gift certificate activation amount; and means for allowing a user of the electronic gift certificate card to purchase goods having a value up to the electronic gift certificate activation amount.

The multifunction card system further comprises at least one phone card having a unique identification number encoded on it, the identification number comprising a bank identification number corresponding to the multifunction card system; means for receiving phone card activation data from an existing standard retail point-of-sale device when the phone card is swiped through the point-of-sale device, the phone card activation data comprising the unique identification number of the phone card and a phone card activation amount; means for activating an account corresponding to the phone card with a value equal to the phone card activation amount; and means for allowing a user of the phone card to obtain long distance telephone calling time having a value up to the phone card activation amount.

In a preferred embodiment, the multifunction card system further comprises at least one loyalty card having a unique identification number encoded on it, the identification number comprising a bank identification number corresponding to the multifunction card system; means for receiving loyalty data from an existing standard retail point-of-sale device when the loyalty card is swiped through the point-of-sale device, the loyalty data comprising the unique identification number of the loyalty card and a purchase amount; and means for crediting an account corresponding to the loyalty card with a number of loyalty points proportional to the purchase amount.

Optionally, the multifunction card system of the present invention may also comprise at least one medical information card having a unique identification number associated with it, the medical information card belonging to a patient; a database comprising at least one record corresponding to the medical information card, the record containing medical history information about the patient; and means for allowing an authorized requester to obtain the medical history information about the patient using the unique identification number associated with the medical information card.

## BRIEF DESCRIPTION OF THE DRAWINGS

The present invention will be more fully understood by reference to the following detailed description when considered in conjunction with the following drawings wherein like reference numbers denote the same or similar portions or processes shown throughout the several Figures, in which:

FIG. **1** is a block diagram of the multifunction card system of the present invention; and

FIG. **2** is block diagram demonstrating the various ways in which a retail point-of-sale device might connect to the multifunction card system of the present invention.

## DETAILED DESCRIPTION OF THE INVENTION

The present invention is a multifunction card system which allows for the activation of prepaid phone cards and the use of Electronic Gift Certificate™ cards, loyalty cards, debit cards, and medical information cards. Further, the system provides for the immediate linkage of these various functions. FIG. **1** illustrates the multifunction card system **108** of the present invention. The system **108** comprises a plurality of cards **101**, a sponsor bank processor **102**, and a processing hub **103**, which serves as the nerve center of the system **108**. If the system **108** is to provide prepaid phone cards, it will also include a prepaid phone card issuer hub **104** maintained by a prepaid phone card issuer. In order to achieve the desired functionality, the system **108** uses existing banking networks in a unique and novel way to gain access to virtually all existing retail point-of-sale (POS) devices **105**. These devices **105** include stand-alone POS terminals, cash registers with POS interfacing, computers with POS interfacing, and other similar devices which can be used to access the banking system. As used herein, POS device includes all such devices, whether data entry is effected by swiping a card through the device or by manual entry.

To access these POS devices, the operator of the system **108** must apply for and obtain a Bank Identification Number (BIN) from the American Banking Association. The BIN serves as a unique identifier of the multifunction card system **108** within the banking network. The BIN is encoded on a magnetic strip **106** on each card **101** in the system **108** as a part of the card's identification number. Alternatively or additionally, the BIN and identification number could be encoded as a bar code, embossed on the surface on the card **101** in numerals for manual entry, or provided by any other means known in the art.

Preferably, the BIN's first digit will be the same number as the first BIN digit used by a popular card issuer. This is because POS devices are preprogrammed to recognize only certain types of cards, such as those issued by VISA® and MasterCard®, American Express®, etc. As a rule, these POS devices must be reprogrammed before they will accept a new type of card. However, since POS devices already recognize cards issued by these popular card issuers, a new type of card will also be recognized by such devices if it has a BIN that begins with the same number used by one of the popular card issuers. Since VISA® and MasterCard® are the most universally accepted cards, the BIN of the multifunction card system **108** of the present invention preferably will begin with the same number used by either VISA® or MasterCard® (i.e., "4" or "5", respectively). By using one of these numbers, the card **101** will be recognized by almost all existing POS devices **105** as a debit or credit card, and its transactions will be automatically routed by the banking system to the correct destination. This occurs regardless of the type of POS device **105** used, since all such devices are designed to interface with the banking network. Although

the BIN number will preferably begin with a "4" or "5", it may begin with any number that is recognized by POS devices **105**.

The operator of the system **108** should also have a sponsoring bank whose bank processor **102** will serve as the link between the processing hub **103** and the banking network. Alternatively, the operator of the system **108** could itself be a banking institution.

By providing a means for any given POS device **105** to connect to the processing hub **103**, the system **108** allows a retailer to remotely activate or add value or loyalty data to a system card. The method by which this occurs is set forth more fully below in the context of the various functions of the card.

I. Prepaid Phone Card

A plurality of long distance service providers may contract with the operator of the multifunction card system **108** to issue prepaid phone cards **101** for use in the system **108**. Alternatively, a long distance service provider may itself be the operator of the system **108**. The long distance service provider will be referred to as a phone card issuer. A phone card issuer provides prepaid phone cards **101** to retailers who sell the cards **101** at their retail locations. Until activated, the cards **101** have no intrinsic value associated with them. Therefore, they may be placed on store shelves in easily accessible areas without the fear of losses due to theft. When a customer wishes to purchase or recharge one of the cards **101**, he or she informs the sales clerk of the monetary amount desired. Depending upon the system chosen by the particular phone card issuer, this amount may be one of a finite number of predefined amount increments, or may be selected by the customer. The clerk swipes the card **101** through the POS device **105**. Depending upon the amount of customization that has occurred at the retailer's location, there are a number of ways in which the POS device **105** may connect to the system's **108** processing hub **103** to carry out the transaction. FIG. **2** illustrates several of these methods.

The first two methods shown in FIG. **2**, methods A and B, are the most easily deployed, but cost the most on a per-transaction basis. To route information to the processing hub **103**, these methods employ the debit network **107** used by banking institutions. The retailer in method A (retailer A) has a central processor which controls each of its POS devices **105** and connects them to a processor **208** at a bank chosen by the retailer. Retailer B's POS device **105** connects directly to the bank processor **208**. Otherwise, the two methods are the same.

Banking regulations currently require that any transaction taking place over the debit network **107** must result in an actual transfer of funds. Since this phone card activation transaction is not a typical debit transaction, it is presently desirable to keep the official amount of the transaction to a minimum, yet still comply with the banking regulations. Therefore, regardless of the actual sale amount, the clerk enters a nominal transaction amount. In a preferred embodiment, the nominal transaction amount is keyed to the actual transaction amount (e.g., $0.01 nominal=$10.00 actual, $0.02 nominal=$20.00 actual, etc.). Therefore, the actual transaction amount can be ascertained from the nominal amount. In this embodiment, the card could only be activated or recharged in predefined increments. If the card is to have a fixed value, the activation amount could also be encoded on the magnetic strip **106** of the card **101** as part of the card's identification number.

In an alternate embodiment, the card could be activated or recharged in any amount desired by the customer. In this case, the nominal transaction amount would be a fixed value, such as $0.01. Once the nominal transaction amount is entered, the actual sale amount could then be entered on the PIN pad of the POS device **105** instead of the personal identification number (PIN) that would normally be entered when using a debit card. By entering the actual sale amount in this manner, it can be any desired amount.

In either case, before it transmits the data, the POS device **105** encrypts the information to be sent. This information includes the identification number read from the card's magnetic strip **106**, the nominal transaction amount, and the actual sale amount if it was entered into the PIN pad. The system **108** contains software which will decrypt and translate the data upon receipt. Once the encryption has taken place, the POS device **105** transmits the data either directly or via the central processor **201** to the bank processor **208**. The bank processor **208** receives the data and transmits it over the debit network **107**. The debit network **107** then forwards the data to the sponsoring bank's processor **102**. As mentioned earlier, the sponsoring bank is one which has agreed to operate as a link between the debit network **107** and the processing hub **103**.

As mentioned earlier, banking regulations as they currently exist require that transactions taking place over the debit network must result in a transfer of funds. Preferably, in order to comply with the banking regulations, the sponsoring bank transfers the nominal amount (e.g., $0.01) from one account belonging to the retailer to another account also belonging to the retailer. The bank processor **102** then forwards the data from the POS device **105** to the processing hub **103**.

In methods C and D, the retailers' central processor **202** or POS device **105**, respectively, again connect to a processor **209** at a retailer-chosen bank. By agreement between the operator of the multifunction card system **108** and the retailer-chosen bank, this bank processor **209** is programmed to recognize the multifunction card system's BIN and to forward the system's transactions directly to the sponsoring bank's processor **102** rather than using the debit network **107**. Since the debit network **107** is not used, it is not necessary to use a nominal sale amount, although such a method would nonetheless work and might be preferred by the retailer for security and bookkeeping purposes. The system **108** could instead be programmed to prompt the clerk for the appropriate information. As in methods A and B, the sponsor bank processor **102** forwards the necessary information to the processing hub **103**. Although methods C and D are more efficient than methods A and B on a per transaction basis, they require some customization at the retailer location to cause the retailer to connect to a bank processor **209** that recognizes the system's BIN.

Methods E and F are the least costly methods of connecting to the processing hub **103** (i.e., directly from the retailer's central processor **203** or from the POS device **105** itself). The connection may be made via a toll-free telephone line, a dedicated phone line, over the Internet, or any other standard communication means. Again, however, these methods require the most customization at the retailer location to cause the retailer's system to recognize the multifunction card system's cards and to route their transactions directly to the processing hub **103**. Such customization, however, still does not require reprogramming of the POS devices themselves. The connection method chosen may be adjusted to fit the individual retailer's needs.

Regardless of the method used, the data will eventually arrive at the processing hub **103**. If the transmission has taken place over the debit network **107**, the data must be

decrypted using equipment well known in the art for decrypting debit transaction data. Once the data is received and, if necessary, decrypted, the processing hub **103** recognizes the identification number of the card as being associated with a particular prepaid phone card issuer. Next, a security check is performed to verify that this transaction is originating from a retailer that is authorized to sell the prepaid phone cards. If the transaction is originating from an authorized retailer, the transaction will proceed. The processing hub **103** will then forward the card identification number, retail store and POS device information, and amount information to the issuer hub **104** maintained by the prepaid phone card issuer. The issuer hub **104** contains one or more phone card databases **204** which store information about each phone card. When the issuer hub **104** receives the data from the processing hub **103**, it activates the record in the phone card database **204** having the same identification number as the card **101**. The value field in the record is then increased by the appropriate purchased amount. If the card is of a fixed value, the record is simply activated. The issuer hub **104** then returns an authorization number which travels back along the same path to the originating POS device **105**. The customer may then dial the prepaid phone card issuer's toll free number, enter the card number and any required PIN, and obtain long distance calling time having a value up to the value of the card stored in the phone card database **204**.

Each activation or recharge transaction is recorded by the system **108**. At the end of the day, a report is preferably created for each card issuer and retail location so that their accounts can be reconciled. Transfer of funds between these parties may then take place by any commercially acceptable means.

II. Electronic Gift Certificate™ Card

The multifunction card system **108** of the present invention is also capable of providing an Electronic Gift Certificate™ (EGC) card **101** for a retail issuer. Such a card **101** could be sold by the retail issuer for making purchases only in the retail issuer's stores or for use in a plurality of stores. As in the phone card context, the customer would ask the sales clerk for an Electronic Gift Certificate™ card of the desired amount. If the customer already has an Electronic Gift Certificate™ card, he or she might ask the clerk to add the desired amount to the already existing balance. The clerk swipes the card **101** and enters the transaction amount, either directly or using a nominal amount and/or the PIN pad, depending upon whether the debit network **107** is to be used. Using one of the methods discussed above, the data then makes its way to the processing hub **103**.

Alternatively, the activation could occur by processing the card **101** as a typical debit card using the debit network **107**. In such a case, the retail issuer would maintain accounts with the sponsor bank. When an activation transaction takes place, the bank would transfer the activation amount from a general account to an account corresponding to the card. If the card is to be accepted at a number of retail locations, the account corresponding to the card could be opened in the name of the card holder if appropriate paperwork is submitted to the bank. In this manner, the card could be used at any retail location capable of processing debit transactions. This would allow the card to serve as a prepaid card substitute for travelers checks and money orders. Regardless of the way in which the card is processed, the transaction data eventually makes its way to the processing hub **103**.

Upon receipt of the transaction data, the hub **103** recognizes the card **101** as being an Electronic Gift Certificate™ card of the retail issuer and activates or recharges the card **101** in the appropriate amount in an EGC database **205** maintained at the processing hub **103**.

Optionally, the Electronic Gift Certificate™ card **101** could also be recharged using a credit card via an on-line connection to the processing hub **103**, such as over the Internet.

Once a card **101** has been activated or recharged, the recipient of the card **101** is allowed to make purchases using the card. If the card is only for use in the retail issuer's stores, the purchase transaction might proceed in much the same manner as the activation process. The clerk would swipe the card **101** and enter the purchase amount. If the transaction is to be transmitted over the debit network, a nominal transaction amount may be used, and the actual amount entered instead of the PIN. A special code is used to indicate that the transaction is a purchase transaction rather than an activation or recharge transaction. If the debit network is used, the code could be the first digit of the PIN, followed by the purchase amount, thus allowing the software of the system **108** to recognize the type of transaction and decrypt the data accordingly.

Upon receipt of the data via one of the methods described above, the processing hub **103** compares the purchase amount to the balance for the card in the EGC database **205**. If the balance is greater than the purchase amount, the processing hub **103** will decrement the record in the database and will send back an approval code which will allow the transaction to proceed. If a sufficient balance is not present, the processing hub **103** will notify the POS device **105** that the transaction may not proceed. Preferably, an automated toll free number is provided for the holder of the card **101** to verify the remaining balance. The processing hub **103** preferably maintains records of all transactions.

If the card **101** is for use in many retail locations, it would instead be processed during purchase transactions as a typical debit card, preferably using the debit network **107**. In this case, either the retail issuer or the cardholder must have an account with the sponsor bank. When a purchase transaction takes place, the clerk or cardholder simply swipes the card and receives back a response in the same manner as a normal debit transaction. If sufficient funds are present in the account corresponding to the card, the transaction will be approved. The sponsor bank then transfers the purchase amount from the retail issuer's or cardholder's account to an account belonging to the retail location at which the purchase occurred, which account may or may not be located at the sponsor bank. The transaction data is then forwarded to the processing hub **103** so that the EGC database **205** can be updated.

In a preferred embodiment, an Electronic Gift Certificate™ card could also be used to obtain long distance calling time in addition to making purchases in the retail issuer's store. The retail issuer could contract with a prepaid phone card issuer to provide the calling time. When the card **101** is activated, the phone card issuer simultaneously creates an entry in its phone card database **204** corresponding to the entry in the EGC database **205**. The card **101** can then be used in exactly the same manner as the prepaid phone card discussed above. In order to prevent the use of the Electronic Gift Certificate™ card simultaneously to make purchases and to obtain long distance calling time, a safety procedure is provided. When the card **101** is used to make a long distance call, the phone card issuer hub **104** instructs the processing hub **103** to seize the record corresponding to the card **101** in the EGC database **205**. With the record seized, the system **108** will not authorize any purchasing activity for the duration of the call. When the call terminates, the phone

card issuer hub **104** decrements the appropriate record in its phone card database **204** and instructs the processing hub **103** to do the same in the EGC database **205**. The record in the EGC database **205** is then unseized. When the card **101** is used to make a purchase, the processing hub **103** similarly instructs the phone card issuer hub **104** to seize the appropriate record in the phone card database **204** for the duration of the transaction. When the transaction is over, the records in the EGC database **205** and the phone card database **204** are decremented appropriately.

In the preferred embodiment of the invention, the retail issuer is also given the capability to award loyalty points to the bearer of the Electronic Gift Certificate™ card in recognition of purchases or recharges made. In such a case, the processing hub **103** maintains a separate loyalty card database **206**. When the Electronic Gift Certificate™ card bearer adds money to the card **101**, or makes a purchase using the card **101**, the system **108** may add a number of points proportional to the purchase price to the card's record in the loyalty card database **206**. Alternatively points could be awarded based upon the frequency of card usage rather than purchase amounts. In either case, when the card bearer reaches certain predefined point plateaus, he or she may be rewarded by the retail issuer with additional card value or with long-distance calling time.

III. Loyalty Card

Not unlike the loyalty feature add-on of the Electronic Gift Certificate™ card, the system **108** of the present invention may provide a separate loyalty card much like a frequent flier card that can have points added at virtually any POS device **105**.

A. Product/Manufacturer-Specific Loyalty Card

The card could be issued by a certain manufacturer to reward a customer with loyalty points for purchasing the manufacturer's product, regardless of the retail location of the purchase. This reward could be tied to the purchase of a single product type or to all of the manufacturer's products. The loyalty points awarded could be varied based upon any promotional campaigns being conducted by the manufacturer. Points are added to the card at participating retail locations which sell the manufacturer's product(s). The card **101** is swiped at any retail location, the purchase amount for the manufacturer's product is entered using the PIN pad of the POS device **105**, and the data is transmitted to the processing hub **103** using one of the methods described above. After receiving the data, the processing hub **103** credits the appropriate record in the loyalty card database **206** with a number of points proportional to the purchase price. The card is transportable to any participating retailer. The system **108** allows the manufacturer to connect to the processing hub **103** via an on-line connection to access the loyalty card database **206**. Again, the customer could be rewarded when certain point plateaus are reached.

B. Retailer-Specific Loyalty Card

Alternatively, the card could be issued by a particular retailer to reward customers for purchases made in the retailer's location(s). The retailer could award points for any purchase within the store, or could target special promotional items. The card would function in a manner similar to the product-specific card. Once again, the customer is rewarded when certain point plateaus are reached.

Alternatively, the loyalty data could be used to simultaneously credit other databases of the system **108**. For instance, instead of awarding loyalty points, the system could add value in real time to a record in the phone database **204** at the prepaid phone card issuer hub **104**, thus rewarding the customer with free phone time. Loyalty points might also be converted into a dollar value for use at the retail location. Optionally, the system **108** can keep records of a consumer's purchasing habits for marketing purposes. As with the manufacturer-specific card, the system **108** allows the retailer to connect to the processing hub **103** via an on-line connection to access the loyalty card database **206**.

IV. Information Retrieval Card

Finally, the multifunction card system **108** of the present invention is capable of providing an information retrieval card. In an exemplary embodiment, a medical information card which allows access and retrieval of a patient's complete medical history from a multitude of remote locations is provided. Each participating patient's medical information is stored in a record in a medical information database **207** maintained at the processing hub **103**. The record contains the identification number encoded on the patient's card **101**.

When medical history information data is needed, it may be requested by swiping the card **101** through a POS device **105** at a participating doctor's office or hospital. Preferably, a PIN is entered into the POS device **105** to ensure that only an authorized person is able to request the information. The POS device **105** would then send the request to the processing hub **103** via one of the routes described above. When the processing hub **103** receives the request from the authorized requester, it then immediately sends the information to the requestor via means preselected by the participating doctor's office or hospital. Such means may include electronic mail, facsimile, voice response, and other similar means. The medical history information may be updated by the patient or his or her doctor or insurer by forwarding new information to the operator of the system **108** via an on-line connection, over the Internet, by telephone, by facsimile, or by mail.

As a backup, the request could instead be made using a computer, wherein the computer connects to the processing hub **103** via the Internet or by direct modem connection. The requestor might be allowed to view, print, or download the appropriate medical history information. Alternatively, the request could be made by facsimile or by calling an automated toll free number and entering the card number.

In order to allow a cardholder to keep track of medical savings accounts or various other means for paying for medical services (e.g., Medicare), the system **108** also allows access to a database which maintains the medical funds for the cardholder. As described above under the Electronic Gift Certificate™ section, the system **108** is able to authorize, reject, and cause money to be transferred based upon the cardholder's available medical funds.

V. Intelligent Card™

In the preferred embodiment of the invention, the multifunction card system **108** is capable of providing a single card **101** which is capable of performing all of the foregoing functions. Preferably, the system **108** also allows for the card **101** to be used as an on-line debit card after the cardholder registers with the system. In order to let the system **108** know which function or functions the card **101** is serving in any particular transaction, a code is entered into the PIN pad of the POS device from which the transaction is originating. Alternatively, the system **108** could prompt the user to indicate the proper card function and the databases that must be accessed. Based upon this input, the system **108** carries out the appropriate actions. The system **108** can access each of the databases discussed above and can simultaneously increase or decrease each database as needed by the type of transaction occurring.

VI. Processing Hub Technical Details

The processing hub **103** of the present invention provides front-end POS device management and message processing

for card authorization and activations. The processing hub **103** can be implemented using any computer having acceptable processing and storage capacity. It preferably comprises a Stratus RADIO Cluster™, which is a scaleable system based upon the standard Intel Pentium processor. The Stratus RADIO Cluster™ provides the processing hub **103** with a high degree of reliability and fault-tolerance. Since the Stratus system is scaleable, an adequate degree of redundancy can be provided in order to reduce the impact of individual failures. In addition, as demand for the multifunction card system increases, the processing hub **103** can be scaled to meet increasing demands for processing power and storage availability. The modular design of such a hub is upgradable for long term capacity planning and expansion.

The software of the system is preferably written in the C, Force, and Foxpro programming languages. The C language programs are preferably written to interface with specialty external interface boards. Force is preferably used for all on-line transaction processing, while Foxpro preferably provides for database management and the user interface. Since Force and Foxpro share database file structures, on-line transactions may be viewed by the system operators using the Foxpro interface.

In order to provide further reliability, all applications and data are replicated and synchronized across the processing hub **103** by Isis Reliable software. Load distribution among the modules is automatically controlled by the software to improve the response time and throughput. External communications nodes provide the necessary interface requirements of physical connectivity, protocol, message transmission, message validation, and message processing.

While the multifunction card system herein described constitutes the preferred embodiment of the present invention, it is to be understood that the invention is not limited to this precise form of system, and that changes may be made therein without departing from the scope of the invention which is defined in the following claims.

I claim:

**1**. A multifunction card system, comprising:

a. at least one electronic gift certificate card having a unique identification number encoded on it, said identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, said identification number corresponding to the multifunction card system;

b. means for receiving electronic gift certificate card activation data from an unmodified existing standard retail point-of-sale device when said electronic gift certificate card is swiped through the point-of-sale device, said electronic gift certificate card activation data comprising the unique identification number of the electronic gift certificate card and an electronic gift certificate activation amount;

c. means for activating an account corresponding to the electronic gift certificate card with a balance equal to the electronic gift certificate activation amount;

d. means for allowing a user of the electronic gift certificate card to purchase goods and services having a value up to the balance of the account corresponding to the electronic gift certificate card; and

e. means for decreasing the balance of the account corresponding to the electronic gift certificate card by the value of the goods and services purchased.

**2**. A multifunction card system as recited in claim **1**, further comprising:

a. means for receiving electronic gift certificate card recharge data from an existing standard retail point-of-sale device when said electronic gift certificate card is swiped through the point-of-sale device, said electronic gift certificate card recharge data comprising the unique identification number of the electronic gift certificate card and an electronic gift certificate recharge amount; and

b. means for increasing the balance of the account corresponding to the electronic gift certificate card by the electronic gift certificate recharge amount.

**3**. A multifunction card system as recited in claim **1**, wherein the first digit of said bank identification number is selected from the group consisting of four and five.

**4**. A multifunction card system as recited in claim **1**, further comprising means for allowing a user of the electronic gift certificate card to obtain long distance telephone calling time, wherein the total of the value of the goods and services purchased and the long distance telephone calling time obtained cannot exceed the balance of the account corresponding to the electronic gift certificate card.

**5**. A multifunction card system as recited in claim **4**, wherein said means for receiving electronic gift certificate activation data from an existing standard retail point-of-sale device when said electronic gift certificate card is swiped through the point-of-sale device employs the banking network.

**6**. A multifunction card system as recited in claim **4**, further comprising means for associating loyalty data with the electronic gift certificate card based upon usage of the electronic gift certificate card.

**7**. A multifunction card system as recited in claim **1**, further comprising means for associating loyalty data with the electronic gift certificate card based upon usage of the electronic gift certificate card.

**8**. A multifunction card system as recited in claim **1**, wherein said means for receiving electronic gift certificate activation data from an existing standard retail point-of-sale device when said electronic gift certificate card is swiped through the point-of-sale device employs the banking network.

**9**. A multifunction card system as recited in claim **1**, further comprising:

a. at least one phone card having a unique identification number encoded on it, said identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, said identification number corresponding to the multifunction card system;

b. means for receiving phone card activation data from an unmodified existing standard retail point-of-sale device when said phone card is swiped through the point-of-sale device, said phone card activation data comprising the unique identification number of the phone card and a phone card activation amount;

c. means for activating an account corresponding to the phone card with a balance equal to the phone card activation amount;

d. means for allowing a user of the phone card to obtain long distance telephone calling time having a value up to the balance of the account corresponding to the phone card; and

e. means for decreasing the balance of the account corresponding to the phone card by the value of the long distance telephone calling time obtained.

**10**. A multifunction card system as recited in claim **9**, further comprising:

a. means for receiving phone card recharge data from an existing standard retail point-of-sale device when said phone card is swiped through the point-of-sale device, said phone card recharge data comprising the unique identification number of the phone card and a phone card recharge amount; and

b. means for increasing the balance of the account corresponding to the phone card by the phone card recharge amount.

**11**. A multifunction card system as recited in claim **9**, wherein a single card with a single identification number can function as an electronic gift certificate card and as a phone card.

**12**. A multifunction card system as recited in claim **1**, further comprising:

a. at least one loyalty card having a unique identification number encoded on it, said identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, said identification number corresponding to the multifunction card system;

b. means for receiving loyalty data from an existing standard retail point-of-sale device when said loyalty card is swiped through the point-of-sale device, said loyalty data comprising the unique identification number of the loyalty card and purchase data; and

c. means for crediting an account corresponding to the loyalty card with loyalty points based upon the purchase data.

**13**. A multifunction card system as recited in claim **12**, wherein a single card with a single identification number can function as an electronic gift certificate card and as a loyalty card.

**14**. A multifunction card system as recited in claim **1**, further comprising:

a. at least one medical information card having a unique identification number associated with it, said medical information card belonging to a patient;

b. a database comprising at least one record corresponding to said medical information card, said record containing medical history information about the patient; and

c. means for allowing an authorized requester to obtain the medical history information about the patient using the unique identification number associated with the medical information card.

**15**. A multifunction card system as recited in claim **14**, wherein a single card with a single identification number can function as an electronic gift certificate card and as a medical information card.

**16**. A prepaid phone card system, comprising:

a. at least one phone card having a unique identification number encoded on it, said identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, said identification number corresponding to the prepaid phone card system;

b. means for receiving phone card activation data from an unmodified existing standard retail point-of-sale device when said phone card is swiped through the point-of-sale device, said phone card activation data comprising the unique identification number of the phone card and a phone card activation amount;

c. means for activating an account corresponding to the phone card with a balance equal to the phone card activation amount;



d. means for allowing a user of the phone card to obtain long distance telephone calling time having a value up to the balance of the account corresponding to the phone card; and

e. means for decreasing the balance of the account corresponding to the phone card by the value of the long distance telephone calling time obtained.

**17**. A prepaid card system as recited in claim **16**, further comprising:

a. means for receiving phone card recharge data from an existing standard retail point-of-sale device when said phone card is swiped through the point-of-sale device, said phone card recharge data comprising the unique identification number of the phone card and a phone card recharge amount; and

b. means for increasing the balance of the account corresponding to the phone card by the phone card recharge amount.

**18**. A prepaid phone card system as recited in claim **16**, wherein the first digit of said bank identification number is selected from group of numbers consisting of the numbers four and five.

**19**. A prepaid card system as recited in claim **16**, wherein said means for receiving phone card activation data from an existing standard retail point-of-sale device when said phone card is swiped through the point-of-sale device employs the banking network.

**20**. A loyalty card system, comprising:

a. at least one loyalty card having a unique identification number encoded on it, said identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, said identification number corresponding to the loyalty card system;

b. means for receiving loyalty data from an unmodified existing standard retail point-of-sale device when said loyalty card is swiped through the point-of-sale device, said loyalty data comprising the unique identification number of the card and purchase data; and

c. means for crediting an account corresponding to the loyalty card with loyalty points based upon the purchase data.

**21**. A loyalty card system as recited in claim **20**, wherein the first digit of said bank identification number is selected from a group of numbers consisting of the numbers four and five.

**22**. A loyalty card system as recited in claim **20**, wherein said means for receiving loyalty data from an existing standard retail point-of-sale device when said loyalty card is swiped through the point-of-sale device employs the banking network.

**23**. A method of activating or recharging a prepaid card having a unique identification number encoded on it, the identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, said identification number corresponding to a prepaid card system, comprising the steps of:

a. swiping the card through an unmodified existing standard retail point-of-sale device;

b. entering an amount into the point-of-sale device;

c. transmitting the identification number and the amount from the point-of-sale device to a processing hub;

d. crediting an account balance in a database with the amount;

e. allowing a user of the card to purchase goods and services using the card; and

f. allowing a user of the card to obtain long distance telephone calling time using the card;

g. wherein the total of the value of the goods and services purchased and the long distance telephone calling time obtained using the card cannot exceed the account balance.

**24**. A method according to claim **23**, further comprising the step of associating loyalty data with the card based upon usage of the card.

**25**. A method according to claim **24**, further comprising the step of transferring loyalty data to a phone card issuer.

**26**. A method according to claim **23**, wherein said step of transmitting the identification number and the amount from the point-of-sale device to a processing hub is carried out at least in part via the banking network.

**27**. A method of activating or recharging a prepaid phone card having a unique identification number encoded on it, the identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, said identification number corresponding to a prepaid phone card system, comprising the steps of:

a. swiping the phone card through an unmodified existing standard retail point-of-sale device;

b. entering an amount into the point-of-sale device;

c. transmitting the identification number and the amount from the point-of-sale device to a processing hub;

d. transmitting the identification number and the amount from the processing hub to a prepaid phone card issuer hub;

e. crediting an account balance in a phone card database with the amount; and

f. allowing a user of the phone card to obtain long distance telephone calling time having a value up to the account balance.

**28**. A method according to claim **27**, wherein said step of transmitting the identification number and the amount from the point-of-sale device to a processing hub is carried out at least in part via the banking network.

**29**. A method of adding points to a loyalty card having a unique identification number encoded on it, the identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, said identification number corresponding to a loyalty card system, comprising the steps of:

a. swiping the loyalty card through an unmodified existing standard retail point-of-sale device;

b. entering purchase data into the point-of-sale device;

c. transmitting the identification number and the purchase data from the point-of sale device to a processing hub; and

d. crediting an account in a database with loyalty points based upon the purchase data.

**30**. A method according to claim **29**, wherein said step of transmitting the identification number and the purchase amount from the point-of-sale device to a processing hub is carried out at least in part via the banking network.

**31**. A method according to claim **29**, further comprising the step of allowing the owner of the loyalty card to redeem loyalty points for an item selected from the group consisting of goods, services, discounts on goods and services, long distance telephone calling time value, and money value.

**32**. A multifunction card system comprising:

a. at least one debit/medical services card having a unique identification number encoded on it comprising a bank identification number approved by the American Banking Association for use in a banking network;



b. a transaction processor receiving card data from an unmodified existing standard point-of-sale device, said card data including a unique identification number;

c. a processing hub receiving directly or indirectly said card data from said transaction processor; and

d. said processing hub accessing a first database when the card functions as a debit card and said processing hub accessing a second database when the card functions as a medical card.

**33**. The multifunction card system of claim **32**, wherein the unique identification number further comprises a medical identification number.

**34**. A system comprising:

a. at least one electronic gift certificate card having an electronic gift certificate card unique identification number encoded on it, said electronic gift certificate card unique identification number comprising a bank identification number approved by the American Banking Association for use in a banking network;

b. a transaction processor receiving electronic gift card activation data from an unmodified existing standard retail point-of-sale device, said electronic gift certificate card activation data including said unique identification number and an electronic gift certificate card activation amount;

c. a processing hub receiving directly or indirectly said activation data from said transaction processor; and

d. said processing hub activating an account corresponding to the electronic gift certificate card unique identification number with a balance corresponding to the electronic gift certificate activation amount.

**35**. The system of claim **34**, wherein the electronic gift certificate card activation amount is encoded in the unique identification number.

**36**. The system of claim **34**, wherein the electronic gift certificate card activation amount is entered at the point-of-sale device.

**37**. The system of claim **34**, wherein said processing hub allows a user of the electronic gift certificate card to purchase a value up to the balance corresponding to the electronic gift certificate activation amount.

**38**. The system of claim **34**, wherein:

a. said transaction processor receives electronic gift certificate card recharge data from the existing standard retail point-of-sale device, said electronic gift certificate card recharge data including said unique identification number and an electronic gift certificate card recharge amount; and

b. said processing hub increasing said amount corresponding to the electronic gift certificate card unique identification number with a balance corresponding to the electronic gift certificate card recharge amount.

**39**. The system of claim **34**, wherein the first digit of the bank identification number is selected from a group of numbers consisting of the numbers four and five.

**40**. The system of claim **34**, wherein the processing hub allows the use of the electronic gift certificate card to obtain phone calling time.

**41**. The system of claim **34**, further comprising:

a. a prepaid phone card issuer hub receiving directly or indirectly the electronic gift card activation data from said processing hub; and

b. said prepaid phone card issuer hub activating a record in a phone card database corresponding to the electronic gift certificate card unique identification number.

**42**. The system of claim **41**, wherein the prepaid phone card issuer hub instructs the processing hub to seize the account corresponding to the electronic gift certificate card unique identification number where an electronic gift certificate card is used to make a call.

**43**. The system of claim **41**, wherein the processing hub instructs the phone card issuer hub to seize the record corresponding to the electronic gift certificate card unique identification number when the electronic gift certificate card is used to make a transaction.

**44**. The system of claim **34**, wherein the transaction processor is coupled to the banking network.

**45**. The system of claim **34**, wherein the processing hub associates loyalty data with the electronic gift certificate card based upon the usage of the electronic gift certificate card.

**46**. The system of claim **34**, wherein the activation data received at the processing hub is encrypted.

**47**. The system of claim **34**, wherein the processing hub includes a loyalty card database.

**48**. The system of claim **34**, wherein the processing hub includes a medical information card database.

**49**. The system of claim **34**, wherein the processing hub includes an electronic gift certificate card database, a loyalty card database, and a medical information database.

**50**. A multifunction card system comprising:

a. at least one electronic gift certificate card having an electronic gift certificate card unique identification number encoded on it, said electronic gift certificate card unique identification number comprising a bank identification number approved by the American Banking Association for use in a banking network;

b. a transaction processor receiving electronic gift card activation data from an unmodified existing standard retail point-of-sale device, said electronic gift certificate card activation data including the electronic gift certificate card unique identification number and an electronic gift certificate card activation amount;

c. a processing hub receiving directly or indirectly said activation data from said transaction processor; and

d. said processing hub activating an account corresponding to the electronic gift certificate card unique identification number with a balance corresponding to the electronic gift certificate activation amount.

**51**. The multifunction card system of claim **50**, wherein the electronic gift certificate card activation amount is encoded in the unique identification number.

**52**. The multifunction card system of claim **50**, wherein the electronic gift certificate card activation amount is entered at the point-of-sale device.

**53**. The multifunction card system of claim **50**, further comprising:

a. at least one phone card having a phone card unique identification number encoded on it, said phone card unique identification number comprising a bank identification number approved by the American Banking Association for use in a banking network;

b. said transaction processor receiving phone card activation data from said existing standard retail point-of-sale device, said phone card activation data including said phone card unique identification number and a phone card activation amount;

c. said processing hub receiving directly or indirectly said phone card activation data from said transaction processor and recognizing the phone card unique identification number of the phone card as being associated with a particular prepaid phone card issuer; and

d. said processing hub forwarding the phone card activation data to a particular prepaid phone card issuer hub.

**54**. The multifunction system of claim **53**, wherein the particular prepaid phone card issuer hub contains at least one phone card database which stores information about each said phone card and activates the stored information to permit debiting of a predetermined value of phone calling in response to the activation data.

**55**. The multifunction system of claim **50**, further comprising:

a. at least one loyalty card having a loyalty card unique identification number encoded on it, said loyalty card identification number comprising a bank identification number approved by the American Banking Association for use in a banking network;

b. said transaction processor receiving loyalty card activation data from said existing standard retail point-of-sale device, said loyalty card activation data including said loyalty card unique identification number and purchase data;

c. said processing hub receiving directly or indirectly said phone card activation data from said transaction processor; and

d. said processing hub crediting an account corresponding to the loyalty card with loyalty points based upon the purchase data.

**56**. The multifunction system of claim **50**, further comprising:

a. at least one medical information card having a medical card unique identification number associated with it, said medical information belonging to a patient; and

b. said processing hub including at least one record corresponding to said medical information card, said record containing medical history information about the patient.

**57**. A multifunction card system comprising:

a. at least one card having a unique identification number encoded on it, said identification number comprising a bank identification number approved by the American Banking Association for use in a banking network;

b. a transaction processor receiving card activation data from an unmodified existing standard retail point-of-sale device, said card activation data including said unique identification number;

c. a processing hub receiving directly or indirectly said activation data from said transaction processor; and

d. said processing hub activating an account corresponding to the unique identification number, thereby permitting later access to said account.

**58**. The multifunction card system of claim **57**, wherein said card is selected from the group consisting of an electronic gift certificate card, a phone card, a loyalty card, and a medical information card.

**59**. The multifunction card system of claim **57**, wherein said card performs the functions of an electronic gift certificate card, a phone card, a loyalty card, and a medical information card.

**60**. A method of activating a prepaid card having a unique identification number encoded on it, the identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, the method comprising the steps of:

a. swiping the card through an unmodified existing standard point-of-sale device;

b. transmitting the identification number and an activation amount from the point-of-sale device to a processing hub; and

c. activating an account in the processing hub corresponding to the identification number.

**61**. The method of claim **60**, further comprising:

a. transmitting the identification number and a recharge amount from the point-of-sale device to a processing hub; and

b. recharging the account in the processing hub corresponding to the identification number.

**62**. The method of claim **60**, further comprising entering the activation amount into the point-of-sale device.

**63**. The method of claim **60**, wherein the step of transmitting the identification number and the activation amount from the point-of-sale device is carried out at least in part over the banking network.

**64**. The method of claim **60**, further comprising allowing a user of the card to obtain calling time using the card.

**65**. The method of claim **60**, further comprising allowing a user of the card to purchase goods and services using the card.

**66**. The method of claim **60**, further comprising associating loyalty data with the card based upon usage of the card.

* * * * *

US006000608C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (9123rd)

# United States Patent

**Dorf**

(10) **Number: US 6,000,608 C1**
(45) **Certificate Issued: Jul. 10, 2012**

(54) **MULTIFUNCTION CARD SYSTEM**

(75) Inventor: **Robert E. Dorf**, Raleigh, NC (US)

(73) Assignee: **AlexSam, Inc.**

**Reexamination Request:**
No. 90/009,793, Aug. 2, 2010

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **6,000,608** |
| Issued: | **Dec. 14, 1999** |
| Appl. No.: | **08/891,261** |
| Filed: | **Jul. 10, 1997** |

(51) **Int. Cl.**
***G07F 7/08*** (2006.01)
***G07F 7/10*** (2006.01)

(52) **U.S. Cl.** ......................... **235/380**; 235/375; 235/376

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/009,793, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner*—John M Hotaling

(57) **ABSTRACT**

Disclosed is a multifunction card system which provides a multifunction card capable of serving as a prepaid phone card, a debit card, a loyalty card, and a medical information card. Each card has an identification number comprising a bank identification number which assists in establishing communications links. The card system can be accessed from any existing point-of-sale (POS) device. The POS device treats the card as a credit or debit card and routes transaction data to a processing hub using the banking system. The processing hub coordinates the various databases corresponding to the various functions of the card.



# EX PARTE REEXAMINATION CERTIFICATE ISSUED UNDER 35 U.S.C. 307

NO AMENDMENTS HAVE BEEN MADE TO THE PATENT

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims **1**, **3-5**, **8-11**, **16-19**, **23**, **26-28**, **34**, **36**, **37**, **39-44**, **50**, **52-54**, **57**, **58**, **60**, **62**, **63** and **65** is confirmed.

Claims **2**, **6**, **7**, **12-15**, **20-22**, **24**, **25**, **29-33**, **35**, **38**, **45-49**, **51**, **55**, **56**, **59**, **61**, **64** and **66** were not reexamined.

* * * * *

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, on behalf of Plaintiff-Appellant ALEXSAM, INC., I caused to be filed with the Clerk of the United States Court of Appeals for the Federal Circuit *via* the Court's CM/ECF system, which caused it to be served on all counsel of record, a copy of the ALEXSAM, INC.'S CORRECTED OPENING BRIEF.

Dated: December 27, 2022 Respectfully submitted,

*/s/ Jacqueline K. Burt*
Jacqueline K. Burt
HENINGER GARRISON DAVIS, LLC
3621 Vinings Slope, Ste. 4320
Atlanta, Georgia 30339
Email: jburt@hgdlawfirm.com
Telephone: (404) 996-0861
*Attorney for Plaintiff-Appellant, AlexSam, Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rules 32(g) and 28.1(e)(3) of the Federal Rules of Appellate Procedure ("Fed. R. App. P.") and Rules 32(b)(3) and 28.1(c) of the Federal Circuit Rules ("Fed. Cir. R."), AlexSam certifies:

1. This document complies with the type-volume limitation because it contains 13,987 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).
2. This document complies with the typeface requirements of because it has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365 MSO in Times New Roman 14 point font.
3. This document complies with the limitations set forth in Fed. Cir. R. 28(d) because it contains no words (including numbers) marked as confidential.

Dated: December 27, 2022 Respectfully submitted,

*/s/ Jacqueline K. Burt*
Jacqueline K. Burt
*Attorney for Plaintiff-Appellant, AlexSam, Inc.*